**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

PETER JOKICH, M.D., FSBI, FACR,      )
                                           )
      Plaintiff,                 )
                                           )
           v.                    )       Case No. 18 C 7885
                                           )
RUSH UNIVERSITY MEDICAL CENTER,  )       Judge Joan H. Lefkow
                                           )
      Defendant.              )

## OPINION AND ORDER

Dr. Peter Jokich filed suit against Rush University Medical Center (Rush), bringing claims under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–34 (the ADEA) (count I), Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* (Title VII) (count II), and the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101 (IHRA) (count III) for retaliation against Dr. Jokich. He also filed breach of contract claims based on Rush's alleged breach of Dr. Jokich's employment agreements (count IV) and the Rush Medical Staff Bylaws (count V), and a declaratory judgment claim (count VI) related to the conduct alleged in the breach of contract claims. Rush has moved to dismiss counts IV, V, and VI pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. 15.) For the reasons stated below, Rush's motion to dismiss is granted in part and denied in part.[1]

---

[1] The court has jurisdiction under 28 U.S.C. §§ 1331, 1367. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391. Dr. Jokich filed a charge of discrimination on October 22, 2018 and received a right to sue letter on December 14, 2018. (*See* dkt. 17 at 4.)

# BACKGROUND[2]

## I.     Employment with Rush

Dr. Jokich is a breast imaging radiologist and was the director of the Division of Breast Imaging (DBI) at Rush for the past seventeen years.[3] (Dkt. 1 ¶¶ 11, 99.) He has published more than two dozen scholarly articles and book chapters, is one of approximately 118 fellows of the Society of Breast Imaging, and serves on the American College of Radiology/Illinois Radiological Society's Committee of Government Relations – Breast Imaging.[4] (*Id.* ¶¶ 12–13.) Dr. Jokich is frequently interviewed for print publications, has been interviewed many times on local and national television programs, and has given both local and national lectures on breast cancer and breast imaging topics. (*Id.* ¶ 13.) He has also received excellent performance reviews during his tenure at Rush. (*Id.* ¶ 14.) Dr. Sharon Byrd, the chairperson of the Radiology Department, has conducted Dr. Jokich's performance reviews since she became the chairperson, and in her most recent June 20, 2018 review wrote that "Dr. Jokich has run an excellent breast imaging service."(*Id.* ¶¶ 100–02.)

Dr. Jokich alleges that he has two employment agreements with Rush: a Faculty Employment Agreement (FEA) and a letter dated August 12, 2016 (the Letter Agreement). (Dkt. 1 ¶ 56.) The FEA is provided to all physicians at Rush and puts its signatories on one-year

---

[2] Unless otherwise noted, the following facts are taken from Jokich's complaint (dkt. 1) and are presumed true for the purpose of resolving the pending motion. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011).

[3] DBI resides within the Department of Diagnostic Radiology and Nuclear Medicine (the Radiology Department). (Dkt. 1 ¶¶ 11.)

[4] Dr. Jokich also served as a board member of the National Accreditation Program for Breast Cancers from 2011–2017, an examiner for the Oral Boards of the American Board of Radiology in the breast section for many years, and a member of the American College of Radiology's Joint Committee on Breast Imaging for Appropriateness Criteria and Guidelines from 2009–2015, through which he became the primary author of the national ACR Appropriateness Criteria on the topic of breast pain. (*Id.* ¶ 13.)

contracts that automatically renew unless the agreement is terminated with at least 120 days' notice. (*Id.* ¶ 57.) Dr. Jokich signed his FEA in 2012. (*Id.* ¶¶ 56–57.) The Letter Agreement stated that the "term of this agreement is for four (4) years through June 30, 2020," and that the term of the agreement would be extended two additional years (through June 2022) upon achievement of certain objectives. (*Id.* ¶ 58; dkt. 1-3.) The letter also stated that Dr. Jokich's "current base compensation and incentive arrangement over the next four (4) years will remain consistent with your current agreement and will have to be approved by the Compensation Committee of the Board of Trustees." (Dkt. 1-3 at 2.) The letter concluded with the statement, "Please indicate your acceptance of this agreement offer by signing in the space below." (*Id.* ¶ 59; *see also* dkt. 1-3 at 4.) The dean of Rush Medical College had already signed the letter when Dr. Jokich received it, and he signed the letter in the space provided on August 18, 2016. (*Id.*) The letter does not mention the FEA. (Dkt. 1 ¶ 60.)

On June 26, 2017, nearly a year after Dr. Jokich signed the Letter Agreement, the dean's office sent Dr. Jokich another pre-signed letter (the Amendment Letter) indicating that the Compensation Committee had "reviewed the compensation and incentive arrangement outlined in [the Dean's] letter to you dated August 12, 2016 (the 'Initial Offer Letter')," and "decided that we must establish pre-determined plan and growth objectives that are quantitative in nature," which had to be presented to and approved by the committee before the plan could be finalized. (*Id.* ¶¶ 61–62, 67; dkt. 18 at 53–54.) The letter outlined such objectives and concluded by asking Dr. Jokich to "indicate acceptance of this letter as an amendment to the Initial Offer Letter by signing below." (Dkt. 18 at 54.) Dr. Jokich does not recall receiving this letter and did not sign it. (Dkt. 1 ¶¶ 61, 66, 70; *see also* dkt. 18 at 54.)

## II. Administrative Suspension

Beginning in or around 2016, Dr. Jokich began to voice concerns to Rush management about various practices that he deemed to be discriminatory. (*Id.* ¶17.) He complained that Rush often demoted or terminated older physicians and chose not to recruit senior breast specialists, that the institution did not treat Mexican-American employees fairly and had a dearth of Hispanics in top executive positions, and that Rush discriminated against women. (*Id.* ¶¶ 17–21.) He also put some of these complaints in writing. For example, on October 4, 2016, Dr. Jokich cosigned a letter to Dr. Robert DeCresce (a pathologist, the director of Rush Medical Laboratories, and the acting director of the Rush University Cancer Center) voicing concern over Rush's decision not to renew the contract of a nationally recognized female breast radiation oncologist. He was later told this letter "ruffled feathers" within Rush. (*Id.* ¶¶ 18, 33, 103–04.) In mid-June of 2018, he also made a written complaint to Rush's senior management listing what he believed to be discriminatory practices by the institution. (*Id.* ¶ 21.)

Around this same time, Dr. Jokich also voiced his opinion that Rush was sacrificing patient care for the benefit of business interests and profits. (*Id.* ¶ 22.) Specifically, Dr. Jokich advocated for Rush to invest in screening breast ultrasound technology to increase the cancer detection rate in dense breast tissue but was met with repeated resistance or silence. (*Id.* ¶¶ 25, 27.) Dr. Jokich felt such technology was important given the growing recognition that women with dense breasts require additional or supplemental screening because dense breast tissue decreases the sensitivity of traditional mammography. (*Id.* ¶¶ 23–24.)

Dr. Jokich expressed further concerns with a technology called 3D/Tomosynthesis mammography, which Rush has installed at several of its locations. (*Id.* ¶ 28.) According to Dr. Jokich, this technology detects far fewer cancers in dense breasts than ultrasound technology and

exposes patients to more than twice the overall radiation dose of a standard mammogram. (*Id.*) In a May 22, 2018 email to all attendees of a Rush multidisciplinary breast conference, Dr. Jokich made his concerns known,

> There are also ethical issues involved with the use of 3D/tomo. Should there be informed consent for a procedure with double the radiation dose of the standard 2D exam? Are we double radiating patients without discussing risks and benefits with them and their physicians? Do we want the primarily minority and low-income population at [Rush Oak Park Hospital] potentially harmed (double radiated) for business, market share or research reasons? . . .

> It is a sad state of affairs when at the "new" Rush, administrators, business people, non-clinical nurses and lawyers, and ultimately the Board of Trustees, are making all the major decisions based on money and business concerns, and **not the working physicians**, who are the only ones, it appears, concerned with what is truly best for our patients, and who really have the Rush mission embedded in our hearts, which is to improve the health of the communities that we serve.

(*Id.* ¶ 29; Dkt. 18 at 7–8) (emphasis in original).[5]

Four days later, on May 26, 2018, Dr. DeCresce wrote an email to Rush's senior vice president of human resources (copying the dean of Rush Medical College) stating, "I would like to inform you that I have made a decision to terminate Dr. Peter Jokich." (*Id.* ¶ 30.) But on July 1, 2018, Dr. Jokich had his "Clinical Privileges" renewed by the Medical Staff and the Board of Trustees, based on the Medical Staff's assessment of his medical skills and good medical citizenship. (*Id.* ¶¶ 15, 30, 96–97.) Then, on August 22, 2018, Dr. DeCresce sent Dr.

---

[5] "Generally, the court, in considering a motion to dismiss, is limited to the complaint and central attachments referred to in the complaint." *C & K NuCo, LLC v. Expedited Freightways, LLC*, No. 13 C 4006, 2014 WL 4913446, at *4 n.3 (N.D. Ill. Sept. 30, 2014 (citing *Albany Bank & Trust Co.* v. *Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002)). But a "district court may also take judicial notice of matters of public record without converting a 12(b)(6) motion into a motion for summary judgment." *Henson* v. *CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994) (finding district court properly considered documents filed in an earlier Indiana state case when deciding a motion to dismiss). It may also consider "documents that are central to the complaint and are referred to in it." *Williamson* v. *Curran*, 714 F.3d 432, 436 (7th Cir. 2013). Dkt. 18 in the present case is an appendix filed with Rush's motion to dismiss, which contains, among other things, documents filed in the earlier Illinois state case and a handful of documents referenced in the complaint before this court. The court will thus consider these documents for purposes of ruling on the motion to dismiss.

Jokich a letter informing him that, (1) effective immediately, he was no longer the director of the DBI; (2) his salary would be decreased by approximately $200,000, a level Rush determined after researching reported salaries paid to experienced breast imaging physicians; (3) he would be placed on paid leave until June 30, 2019, the date on which (in Rush's view) Dr. Jokich's contract expires; and (4) he was not to communicate on Rush official business with anyone, including Rush leadership, department members, or other medical staff members, and did not have authority to act or speak on behalf of Rush. (*Id.* ¶¶ 32–33; *see also* dkt. 1-4.)

## III.    Litigation History

Dr. Jokich originally brought a breach of contract claim in the Circuit Court of Cook County for breach of his employment agreements. (*See* dkt. 18 at 9–145.) He sought a TRO, which was denied by the state court judge in a written order after a hearing. (*See id.* at 146–252.) That decision was subsequently affirmed by the Illinois Appellate Court. (*Id.* at 278.) Dr. Jokich then amended his complaint, this time alleging breach of his employment agreements and breach of the Bylaws of the Medical Staff of Rush University Medical Center (the Bylaws), and seeking a declaratory judgment pertaining to his contract claims. (*See id.* at 279–448.) After the judge set a briefing schedule for dispositive motions, Dr. Jokich filed a motion for voluntarily dismissal of his complaint in state court, which the court granted on October 26, 2018. (*See id.* at 449–50.)

Further, after the August 31, 2018 TRO hearing in state court, at which Dr. Jokich indicated that he did not have sufficient guidance around transitioning patients and what he could and could not communicate to Rush patients and staff, Rush sent Dr. Jokich a letter on September 4, 2018 outlining protocols for patients he had tested in the past. (*See* dkt. 18 at 350–51.) The letter provides, in relevant part:

- If a patient contacts Rush and asks to speak with Dr. Jokich, Rush will tell the patient that he is on leave and that Rush can provide further breast imagining services

through one of its other physicians. But, if the patient indicates he or she wants to speak with Dr. Jokich in particular or has another reason for speaking with Dr. Jokich, Rush will send Dr. Jokich an e-mail so he can call the patient.

- If a patient contacts Dr. Jokich directly, he can give the patient advice as he deems in the patient's best interest, including advice as to what treatment her or she needs. Dr. Jokich will inform Dr. Grabler (the acting director of the division) of the contact and provide a summary of any treatment or medical advice he gave the patient so that a note can be made in the patient's medical record.

- If Dr. Jokich receives e-mails from Rush physicians or employees seeking advice on how to treat a patient, he may respond to those emails, but will forward a copy of his response to Dr. Grabler.

- Dr. Jokich will be invited to a promptly scheduled meeting with Dr. Grabler and other appropriate personnel to provide information regarding the care of patients he treated and recommendations for which Rush breast imagining physicians each such patient should be transitioned to, as well as information about his past administrative work as director.

- If Dr. Jokich acquires employment at another institution where he is able to read images and a Rush patient calls seeking treatment by Dr. Jokich, Rush will provide the patient with the name and number of the institution where he can be reached and tell the patient that he or she has the choice of contacting Dr. Jokich for service or having such service at Rush.

(*Id.*)

Dr. Jokich then filed a grievance with Rush on September 20, 2018, requesting that the Medical Staff grievance procedures in the Bylaws be invoked. (*See* dkt. 1-8.) Rush denied Dr. Jokich's request to initiate the Medical Staff grievance procedures on September 27, 2018, stating that its employment actions against Dr. Jokich are not governed by the Bylaws. (Dkt. 1 ¶ 112; *see also* dkt. 1-9.)

Finally, Dr. Jokich filed the present suit on November 29, 2018. He now brings claims for retaliation under the ADEA, Title VII, and the Illinois Human Rights Act, which are not at issue for purposes of resolving the present motion to dismiss. He also brings claims for breach of his employment agreement(s) (count IV), breach of the Bylaws (count V), and a declaratory

judgment action seeking declarations related to his breach of contract claims (count IV).[6] Rush has moved to dismiss counts IV–VI.

## LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) challenges a complaint for failure to state a claim upon which relief may be granted. In ruling on a Rule 12(b)(6) motion, the court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Active Disposal, Inc.* v. *City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011); *Dixon* v. *Page*, 291 F.3d 485, 486 (7th Cir. 2002). To survive a Rule 12(b)(6) motion, the complaint must not only provide the defendant with fair notice of a claim's basis but must also establish that the requested relief is plausible on its face. *See Ashcroft* v. *Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937 (2009); *Bell Atl.* v. *Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955 (2007). The allegations in the complaint must be "enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. At the same time, the plaintiff need not plead legal theories; it is the facts that count. *Hatmaker* v. *Mem'l Med. Ctr.*, 619 F.3d 741, 743 (7th Cir. 2010); *see also Johnson* v. *City of Shelby*, --- U.S. ---, 135 S. Ct. 346, 346 (2014) (per curiam) ("Federal pleading rules call for a short and plain statement of the claim

---

[6] Specifically, Dr. Jokich asks the court to declare that: (a) an August 12, 2016 Letter Agreement between Rush and Dr. Jokich is valid and in force; (b) Rush acquiesced to the August 12, 2016 Letter Agreement by allowing Dr. Jokich to perform under it for ten months before attempting to alter terms of the incentive provisions of the Agreement; (c) Rush acquiesced to the August 12, 2016 Letter Agreement by failing to tell Dr. Jokich that the Letter Agreement was not in force until he met with Dr. DeCresce and the dean in August 2018; (d) Rush cannot avoid the automatic two year contract renewal until June 30, 2022, as set forth in the Letter Agreement, by terminating Dr. Jokich as director of the DBI; (e) Rush's limitations on Dr. Jokich's ability to speak to Rush staff or patients violate Dr. Jokich's ethical obligations under the AMA code, Rush's obligations under the Bylaws, Rush's obligations under the a Faculty Employment Agreement, and Rush's obligations under the Illinois Hospital Licensing Act; (f) Rush has violated the Bylaws and thus the employment actions taken against Dr. Jokich are null and void; and (g) Rush's actions have interfered with Dr. Jokich's Clinical Privileges as defined under the Bylaws. (Dkt. 1 ¶ 148.)

showing the pleader is entitled to relief; they do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted.").

## ANALYSIS

### I. Breach of the Employment Agreements (Count IV)

To state a claim for breach of contract under Illinois law,[7] a plaintiff must allege four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC* v. *Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co.* v. *First Colony Life Ins. Co.*, 814 N.E.2d 960, 967, 351 Ill. App. 3d 752 (Ill. App. Ct. 2004)). Although stated as two claims, Dr. Jokich's breach of contract claims are essentially made up of several distinct sub-claims, each of which is addressed below.

#### A. Letter Agreement vs. FEA

Dr. Jokich first alleges that Rush breached the Letter Agreement because that letter provides him a term of employment through 2020 (and automatically extends to 2022 if certain performance metrics are achieved), and Rush has declared that as of July 1, 2019, it will no longer employ him. Rush maintains that the Letter Agreement never became a contract because of a condition precedent contained in the letter: "Your current base compensation and incentive arrangement over the next (4) years will remain consistent with your current agreement and will have to be approved by the Compensation Committee of the Board of Trustees." (Dkt. 1-3 at 2.) Rush thus argues that the 2016 Letter Agreement was an initial offer and that because Dr. Jokich did not sign the 2017 Amendment Letter, he did not accept the modified terms of the contract,

---

[7] Section 4.2 of the General Terms and Conditions of the FEA states that Illinois law governs. (Dkt. 1-6 at 11.) All parties appear to agree that Illinois law governs the other contracts at issue.

and no contract was formed. Dr. Jokich counters that Rush implicitly waived any condition precedent by accepting his work for ten months prior to sending the Amendment Letter.

Under Illinois law, "a condition precedent is some act that must be performed or event that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform." *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd.* v. *Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992) (citing *Kilianek* v. *Kim*, 548 N.E.2d 598, 192 Ill. App. 3d 139 (Ill. App. Ct. 1989)). "Conditions precedent may be waived when a party to a contract intentionally relinquishes a known right either expressly or by conduct indicating that strict compliance with the conditions is not required." *Id.* (citing *MBC, Inc.* v. *Space Ctr. Minnesota, Inc.*, 532 N.E.2d 255, 259–60, 177 Ill. App. 3d 226 (Ill. App. Ct. 1988)). "Such conduct might include continuing to accept the breaching party's performance and the benefits thereof after learning of the breach." *Id.* "Although waiver may be implied, the act relied on to constitute the waiver must be clear, unequivocal and decisive." *Levin* v. *Grecian*, 974 F. Supp. 2d 1114, 1125 (N.D. Ill. 2013) (citing *Galesburg Clinic Ass'n* v. *West*, 706 N.E.2d 1035, 1037, 302 Ill. App. 3d 1016 (Ill. App. Ct. 1999)).

Here, Dr. Jokich performed as a doctor at Rush for ten months before Rush proposed changes to the Letter Agreement. Under the doctrine of waiver, one interpretation is that by allowing Dr. Jokich to perform under the Letter Agreement for ten months without objection, Rush waived the condition precedent that Dr. Jokich's compensation would have to be approved by the Compensation Committee. But Rush argues that Dr. Jokich was operating under the FEA, and thus, in Rush's view, Dr. Jokich could have been performing under the FEA while Rush worked out his compensation with the Compensation Committee. Dr. Jokich does not appear to

dispute that the FEA was in effect but argues that the Letter Agreement governs over the FEA.[8]

Where "the facts necessary to constitute waiver are in dispute or if reasonable minds might differ as to the inferences to be drawn from the undisputed evidence, then the issue becomes a question of fact." *Delta Consulting Grp., Inc.* v. *R. Randle Const., Inc.*, 554 F.3d 1133, 1140 (7th Cir. 2009). Whether waiver occurred here may depend on other facts such as how Rush applied the FEA to other physicians. This is thus a fact question, which cannot be resolved on a motion to dismiss. *See Batteast Const. Co.* v. *Pub. Bldg. Comm'n of Chicago*, 195 F. Supp. 2d 1045, 1050 (N.D. Ill. 2001).[9]

### B. Termination vs. Nonrenewal

Dr. Jokich next alleges that Rush terminated him as the director of the DBI and did so without "cause" as required under the FEA. Rush counters that it did not terminate Dr. Jokich, but instead chose not to renew his FEA, which requires no cause. The relevant provisions of the FEA provide guidance. Section 6 of the FEA states,

---

[8] Dr. Jokich also adds that he and his division received their bonuses predicated on the 2016 Letter Agreement's metrics for every year since 2016. But there are no allegations to this effect in the complaint and it is not clear whether Rush paid such bonuses during the 10 months before it sent the Amendment Letter (which would counsel in favor of waiver) or after it sent that letter. Nor is it clear whether the bonuses would have been different if Dr. Jokich was simply operating under the FEA and not the Letter Agreement.

[9] Jokich also argues that Rush is equitably estopped from denying the validity of the 2016 Letter Agreement and that Rush's conduct in pursuing Compensation Committee approval violates the covenant of good faith and fair dealing. "The doctrine of equitable estoppel is invoked to prevent injustice, and the test is whether, under all the circumstances, conscience and honest dealing require that a party be estopped." *Estate of Besinger* v. *Vill. of Carpentersville*, 630 N.E.2d 178, 187, 258 Ill. App. 3d 218 (Ill. App. Ct. 1994). And "[t]he duty of good faith and fair dealing is implied in every contract and requires a party vested with contractual discretion to exercise it reasonably, and not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of parties." *Seip* v. *Rogers Raw Materials Fund, L.P.*, 948 N.E.2d 628, 637, 408 Ill. App. 3d 434 (Ill. App. Ct. 2011). These arguments, however, depend on the assumption that Rush was not operating under the FEA while it sought Compensation Committee approval, which the court has determined to be a fact question. Further, given that the court will deny the motion to dismiss as to this sub-claim, it need not reach these issues here.

The initial term of this Agreement will commence on the Effective Date and continue until the next June 30th. Thereafter, this Agreement will automatically renew for additional one (1) year terms unless (i) one Party provides the other Party with notice of its intent not to renew at least one hundred twenty (120) days prior to the end of any term or (ii) this Agreement is terminated in accordance with Section 7 of this Agreement or the "General Terms and Conditions" identified on Exhibit C.

(Dkt. 1-6 at 2.) As to termination, Section 6 refers to both Section 7 and the General Terms and Conditions (GT&C) in Exhibit C.[10] Rush told Dr. Jokich in the August 22, 2018 letter that he was "no longer the Division Director of Breast Imaging," "effectively immediately," and lowered his salary to account for his change in position from division director to breast imaging physician. (Dkt. 1-4 at 2.) And Section 7 provides that Rush may modify Dr. Jokich's services—which include his position as director—by providing at least 60 days prior written notice. Given that Section 6 indicates that "the Agreement [can be] terminated in accordance with Section 7," it is possible that by removing Dr. Jokich from his position as director and thus modifying the FEA, Rush was actually terminating him from this position. On the other hand, it could be the case that removing Dr. Jokich from his position as the head of DBI was simply a demotion. *Cf. Ribando* v. *United Airlines, Inc.*, 200 F.3d 507, 511 (7th Cir. 1999) (distinguishing between various adverse changes for purposes of Title VII retaliation claims and explaining that "a materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation"). Given the ambiguity in the contract language, the court will not resolve

---

[10] The GT&C allows for termination for cause by Rush under Section 3.2. That section provides that "Rush will have the right to terminate this Agreement immediately by giving written notice to the Faculty Member" upon the occurrence of certain specified events. (Dkt. 1-6 at 10.) But section 3.2 of the FEA contemplates "the right to terminate this Agreement," not the right to "terminate" an employee from a particular position.

this issue on a motion to dismiss. *See Gumino* v. *First Data Corp.*, No. 16 C 9419, 2017 WL 1478115, at \*8 (N.D. Ill. Apr. 25, 2017) ("A court should not dismiss a breach of contract claim under Rule 12(b)(6) if the language of the contract is ambiguous.")

### C.    Lack of Contractual Authority

Dr. Jokich also alleges that there is no contractual authority (in the FEA or the Letter Agreement) that allows Rush to (a) remove Dr. Jokich from his position as the director of the DBI and change his duties to that of a nonsupervisory breast imager, (b) lower his salary, or (c) put him on paid leave. Section 7 of the FEA provides some guidance with respect to Dr. Jokich's director position and his salary,

> **Amendment or Modification.** No amendment or modification of this Agreement will be valid unless the Parties agree in writing; provided, however, that after the initial term of this Agreement, Rush may modify Exhibits A or B of this Agreement by providing the Faculty Member with at least sixty (60) days prior written notice of the modification. Unless Faculty Member provides Rush with a written objection within fifteen (15) days of the modification notice, then the modification is deemed accepted. If Faculty Member objects to a modification, the Parties will use good faith efforts to reach agreement regarding the Exhibit modification within thirty (30) days of the Faculty Member's objection. If agreement is not reached within this time period, then either Party may terminate the Agreement upon fifteen (15) days notice to the other Party.

(Dkt. 1-6 at 2–3.) Exhibit A lists the services that Dr. Jokich agreed to provide under the FEA. (*Id.* at 4.) These services include (a) clinical activities, defined as the provision of patient care services; and (b) hospital administration, defined as the "[e]ffort assigned for defined hospital management, quality and safety, or corporate roles within the Medical Center." (*Id.* at 5.) Exhibit B lists Dr. Jokich's salary. (*Id.* at 6.)

Reading Section 7 and Exhibits A and B together, it is clear that Rush could modify Dr. Jokich's services or salary upon 60 days' prior written notice. Rush provided 60 days' notice for the modification to Dr. Jokich's salary in the August 22, 2018 letter, and there is no argument

that Dr. Jokich objected within 15 days of the notice. (*See* dkt. 1-4 at 2.) Rush did not, however, provide the requisite notice when removing Dr. Jokich from his position as director of the DBI. Although Exhibit A does not list his title as division director explicitly, it does make clear that his services included a defined hospital management role, and Rush clearly removed Dr. Jokich from that role "immediately" as of August 22, 2018. Thus, to the extent the FEA governs the employment relationship between Rush and Dr. Jokich, Rush's motion to dismiss is granted as to the lowering of Dr. Jokich's pay but is denied as to the modification of Dr. Jokich's services (in other words, removing Dr. Jokich from his position as director of the DBI).

As to placing Dr. Jokich on paid leave, both parties argue that the lack of a contractual provision related to administrative suspension has significance. Rush argues that no provision in the FEA barred it from putting Dr. Jokich on paid leave. Dr. Jokich argues that the absence of express contractual authority to put Dr. Jokich on paid leave is meaningful because Rush could have insisted on the right to administratively suspend an employee but did not. He also maintains that certain suspensions are made part of the FEA because there is a grievance process for those suspensions under the Bylaws. But "Illinois courts maintain a 'strong presumption against provisions that easily could have been included in [a] contract but were not. A court will not add another term about which an agreement is silent.'" *PQ Corp.* v. *Lexington Ins. Co.*, 860 F.3d 1026, 1033 (7th Cir. 2017) (quoting *Klemp* v. *Hergott Grp., Inc.*, 641 N.E.2d 957, 962, 267 Ill. App. 3d 574 (Ill. App. Ct. 1994)). The court will thus not imply a contract term related to administrative suspension where none exists. And there can be no breach of an absent contractual term. Rush's motion to dismiss is granted as to this point.

**D.      September 4, 2018 Letter**

Dr. Jokich further alleges that the September 4, 2018 Letter—which outlines protocols for communications with Rush patients and physicians while Dr. Jokich is on paid leave—violates the FEA, the Bylaws, the Illinois Hospital Licensing Act, and his ethical obligations under the AMA code.[11]

Section 1.4 of the GT&C of the FEA reads,

> **Professional Judgment.** Rush will not unreasonably exercise, control, direct or interfere with Faculty Member's exercise and execution of professional judgment in a manner that materially adversely affects Faculty Member's ability to provide quality medical care to patients. For the purposes of this Section 1.4 "professional judgment" means the exercise of a physician's independent clinical judgment in providing medically appropriate diagnosis, care and treatment to a particular patient at a particular time.

(Dkt. 1-6 at 7.)[12] Under the protocols in the September 2018 letter, Rush directs patients to Dr. Jokich if they ask for him; if patients contact Dr. Jokich directly, he is permitted to give them advice, including advice as to what treatment they need; and he can respond to emails from physicians and employees seeking advice on how to treat a patient. He is also required to keep Dr. Grabler apprised of any communications with patients or Rush physicians or staff. Such narrowly tailored provisions stay within the bounds of Section 1.4. But Dr. Jokich likely does not have access to patients' medical files and other data which could impair his ability to exercise his

---

[11] Specifically, Paragraph 1(b) of the AMA Principles for Physician Employment states: "Employed physicians should be free to exercise their personal and professional judgment in . . . advocating on any matter regarding patient care interests, the profession, health care in the community, and the independent exercise of medical judgment." (Dkt. 22 at 2–3.)

[12] The Illinois Hospital Licensing Act requires hospitals to sign a written statement with an employed physician acknowledging that they "shall not unreasonably exercise control, direct, or interfere with the employed physician's exercise and execution of his or her professional judgment in a manner that adversely affects the employed physician's ability to provide quality care to patients." 210 Ill. Comp. Stat. 85/10.8(a)(3); *see also* dkt. 1 ¶ 86. Pursuant to this requirement, Rush included Section 1.4 in Dr. Jokich's FEA and repeated this language in its Bylaws.

clinical judgment when providing a diagnosis. This is thus a fact issue the court cannot decide at this stage. Rush's motion to dismiss is denied as to this sub-claim.[13]

## II. Breach of the Bylaws (Count V)

As a threshold issue pertaining to the Bylaws, Rush argues that under the "law of the case" doctrine, this court is bound by the state court's TRO decision, which the appellate court affirmed.[14] Not so. "The law of the case doctrine provides that once a competent court rules on a question of law, that ruling is generally binding on courts of equal or inferior dignity as to that legal issue between the same or substantially similar parties given the same material facts."[15] *PaineWebber Inc.* v. *Farnam*, 870 F.2d 1286, 1290 (7th Cir. 1989) (citing *Bismarck Hotel Co.* v. *Sutherland*, 529 N.E.2d 1091, 1095–96, 175 Ill. App. 3d 739 (Ill. App. Ct. 1988)). But the law-of-the-case doctrine "only applies where a court actually decided the issue in question," and courts "refuse to apply the law-of-the-case-doctrine to a ruling at the preliminary injunction stage unless the ruling was based on a pure issue of law." *Wells Fargo Bank, Nat'l Ass'n* v. *Worldwide Shrimp Co.*, No. 17 C 4723, 2017 WL 7689635, at *6 (N.D. Ill. Dec. 29, 2017) (citing *Universal*

---

[13] Rush maintains that the provisions in the September 4, 2018 Letter are management and personnel decisions subject to the "rule of nonreivew." *See generally Garibaldi* v. *Applebaum*, 742 N.E. 2d 279, 286, 194 Ill. 2d 438 (Ill. 2000); *Goldberg* v. *Rush Univ. Med. Ctr.*, 863 N.E.2d 829, 834–36, 371 Ill. App. 3d 597 (Ill. App. Ct. 2007). But Jokich is alleging that Rush interfered with his professional judgment, which is, according to Dr. Jokich, contractually and statutorily protected and is a grievable matter under the Bylaws. These allegations thus do not relate to "management and personnel decisions." To the extent Dr. Jokich is arguing that Rush placing him on leave is prohibited because it caused Rush to interfere with his professional judgment, the court cannot review that decision because, "in cases involving private hospital staff privileges, a 'rule of non-review' under which, as a matter of public policy, internal staffing decisions of private hospitals are not subject . . . to judicial review." *Adkins* v. *Sarah Bush Lincoln Health Ctr.*, 544 N.E.2d 733, 737–38, 129 Ill. 2d 497 (Ill. 1989).

[14] In its reply, Rush backtracks, arguing that it "has never claimed preclusion, only deference." (Dkt. 27 at 2.)

[15] "While the law of the case doctrine is most commonly invoked upon remand from an appellate ruling on a question of law, the law of the case doctrine has been applied by federal courts to orders issuing from state courts." *PaineWebber*, 870 F.2d at 1290–91 (internal citations omitted).

*Guar. Life Ins. Co.* v. *Coughlin*, 481 F.3d 458, 462 (7th Cir. 2007); *Sherley* v. *Sebelius*, 689 F.3d 776, 782 (D.C. Cir. 2012)). Moreover, "[t]here is no self-evident reason why the same should not be true of rulings at the temporary restraining order stage because the standards for issuing a temporary restraining order are the same as for a preliminary injunction." *Id.*

The state court TRO decision—issued on the same day as the TRO hearing—did not decide whether Rush breached either the Bylaws or its contract(s) with Dr. Jokich. The cover sheet indicates that the TRO was denied because Jokich failed to show "[t]he necessity for immediate temporary injunctive relief to preserve the status quo *pending a decision on the merits*." (Dkt. 18 at 251 (emphasis added).) Further, the decision concludes by stating that Jokich's "request for temporary injunctive relief is premature." (*Id.* at 252.) Although the circuit court judge made some findings, (*see, e.g.*, *id.* ("It is well within Rush's administrative power to place [Dr. Jokich] on administrative leave," and Dr. Jokich "continues to be an employee on administrative leave [and] maintains full privileges")), this was done in the context of determining whether a TRO was appropriate, not as a final decision on the breach of contract claim alleged in the state case. Similarly, the appellate court's decision concludes by stating, "Our ruling is not meant to reflect on the ultimate merits of the plaintiff's suit or his request for other types of injunctive relief." (*Id.* at 278.)[16]

### A.    Clinical Privileges

Dr. Jokich first alleges that Rush violated the Bylaws by suspending or otherwise impinging on his clinical privileges without notice and a hearing as provided for under Section 15.1(a) of the Bylaws. Rush argues that it did not curtail such privileges, so the Bylaws and their

---

[16] Rush also argues that the panel decision rejecting Dr. Jokich's Medical Staff grievance is independently entitled to deference. The court need not address this argument as its decision is consistent with the outcome of the panel decision on relevant issues.

notice and hearing procedures are thus inapplicable here. "Clinical Privileges" is defined in the Bylaws as including the privilege "to refer and follow and/or provide . . . inpatient and outpatient care at the Hospital and access to Hospital resources to exercise such privileges," as well as "the privilege to practice medicine . . . at the Hospital via those Privileges granted to the extent and in the manner granted by the Medical Staff and Medical Center." (Dkt. 1-7 at 8.) And Section 15.1(a) provides for a hearing when there is, among other things, an involuntary reduction or denial of current Clinical Privileges, a suspension of Clinical Privileges, or a termination of certain Clinical Privileges. (*Id.* at 65.)

The parties debate whether *Garibaldi* v. *Applebaum*, 742 N.E. 2d 279, 194 Ill. 2d 438 (Ill. 2000) applies to the present case. In that case, the plaintiff argued that by entering into an exclusive contract with certain doctors to perform open-heart surgery (the plaintiff not being one of them), the defendant-hospital had effectively revoked his clinical privileges without notice and a hearing. *Id.* at 281. The court found that, "The granting of privileges . . . signifies that a doctor is qualified to practice at the hospital. . . . The right to exercise those privileges, however, is a separate matter that may be affected by a host of hospital administrative decisions that are wholly unrelated to the doctor's professional competence or ethics."[17] *Id.* at 284. Similarly, in *Collins* v. *Associated Pathologists, Ltd.*, the court stated,

> Dr. Collins also asserts that St. John's wrongfully removed or reduced his staff privileges in violation of the by-laws of the hospital. However, the record reflects that St. John's has neither removed nor reduced Dr. Collins' staff privileges. In May 1982, Dr. Collins was, on his own request, placed on leave of absence, but he retains full staff privileges to this day. Staff privileges reflect the hospital's decision that a physician is qualified to practice in the facility, but do not in and of themselves confer employment. Employment as a pathologist at St. John's was determined by

---

[17] Clinical Privileges was defined in the bylaws relevant to *Garibaldi* as "the permission to provide medical or other patient care services in the Hospital within well-defined limits, based on the individual's professional license, experience, competence, ability and judgment." 742 N.E.2d at 284. The court finds that that provision is substantially similar to the definition of Clinical Privileges in the Bylaws here—providing care and practicing medicine.

> the legal contract between St. John's and [Associated Pathologists, Ltd]. Although without concurrent employment by St. John's as a pathologist these staff privileges may be of little or no value to Dr. Collins, the fact remains that the privileges were neither removed nor reduced.

844 F.2d 473, 481 (7th Cir. 1988) (internal citation omitted). The same is true here. Although Dr. Jokich is on paid leave and thus cannot exercise his clinical privileges at Rush, there is no indication that his clinical privileges have been curtailed, suspended, or revoked.

Dr. Jokich also argues that Rush's decision to put him on paid leave was "corrective action" and that Rush has not followed the criteria under Section 8.1 of the Bylaws for initiating such action. Section 8.1-1 of the Bylaws provides that "[w]henever the activities or professional conduct of any practitioner with Clinical Privileges are . . . reasonably likely to be disruptive to Medical Center operations, or otherwise fail to comply with these Bylaws, routine corrective action against such practitioner *may be* initiated" by various individuals or the Board. (Dkt. 1-7 at 29 (emphasis added).) By its terms, the initiation of procedures for corrective action is discretionary and the procedures thus did not have to be followed for Rush's decision to place Dr. Jokich on leave.

This is consistent with the rule that "courts exercise only a limited form of review in cases involving medical staffing decisions." *Garibaldi*, 742 N.E.2d at 286 (citing *Adkins*, 544 N.E.2d at 737–38 ("[T]here is, in cases involving private hospital staff privileges, a 'rule of non-review' under which, as a matter of public policy, internal staffing decisions of private hospitals are not subject . . . to judicial review."); *see also Goldberg*, 863 N.E.2d at 836 (recognizing that "hospital staffing decisions are entitled to deference from the courts").[18] Rush's motion to dismiss this sub-claim is granted.

---

[18] The Illinois Supreme Court has recognized an exception to the rule of non-review "when the decision involves a revocation, suspension or reduction of existing staff privileges." *Adkins*, 544 N.E.2d at 738. In such cases, "the hospital's action is subject to a limited judicial review to determine whether the

19

## B. Bylaws Section 10.3-2

Dr. Jokich also alleges that Rush breached the Bylaws when it removed Dr. Jokich as the director of the DBI. Section 10.3-2 governs the qualifications, selection, appointment, term, and duties of division or section directors. Section 10.3-2(c), entitled "term of office," provides that, "A division . . . director shall be appointed and shall serve solely at the discretion of the Department Chairperson." (Dkt. 1-7 at 43.) As Dr. Jokich sees it, this provision allows only the chairperson of the Department of Radiology (Dr. Sharon Byrd) to remove Dr. Jokich from his director position, so his removal by Dr. DeCresce—a pathologist who is not a member of the Radiology Department—was ineffective. Rush counters that Section 10.3-2(c) actually limits directors' rights, meaning that directors have no fixed term and can be removed at any time. Rush also maintains that, at most, Section 10.3-2 protects Dr. Jokich from removal if Dr. Byrd opposed it and asserts that she did not. Finally, Rush points out that Dr. Jokich's clinical appointment was in the Radiology Department, but that he reported to Dr. DeCresce as the director of the DBI. There are, however, no allegations in the complaint related to whether Dr. Byrd opposed the removal of Dr. Jokich from his director position or who Dr. Jokich reported to in that position. Under the allegations in the complaint, reasonable minds could find either party's interpretation plausible and this is thus a fact issue that cannot be resolved on a motion to dismiss. *See Batteast Const. Co.*, 195 F. Supp. at 1050. Rush's motion to dismiss is denied as to the Section 10.3-2 claim.

---

decision made was in compliance with the hospital's bylaws." *Id.*; *see also Vakharia* v. *Little Co. of Mary Hosp. & Health Care Ctrs.*, 917 F. Supp. 1282, 1302 (N.D. Ill. 1996). Because the court has determined that there was no revocation, suspension, or reduction of Dr. Jokich's privileges, this exception is inapplicable here.

## CONCLUSION

Rush's motion to dismiss is granted in part and denied in part. With respect to count IV, Rush's motion is granted as to the Lack of Contractual Authority sub-claim as it pertains to the lowering of Dr. Jokich's pay and placing Dr. Jokich on paid leave. The motion is denied as to the Letter Agreement vs. FEA sub-claim, Termination vs. Nonrenewal sub-claim, the Lack of Contractual Authority sub-claim as it pertains to the modification of Dr. Jokich's services (in other words, removing Dr. Jokich from his position as director of the DBI), and the September 4, 2018 Letter sub-claim. With respect to count V, Rush's motion is granted as to the Clinical Privileges sub-claim and denied as to the Bylaws Section 10.3-2 sub-claim. Count VI (declaratory judgment) shall be consistent with this court's decision on counts IV and V. *See Elward* v. *Electrolux Home Prod., Inc.*, 214 F. Supp. 3d 701, 708 (N.D. Ill. 2016) (recognizing that "requests for declaratory judgment . . . are not independent causes of action"). A status hearing is set for April 3, 2019 at 9:30 am. at which time the parties shall report on whether this case has potential for early settlement. Plaintiff is given 28 days to file an amended complaint.

Date:   March 13, 2019

_____
U.S. District Judge Joan H. Lefkow