# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **PETER JOKICH, M.D., FSBI, FACR,**<br><br>      **Plaintiff,**<br><br>      v.<br><br>**RUSH UNIVERSITY MEDICAL CENTER,**<br><br>      **Defendant.** | No. 18 C 7885<br><br>Magistrate Judge Beth W. Jantz |

## MEMORANDUM OPINION & ORDER

Plaintiff Peter Jokich, M.D., filed suit against Defendant Rush University Medical Center ("Rush"), bringing claims for retaliation under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–34 ("the ADEA"), Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101 ("IHRA"). He also brings breach of contract claims for Rush's alleged breach of his employment agreements and the Rush Medical Staff Bylaws. (*Id.*). For the reasons set forth below, Dr. Jokich's Motion to Compel Production of Documents Responsive to Second Request for Production based on Rush's Subject-Matter Waiver of Attorney-Client Privilege [66] is denied in part and moot in part.

### A. Relevant Background

Dr. Jokich worked as the Director of Breast Imaging at Rush for seventeen years. On August 22, 2018, Dr. Jokich was demoted and placed on administrative

leave, at a reduced salary, through June 2019. He was also suspended and not allowed to practice medicine at Rush until his contract expired on June 30, 2019. Dr. Jokich alleges that his termination was retaliation for his complaint about discrimination against women and older physicians as well as the lack of Latinx persons in top executive positions at Rush. He also claims Rush breached an employment agreement it had with him dated August 12, 2016 that guaranteed his position as Director of Breast Imaging through June 30, 2020, which would automatically be extended to June 2022 if certain goals were met.

In May 2019, Rush retained an attorney, George Galland, to advise it on how Dr. Jokich should be terminated. On June 6, 2019, Mr. Galland drafted for Rush's internal review and consideration a proposed letter to be sent to Dr. Jokich, explaining that Dr. Jokich would be immediately removed from his position and placed on paid leave through June 30, 2019, "unless and until" the termination plan outlined is "superceded by a separation agreement." (Dkt. 66-1 at 2, 5). The draft letter included a discussion of whether Rush was obligated to renew his Faculty Employment Agreement ("FEA") based on an August 16, 2016 letter agreement Rush offered Dr. Jokich, if certain conditions were met. (*Id.* at 2–5). The draft letter concluded that because Dr. Jokich's conduct violated the conditions identified in the August 16, 2016 letter agreement, Rush had "the right, at a minimum, not to renew [Dr. Jokich's] FEA upon any given annual expiration." (*Id.* at 4). The draft letter was labeled "DRAFT—June 6, 2018 PRIVILEGED AND CONFIDENTIAL—ATTORNEY-CLIENT PRIVILEGE DOCUMENT" and indicated that it was meant for

2

the "LETTERHEAD OF DEAN KRISHNAN." (*Id.* at 2). The draft letter was sent to Rush's leadership for consideration on June 6, 2018, but was never sent to Dr. Jokich or to anyone else who was not subject to Rush's attorney-client privilege. (Dkt. 73 at 2–3).

On June 11, 2018, Dr. Jokich sent an email to Rush President and CEO, Larry Goodman, M.D., and two Rush officials that he had information about gender, age and race discrimination at Rush. (Dkt. 73 at 3). Dr. Goodman postponed Dr. Jokich's planned termination and retained an outside attorney, Thomas Johnson, to investigate Dr. Jokich's claims of Rush's discriminatory practices. (*Id.*). Mr. Johnson was given a copy of Mr. Galland's June 6, 2018 draft letter as background information. (*Id.*).

On July 30, 2018, after investigating these claims, Mr. Johnson submitted a report (the "Johnson Report") to Dr. Goodman concluding that Dr. Jokich's allegations were unsupported. After reviewing the Johnson Report, Dr. Goodman reinstated the planned termination of Dr. Jokich. On August 8, 2018, Acting Director of Rush Cancer Center, Robert DeCresce, M.D., and Dean of Rush Medical College, Ranga Krishnan, M.D., met with Dr. Jokich to inform him of his alternatives: a proposed severance agreement with 21 days to consider the offer, or immediate removal from his position. (Dkt. 73 at 5). After Dr. Jokich rejected the severance offer, Rush sent Dr. Jokich a letter on August 22, 2018 terminating him. The August 22, 2018 letter was different from Mr. Galland's June 6, 2018 draft letter, which was never sent to Dr. Jokich.

3

On August 29, 2018, Dr. Jokich moved for a temporary restraining order ("TRO") in state court. Rush relied on the Johnson Report to oppose Dr. Jokich's motion for a TRO and "elected to waive the privilege as to the Johnson Report, and attached that Report as an exhibit to its opposition brief." (Dkt. 72 at 5). Rush did not attach or address the June 6, 2018 draft letter that had been provided to Johnson during his investigation. (*Id.*).

When Dr. Jokich filed the present suit in federal court and asked for all documents relating to the Johnson Report in his first request for production, Rush produced to Dr. Jokich, *inter alia*, the June 6, 2016 draft letter. (Dkt. 72 at 5). Rush explains that "[b]ecause it had waived attorney-client privilege with respect to the Johnson Report by using it to oppose the TRO motion in state court, Rush produced all materials given to Mr. Johnson and all communications with him, including the June 6 draft letter." (*Id.*).

On December 18, 2019, Dr. Jokich served a second request for production, seeking documents relating to the June 6, 2018 draft letter. (Dkt. 66 at 4–5). Rush generally objected to these requests on the basis of attorney-client and work product privileges. Dr. Jokich now moves to compel production of these related documents, arguing that they are within the subject matter of the privileged June 6, 2018 draft letter that "Rush voluntarily and willingly produced and for which Rush knowingly waived any claim to attorney/client or work product privilege." (*Id.* at 1). Rush argues that it did not make a "subject matter waiver" as to any other privileged communications. (Dkt. 72 at 6).

4

B. <u>Discussion</u>

Federal Rule of Evidence 502 governs attorney-client privilege and work product and limitations on subject matter waiver, and was enacted in part to abolish the prior "dreaded subject-matter waiver" doctrine in which "any disclosure of privileged matter worked a forfeiture of any other privileged information that pertained to the same subject matter." *Appleton Papers, Inc. v. E.P.A.*, 702 F.3d 1018, 1026 (7th Cir. 2012) (internal quotations omitted). By contrast, Rule 502(a) provides that subject matter waiver occurs *only* when: "(1) the waiver is intentional; (2) the disclosed and undisclosed communications or information concern the same subject matter; and (3) they ought in fairness to be considered together." Fed. R. Evid. 502(a).

The fairness prong in Rule 502(a)(3), and limitations on subject matter waivers, is addressed in the Advisory Committee Notes for Rule 502, which explain:

> **[A] subject matter waiver (of either privilege or work product) is reserved for those *unusual situations*** in which fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary . . . Thus, **subject matter waiver is limited to situations in which a party intentionally *puts protected information into the litigation in a selective, misleading and unfair manner*** . . . The language concerning subject matter waiver —"ought in fairness"— is taken from Rule 106 because the animating principle is the same. Under both Rules, a party that makes a selective, misleading presentation that is unfair to the adversary opens itself to a more complete and accurate presentation.

Fed. R. Evid. 502 Advisory Committee Notes (revised November 28, 2007) (emphasis added). Courts in this District have emphasized that "subject matter waiver is reserved for rare cases in which a party attempts to use privileged information as

5

both a sword and a shield in litigation." *McCullough v. Hanley*, No. 17 CV 50116, 2019 WL 3776962, at *12 (N.D. Ill. Aug. 12, 2019); *see also Patrick v. City of Chi.*, 154 F. Supp. 3d 705, 715–16 (N.D. Ill. 2015) ("[S]ubject matter waiver generally occurs *only* where the party holding the privilege seeks to gain some strategic advantage by disclosing favorable, privileged information, while holding back that which is unfavorable.") (emphasis added).

There is no dispute that Rush intentionally waived privilege over the June 6, 2018 draft letter. (*See* Dkt. 72 at 5). Nor is there a dispute that the undisclosed material Dr. Jokich seeks concerns the same subject matter as the draft letter. (*See* Dkt 66-3 at 8–9). The question is whether Rush's disclosure of the draft letter ought in fairness extend the waiver to the draft letter's subject matter.

Dr. Jokich argues that it should because Rush is unfairly attempting to use privilege as both a sword and a shield. He argues that Rush used the June 6, 2018 draft letter as a sword because it relied on the Johnson Report to defeat the TRO in state court and disclosed the letter to Mr. Johnson during his investigation when Rush could have claimed privilege. (Dkt. 66 at 10) ("Rush did not even make an effort at protecting the privilege because Rush wanted the letter produced as exculpatory evidence as to retaliation."). Dr. Jokich asserts that the draft letter contradicts the defense Rush now asserts as to his contract claim. (*See* Dkt. 66 at 1) ("Rush's legal position in the June 2018 draft letter is dramatically different than its position in this litigation. The draft letter admits that a 2016 long-term letter agreement was binding and valid, while Rush's current position is that the 2016 letter agreement never went

6

into effect due to a failure of a condition precedent."). Thus, Dr. Jokich argues, Rush cannot waive privilege to use the letter (as a sword) to defend against Jokich's retaliation claim, while asserting privilege (as a shield) to prevent discovery that could work to its disadvantage on the contract claim.

In response, Rush represents that it "will not use . . . the [draft] letter *at all*" to defend against Jokich's claims; and argues, therefore, that the "sword and shield" argument fails. (Dkt. 72 at 11-12) (emphasis in original); (*See also* Dkt. 87-14 at 47) ("[W]e won't use that letter for any purpose."). Rush explains that the letter gives it no tactical advantage because Dr. Jokich admits and other documents establish that Rush was planning to fire Dr. Jokich before he complained about discrimination at Rush. (*See id*.) ("Dr. Jokich's *own complaint* asserts that the termination decision was made well before the June 6 draft letter — specifically, by May 26, 2018, by Dr. DeCresce."). Additionally, Rush argues that "aside from Dr. Jokich's own complaint, the emails of May 22 and May 26, 2018 prove the timing of the decision beyond dispute." *(Id.*). Rush therefore posits that it had and has no reason to use the draft letter to prove a fact – that Rush did not retaliate against Dr. Jokich because it had decided to fire him before he complained about discrimination – for which abundant other proof exists.

Indeed, if and how the disclosed communication is used is "critical to the fairness inquiry" under Rule 502(a)(3). *McCullough*, 2019 WL 3776962, at *12 (collecting cases and explaining that, "if a party is going to use the disclosed communications or information (which were previously privileged) in a misleading way, then Rule 502(a)

7

authorizes a broader, court-imposed waiver of other undisclosed, privileged communications and information that concern the same subject matter to avoid unfairness."). Having agreed not to use the letter in any way, Rush in this case is not seeking an unfair strategic advantage or to use the privilege as both "a shield and a sword."

Dr. Jokich relies on several cases that both pre-date the 2008 enactment of Rule 502 and are inapposite to the facts of this case. In *Neal*, the court found subject matter waiver where Honeywell, the holder of the privilege, gained a "tactical advantage" from its disclosures of privileged information to the government. *Neal v. Honeywell, Inc.*, No. 93 C 1143, 1995 WL 591461, at *5-6 (N.D. Ill. Oct. 3, 1995). No such tactical advantage is present in Rush's case. In *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 216–19 (N.D. Ill. 2001), the court extended waiver under the "at issue waiver" doctrine, finding that an alleged patent-infringer put privileged documents and communications "at issue" by asserting an equitable estoppel defense. In contrast here, Rush's disclosure of the draft letter does not invoke the "at issue waiver" doctrine, nor does Rush seek to use the letter in any way to its strategic advantage.

This Court finds that the fairness prong of Rule 502(a)(3) is not met, and a broader subject matter waiver is not warranted in this case. *See McCullough*, 2019 WL 3776962, at *12 (holding that waiver of attorney-client privilege in that case did not require subject matter waiver of privileged communications when the privilege

holder did not intend to use the disclosed communications in litigation, and explaining that, "[w]ithout any use of the previously privileged/now disclosed information, the sword has not been wielded. When a privilege holding party will not or does not use the disclosed information affirmatively to influence a decisionmaker, no subject-matter waiver is found because unfairness is lacking.") (internal citations omitted); *see also Patrick*, 154 F. Supp. 3d at 716 (declining to find subject matter waiver where the plaintiff asserting the privilege did not attempt to rely on any aspect of the disclosed communication in litigating his claims).

Alternatively, in his reply brief, Dr. Jokich argues that a supplemental declaration from defense counsel, Mr. Galland, and Rush's response brief constitute independent and additional subject matter waiver because it "purports to explain when Mr. Galland was retained, why he was retained, the work Mr. Galland did when he was first retained (he claims he drafted the June 6, 2018 draft letter), and what he did with his work product." (Dkt. 78 at 6–7). This Court declines to find an independent subject matter waiver based on these filings. It is not necessary to decide whether Rush has even waived any additional attorney-client privilege, because even if Rush did, it did not do so to obtain an unfair tactical advantage as required by the fairness prong of Rule 502(a) to justify "a broader, court-imposed waiver of other undisclosed, privileged communications and information that concern the same subject matter." *McCullough*, 2019 WL 3776962, at *12. Rather, it was explaining the circumstances of the creation of the document at issue to give context to its arguments. As such, it would be unfair to allow Dr. Jokich to use any of these

9

filings "as the thin edge of a wedge to gain access to undisclosed information to which the privilege was not waived." *Id.* at *13.

Finally, Dr. Jokich argues in his reply brief that he should be able to obtain additional discovery through subject matter waiver in order to try to establish that certain statements in the draft letter constitute a party admission. (Dkt. 78 at 4–5). Judge Weisman addressed this issue in the motion hearing on January 27, 2020, and determined that, while an interesting question, whether statements in a draft letter amount to a party admission is beyond the scope of the present motion. (*See* Dkt. 87-14 at 68). This Court agrees. The narrow question before the Court is whether there is a broader subject matter waiver based on Rush's production of the June 6, 2018 draft letter. The Court finds that there is not. Whether statements in that letter constitute an admission is beyond the purview of this motion to compel and need not be reached at this time. And any purposes for which Dr. Jokich would hope to use further discovery does not change the Court's fairness analysis under Rule 502(a)(3).

## CONCLUSION

For the foregoing reasons, Dr. Jokich's Motion to Compel Production of Documents Responsive to Second Request for Production based on Rush's Subject-Matter Waiver of Attorney-Client Privilege [66] is denied in part and moot in part. Requests 1–4 are denied for the reasons stated in this opinion. Requests 5 and 7 are moot because Rush represents that no responsive documents exist. (Dkt. 72 at 13–

15). Requests 6 and 8–10 are moot in part, because Rush asserts that it has produced all non-privileged responsive documents, (*id.*), and denied as to any other responsive documents that are privileged, for the reasons stated in this opinion.

ENTER:

Dated: April 1, 2020

BETH W. JANTZ
United States Magistrate Judge