IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PETER JOKICH, M.D., FSBI, FACR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-7885 |
| | ) | |
| v. | ) | The Honorable Joan H. Lefkow |
| | ) | |
| RUSH UNIVERSITY MEDICAL CENTER, | ) | Magistrate Judge Beth W. Jantz |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MEMORANDUM IN SUPPORT OF
ITS MOTION FOR SUMMARY JUDGMENT**

George F. Galland, Jr.
ggalland@lawmbg.com
Benjamin J. Blustein
bblustein@lawmbg.com
Matthew Owens
mowens@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

## TABLE OF CONTENTS

Page

Table of Authorities .................................................................................... iii

FACTS ........................................................................................................ 1

I.      DR. JOKICH'S CONTRACTS .......................................................... 1

II.     HOW DR. JOKICH LOST HIS JOB.................................................. 4

ARGUMENT .............................................................................................. 9

I.      SUMMARY JUDGMENT IS REQUIRED
        ON THE RETALIATIONS CLAIMS ................................................ 9

        A.      Dr. Jokich engaged in no protected activity................................ 9

        B.      Dr. Jokich cannot establish a causal link between his
                purported protection activity and the removal decision............................... 16

        1.      Dr. Jokich has no evidence suggesting a causal link .................................... 16

        2.      Dr. Jokich cannot use *McDonnell-Douglas*
                in lieu of causal link evidence ....................................... 17

II.     SUMMARY JUDGMENT IS REQUIRED ON THE CONTRACT CLAIMS ........ 21

        A.      Summary judgment must be rendered on all surviving FEA claims ............. 21

        1.      Rush needed no "Cause" to nonrenew the FEA ........................................... 21

        2.      Dr. Jokich has no claim for failure to give notice
                of a change of his duties under FEA Exhibit A ............................................ 22

        3.      Dr. Jokich has no claim for "termination"
                as opposed to "demotion" ............................................................. 23

        4.      Dr. Jokich has no claim based
                on the Hospital Licensing Act clause............................................ 24

        B.      The Court should grant summary judgment on Dr.
                Jokich's claim based on the August 12, 2016 Letter ..................................... 25

i

1.      Dr. Jokich cannot prove implied waiver ......................................................... 25

2.      Dr. Jokich cannot use estoppel or the covenant of good
         faith to prevent enforcement of the condition precedent .............................. 29

3.      The draft termination letter from Rush's counsel creates no
         issue of fact on the enforceability of the August 2016 Letter ....................... 30

C.      Summary judgment is required on the remaining Bylaws claim ................... 31

CONCLUSION ...................................................................................................................... 35

<u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                              <u>Page</u>

*Abrego v. Wilkie*, 907 F.3d 1004 (7th Cir. 2018)..........................................................18

*Abuelyaman v. Illinois State Univ.*, 667 F.3d 800, 813 (7th Cir. 2011).......................13

*Ballard v. Solid Platforms, Inc.,* No. 2:10 CV 238,
2012 WL 1066760 (N.D.Ind. Mar. 27, 2012)...............................................................13

*Barnes v. Humana Health Plans, Inc.,* No. 96 C 5212,
1997 WL 779094 (N.D.Ill. Dec. 11, 1997)..............................................................20, 21

*Baskerville v. Culligan International Co.*, 50 F.3d 428 (7th Cir. 1995)......................15

*Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.2d 856 (7th Cir. 2002).......................35

*Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536 (4th Cir. 2003).........................20

*Candle Corp. v. Boole & Babbage, Inc.,*
1985 WL 1087794 (Aug. 2, 1985 C.D.Cal. 1985)........................................................32

*Cora v. Rancilio Macchine Per Caffe*, No. 01 C 3613,
2003 WL 21654152 (N.D.Ill. July 14, 2003)...............................................................26

*Coleman v. Donahoe*, 667 F.3d 835 (7th Cir. 2012)....................................................20

*Denham v. Saks, Inc.*, No. 07 C 694,
2008 WL 2952308 (N.D.Ill. July 30, 2008)..................................................................12

*Ellis v. United Parcel Service, Inc.*, 523 F.3d 823 (7th Cir. 2008)..............................20

*Epps v. First Energy Nuclear Operating Co.*, No. 11-462,
2013 WL 1216858 (W.D.Pa. Mar. 25, 2013)................................................................20

*Fed. Deposit Ins. Corp. v. Rayman*, 117 F.3d 994 (7th Cir. 1997).............................29

*Ford v. Minteq Shapes & Services, Inc.*, 587 F.3d 845 (7th Cir. 2009).......................15

*Foster v. Arthur Andersen, LLP*, 168 F.3d 1029 (7th Cir. 1999)................................19

*Garza v. City of Chicago*, No. 99 C 391,
2000 WL 283910 (N.D.Ill. Mar. 14, 2000)..................................................................13

*Garza v. Illinois Inst. of Tech.*, No. 17 C 6334,
2018 WL 264198 (N.D.Ill. Jan. 2, 2018) ...................................................................11

*Gates v. Caterpillar, Inc.*, 513 F.3d 680 (7th Cir. 2008) .............................................18, 20

*Glass v. Kemper Corp.*, 949 F.Supp. 1341 (N.D.Ill. 1997),
*aff'd*, 133 F.3d 999 (7th Cir. 1998) ...................................................................26, 30

*Grayson v. O'Neill*, 308 F.3d 808 (7th Cir. 2002) ........................................................13

*Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19 (D.C. Cir. 2013) ........................11

*Grun v. Pneumo Abex Corp.*, 163 F.3d 411 (7th Cir. 1998) ........................................21

*Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v.
Paradigm Ins. Co.*, 962 F.2d 628 (7th Cir. 1992) ........................................................25

*Hentze v. Unverfehrt,* 237 Ill.App.3d 606, 604 N.E.2d 536 (5th Dist. 1992) ..............22

*Herron v. DaimlerChrysler Corp.*, 388 F.3d 293 (7th Cir. 2004) ................................18

*Home Ins. Co. v. Cincinnati Ins. Co.*, 213 Ill.2d 307, 821 N.E.2d 269 (2004) ............25

*Horizon Fed. Sav. Bank v. Selden Fox & Assocs.*, No. 85 C 9508,
1988 WL 70473 (N.D.Ill. June 30, 1988) ........................................................22

*IFC Credit Corp. v. Nuovo Pasta Co.*, No. 91 C 7978,
1993 WL 303118 (N.D.Ill. Aug. 9, 1993) ...................................................................22

*Jajeh v. Cty. of Cook*, 678 F.3d 560 (7th Cir. 2012) ....................................................11

*Jokich v. Rush Univ. Med. Ctr.*, No. 18-CV-7885,
2019 WL 1168106 (N.D.Ill. Mar. 13, 2019).....................................................passim

*Jokich v. Rush Univ. Med. Ctr.*, No. 18-CV-7885,
2020 WL 1548955 (N.D.Ill. Apr. 1, 2020) ...................................................................31

*Jones v. Barton Staffing Sols., Inc.*, No. 13-CV-2316,
2013 WL 5663811 (N.D.Ill. Oct. 16, 2013)...................................................................11

*Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012) ....................................................17

*Kuttner v. Zaruba*, 818 F.3d 970 (7th Cir. 2016) ........................................................19

*Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253 (5th Cir. 2009)........................................20

*Lewis v. Wilkie*, 909 F.3d 858 (7th Cir. 2018) ............................................................9, 18

*Lord v. High Voltage Software, Inc.*, No. 09 C 4469, 2013 WL 6009246
(N.D.Ill. Nov. 13, 2013), *aff'd*, 839 F.3d 556 (7th Cir. 2016)......................................11

*Mattson v. Caterpillar, Inc.*, 359 F.3d 885 (7th Cir. 2004) ...........................................11

*McDonnell-Douglas v. Green*, 411 U.S. 792 (1973) .....................................................17

*McPherson v. City of Waukegan*, 379 F.3d 430 (7th Cir. 2004)....................................15

*Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000)...............................10

*Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382 (7th Cir. 2010).................................10

*Moore v. CN Transportation Ltd.*, No. 17-CV-6188,
2019 WL 7290727 (N.D.Ill. Dec. 30, 2019).................................................................13

*Nelson v. Realty Consulting Servs., Inc.*, 431 F.App'x 502 (7th Cir. 2011)................11

*Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594 (7th Cir. 2014)...........15

*North v. Madison Area Ass'n for Retarded Citizens-Developmental
Centers Corp.*, 844 F.2d 401 (7th Cir. 1988)................................................................15

*Paulos-Johnson v. Advocate Trinity Hosp.*, No. 01 C 3639,
2002 WL 230783 (N.D.Ill. Feb. 15, 2002) ...................................................................12

*Perez v. Thorntons, Inc.*, 731 F.3d 699 (7th Cir. 2013) ...............................................19

*Pope v. United States*, No. 16-1059-SLD,
2017 WL 6523141(C.D.Ill. Aug. 28, 2017)..................................................................13

*Poullard v. McDonald*, 829 F.3d 844 (7th Cir. 2016) ..................................................15

*Pubentz v. Holder*. No. 10 C 7722, 2013 WL 812377 (N.D.Ill. Mar. 5, 2013) ...........10

*Radue v. Kimberly-Clark Corp.*, 219 F.3d 612 (7th Cir. 2000)....................................19

*Rahn v. Bd. of Trustees of N. Illinois Univ.*, No. 09 C 3033,
2014 WL 11395169 (N.D.Ill. June 6, 2014), *aff'd*, 803 F.3d 285 (7th Cir. 2015)........13

*Royal's Reconditioning Corp. v. Royal*, 293 Ill.App.3d 1019,
689 N.E.2d 237 (1st Dist. 1997) ...................................................................................22

*Sanders v. Mid City Salon Res*., LLC, No. 06 C 3971,
2008 WL 244292 (N.D.Ill. Jan. 23, 2008) ....................................................13

*Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) .................................13

*Smart v. Ball St. U.*, 89 F.3d 437 (7th Cir. 1996) ..........................................14

*Snipes v. Illinois Department of Corrections*, 291 F.3d 460 (7th Cir. 2002) ...............20

*Southwest Forest Indus., Inc. v. Sharfstein*, 482 F.2d 915 (7th Cir. 1972) .................26

*Stephens v. Erickson*, 569 F.3d 779 (7th Cir. 2009) ......................................14

*Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640 (7th Cir. 2002) .............17

*Student Transit Corp. v. Board of Education,* 76 Ill.App.3d 366
395 N.E.2d 69 (1st Dist. 1979) ...............................................................22

*Swinney v. Illinois State Police*, 332 F. App'x 316 (7th Cir. 2009) .........................11

*Teruggi v. CIT Grp./ Capital Fin., Inc.*, 709 F.3d 654 (7th Cir. 2013) .......................9

*U.S. v. Harris*, 914 F.2d 927 (7th Cir. 1990) .............................................32

*U.S. v. Sanders*, 979 F.2d 87 (7th Cir. 1992) .............................................32

*Villanueva v. Wellesley Coll.*, 930 F.3d 124 (1st Cir. 1991).................................20

*Washington v. Ill. Dep't of Revenue*, 420 F.3d 658 (7th Cir. 2005) ..........................14

*Wilcox v. Allstate Corp.*, No. 11 C 814,
2012 WL 6569729 (N.D.Ill. Dec. 17, 2012) ..................................................10

*Williams v. Office of Chief Judge of Cook Cty. Illinois*,
839 F.3d 617 (7th Cir. 2016) ...............................................................19

*Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125 (2d Cir. 1999) ...........................12

## STATUTES

210 ILCS 85/10............................................................................24

OTHER AUTHORITIES

Federal Rule of Evidence 801 ........................................................................31

Restatement (Third) of Agency (2006) ..........................................................30

In his final years at Rush, Dr. Peter Jokich stirred up conflict with colleagues and became bitterly critical of Rush's top leaders. In May 2018, his anger boiled over in a public attack on his superiors and the Board of Trustees. Rush decided to part ways with him. When he rejected a generous severance offer, it removed him. He sued in state court, but dismissed that suit and refiled his state claims in this Court, joined to federal retaliation claims. What is left of the case after the Court's ruling on Rush's motion to dismiss boils down to three questions:

1. Could a reasonable jury find that Rush removed Dr. Jokich for complaining that Rush was discriminating against other employees, when he has admitted he made no such complaints before Rush decided to remove him, and where he would have had no reasonable basis to make them?

2. Can he enforce a proposed employment agreement the Board of Trustees expressly rejected and never reconsidered?

3. Does a Medical Staff Bylaw saying that a Division Director "serves at the discretion of" his Department Chair mean that only his Chair could remove him, when that Chair never supervised him, his actual bosses decided to remove him, and she did not object?

The answers are no, no, and no. All of Dr. Jokich's claims deserve summary judgment.

## FACTS

The following cites to Rush's Local Rule 56.1(a) Statement ("RS ¶__") and certain exhibits ("Ex.__"). Other undisputed facts relating to specific issues are given in the Argument.

## I. DR. JOKICH'S CONTRACTS.

**His job, his dual agreements, and the Board's review.** From 2001, Rush employed Dr. Jokich to run mammography. By 2017 he was a member of leadership -- a Division Director supervising eight physicians. RS ¶1. At all times during his employment by Rush, he had an underlying standard employment agreement with a one-year term. RS ¶4. From 2012 on, that agreement was his "Faculty Employment Agreement" (FEA), an "evergreen" contract whose one-year terms were renewable unless either party gave 120-days' advance written notice. RS

¶5.  Because Dr. Jokich knew his underlying faculty agreements assured him only a year's term, he insisted on and negotiated separate letter agreements requiring Rush to renew those underlying agreements for specified multi-year terms.  RS ¶6; Ex. 65, 67, 68.

Rush is a not-for-profit, tax-exempt corporation whose governing Board of Trustees conducts business through standing committees, including a Compensation Committee ("Comp Committee").  RS ¶¶2, 8.  Anti-kickback laws require Rush's employment contracts to pay no more than fair market value (FMV) and to be commercially reasonable.  The Comp Committee, advised by the firm of Sullivan Cotter, therefore reviews contracts proposed by management for unusually highly-paid physicians.  RS ¶8.  If proposed compensation exceeds the 75th percentile for comparable physicians, Sullivan Cotter asks if it is justified by the physician's productivity. If it is not, Sullivan Cotter offers the Committee no FMV opinion, and advises it to decide whether the contract is a "sound business judgment."  RS ¶9.

Sullivan Cotter measures a physician's productivity by the standard industry metric of "Relative Value Units" (RVUs), as tracked by Rush.  In determining physicians' RVU targets, Rush assigns them a "Full Time Equivalent" (FTE) percentage.  RS, ¶12.  Dr. Jokich detested the RVU metric, but its use is deeply embedded at Rush and in American medicine.  RS ¶11.

In 2013, Rush management submitted for Comp Committee approval a proposed three-year letter agreement for Dr. Jokich.  Sullivan Cotter advised that for his specialty, the proposed pay exceeded the 95th percentile and his productivity was lower than the 10th percentile.  RS ¶13.  But management argued that business factors justified the agreement, and the Committee approved it.  It expired by its terms on June 30, 2016.  On August 12, 2016, Rush's Dean, Ranga Krishnan, M.D., signed a new letter agreement with Dr. Jokich (the "August 2016 Letter"), retaining him through at least June 30, 2020, at his existing salary.  This Letter said it would

2

require Comp Committee approval.  RS ¶16; Ex. 77.  Management submitted it to the

Committee.  Sullivan Cotter advised that Dr. Jokich's proposed compensation approximated the

90th percentile while his productivity remained below the 10th percentile, so that "strong

business judgment factors should be identified" to justify the agreement.  RS ¶17.  On October

21, 2016, the Committee rejected the August 2016 Letter.  It instructed management to develop

and embed a productivity metric for Dr. Jokich in an amended agreement and submit it for

Committee approval in 2017.  RS ¶¶18-19; Ex. 70, 78.

> **Dr. Jokich's rejection of an amended agreement.**  Dean Krishnan asked Dr. Antonio

Bianco, President of Rush's employed-physician practice, and Katherine Struck, an in-house

lawyer, to negotiate with Dr. Jokich an acceptable amendment to the August 2016 Letter.  RS

¶19.  In early March, Dr. Bianco proposed a new non-RVU productivity metric.  RS ¶20.  A testy

negotiation ensued in which Dr. Jokich repeatedly acknowledged in writing that the Comp

Committee had to approve any agreement.  RS ¶21; Ex.84-88.  On April 19, 2017, Dr. Bianco

sent him a draft amendment with a 0.80 FTE, a productivity target of 95% of his Division's

mean, a phase-out of enhanced benefits his Division had long enjoyed, and a requirement that he

help identify a successor.  RS ¶¶22-23; Ex. 91.  On April 21, 2017, Dr. Jokich rejected the

proposal, calling it "insulting and disrespectful."  RS ¶24; Ex. 21; Ex. 4, 141:17-143:11.

With the Comp Committee's June meeting approaching, management offered two

concessions.  It proposed lowering his FTE to 0.60, which would make it easier to hit his

productivity target, and withdrawing the phase-out of enhanced fringe benefits.  On June 14,

2017, management presented the revision to the Committee, which approved it.  RS ¶¶25-27; Ex.

12, 110:10-17; Ex. 93, ¶¶2-3.  On June 26, 2017, a Dean's office employee sent Dr. Jokich the

approved amendment to sign and return.  RS ¶¶27-28; Ex. 94.  He intentionally did not sign or

return it, seeing it as "basically the same letter that [he] had earlier said [he] wouldn't sign." RS ¶29; Ex. 4, 149:21-150:4; Ex. 15, ¶¶53-55. He told nobody that he did not sign, but just "sat on it." Ex. 4,150:2-7. His lawsuit seeks to enforce the August 2016 Letter that the Committee rejected, not the amendment he refused to sign. Ex. 60, ¶¶58-70.

## II.   HOW DR. JOKICH LOST HIS JOB.

**The buildup of conflict.** The conflicts between Dr. Jokich and Rush management which led to his removal began in fall 2016. A radiation oncologist named Dr. Katherine Griem worked at Rush pursuant to Rush's contract with a non-Rush corporation which employed her. In 2016, Rush's Chair of Radiation Oncology notified this corporation that Rush would not renew the contract when it expired on June 30, 2017. Dr. Jokich was upset by this decision. RS ¶¶37-38. On October 4, 2016, he and 15 others wrote Robert DeCresce, M.D., Acting Director of the Rush Cancer Center, urging Dr. Griem's retention. RS ¶38; Ex. 19. He and three colleagues then met with Dr. DeCresce for the same purpose. RS ¶38; Ex. 6, 88:23-90:12. In April 2017, Dr. Jokich and two of those colleagues wrote Rush's CEO, Dr. Larry Goodman, on Dr. Griem's behalf, then met with Dr. Goodman and Dean Krishnan. RS ¶39; Ex. 20. (The Argument details Dr. Jokich's account of this meeting.) When Rush adhered to its decision, Dr. Jokich was "very, very disappointed" in Dr. Goodman and Dr. Krishnan, and talked with and emailed "everybody" about physicians being disrespected at Rush. RS ¶40; Ex. 4, 193:10-21, 198:7-17.

Dr. Jokich had conflicts with Dr. Bianco, the head of Rush's physician practice who, he thought, was doing a "piss-poor job," and said so to "anyone who would listen." RS ¶¶44-45; Ex. 4, 198:22-199:13, 202:3-203:13, 206:4-209-13; Ex. 22-24, 26.

By 2018, Dr. Jokich was so alienated from Rush leadership that he emailed a friend:

> Rush is becoming more of a hot mess. They keep picking the wrong people for
> leadership roles, which leads to bad decisions and bad morale. I think working
> physicians at Rush should have half the seats on the board of trustees to straighten
> everything out from the top down.

RS ¶46; Ex. 26. Among others, he was referring to Dean Krishnan, Dr. Thomas Deutsch (Rush's

Provost), Michael Dandorph (Rush's COO), and Dr. DeCresce, who would shortly become his

boss, as described below. RS ¶46; Ex. 4, 211:18-215:10, 217:2-17; 222:4-223:10.

Another source of conflict involved medical technology. Dr. Paula Grabler, the

mammographer at Rush Oak Park Hospital, persuaded that hospital to acquire a breast imaging

technology called 3D Tomosynthesis. Dr. Jokich vehemently opposes it. He believed Dr.

Grabler went behind his back to get it and was aiming for his job. RS ¶47; Ex. 69. In 2017 he

tried to block her bonus, then backed off. RS ¶47; Ex. 7, 110:10-112:21.

In March 2018, Dean Krishnan decided to have Dr. Jokich report to Dr. DeCresce, who

was still Acting Head of the Rush Cancer Center. At the same time, Dr. Krishnan removed Dr.

Grabler from Dr. Jokich's supervision and had her report to Dr. DeCresce as well. This decision

did not change Dr. Jokich's pay or title, but it incensed him. RS ¶¶48-49; Ex. 27. He thinks it

was due to "nepotism," although he admits he has no evidence for this accusation. RS ¶49.

In February 2018, Dr. Jokich upset Rush's two breast surgeons, Drs. Andrea Madrigrano

and Cristina O'Donoghue, by emailing the Chair of Surgery and Rush's top leaders, imploring

them to find a replacement for Dr. Thomas Witt, who had retired. RS ¶50; Ex. 30, 31. The

Chair was upset by Dr. Jokich's intervention in a department not his own, and the two surgeons

took his email as belittling their competence. RS ¶51; Ex. 30. They and Dr. Grabler consulted

Katherine Struck, asking that something be done about the toxic atmosphere they said Dr. Jokich

had created. Dr. Jokich believed "a number of the leaders of Rush" put the three women up to

complaining about him. He admits he has no evidence for this belief. RS ¶127; Ex. 4, 241:18-

21. Ms. Struck notified Human Resources, which hired an outside investigator, Patience Nelson. On April 9, 2018, Ms. Nelson's report exonerated Dr. Jokich of bias toward women. She said she was "inclined to accept" his statement that he had not meant to impugn the breast surgeons, and concluded his conduct was not "disruptive." She recommended that the leadership of Surgical Oncology, General Surgery and Breast Imaging meet "to determine how they can best provide the remedial actions that [the women] seek and redress underlying tensions." RS ¶¶53-54; Ex. 32. When Dr. DeCresce told Dr. Jokich he would convene such a meeting, Dr. Jokich erupted, saying he had "never been officially informed" that Dr. DeCresce was his boss and would "continue to operate under the assumption" that he reported to the Chair of Radiology, Dr. Byrd. RS ¶55; Ex. 33. As discussed below at 34-35, Dr. Byrd had never supervised him.

In April 2018, Dr. DeCresce put Dr. Grabler in charge of planning for breast imaging at two offsite locations under development. RS ¶¶56-57. Although this decision did not affect Dr. Jokich's title or pay, and barely affected Dr. Grabler's workload, it enraged him. RS ¶58. On April 18, 2018, he asked Human Resources officials to meet to discuss Ms. Nelson's report. When asked why (since it had been favorable to him), he said he wanted to discuss "retaliation and other very serious matters that were brought to light during this process." He did not elaborate on what he meant. RS ¶¶106-08; Ex. 57. Efforts to schedule the meeting he requested continued for the next month. RS ¶¶109-16.

**The removal decision.** On May 21, 2018, Dr. Grabler gave a talk on 3D Tomosynthesis at the Rush cancer service's weekly breast conference. She addressed criticisms of 3D Tomo and presented data from her year of using it at Rush Oak Park. RS ¶64; Ex. 39. Dr. Jokich had long known she would give the talk and never objected. RS ¶¶62-63. He attended but said nothing. She made no personal remarks about him, and he admits it was a "reasonable

presentation." RS ¶65. Nonetheless, he believed it was intended to humiliate him in a public setting. *Id.;* Ex. 4, 254:17-255:1, 270:10-271:2. Although she had been removed from his supervision in March, he viewed her as "somebody under me giving a presentation about things that I don't agree with." He felt that "I had been not listened to for so many years, and I had been disrespected, and I had been just really humiliated in a lot of different situations, and [the Grabler presentation] was the final straw to me." RS ¶75; Ex. 4, 271:11-272:4.

The next day, he sent an email to 60 persons at Rush, including Dr. DeCresce and Rush's three top leaders. RS ¶66; Ex. 40. It responded to Dr. Grabler's presentation, but he deliberately did not send it to her. Ex. 4, 271:11-274:1. He called 3D Tomo a "marketing gimmick" and said it might be harming "our primarily minority and low-income population" at Rush Oak Park. He accused "administrators, business people, non-clinical nurses and lawyers, and ultimately the Board of Trustees" of making "all the major decisions based on money and business concerns" and said it appeared that the "working physicians…are the only ones, it appears, concerned with what is truly best for our patients, and who really have the Rush mission embedded in our hearts, which is to improve the health of the communities that we serve." RS ¶66; Ex. 40. That day Dr. DeCresce read the email, was outraged by it, decided Dr. Jokich should be removed, and emailed Dean Krishnan explaining his decision. RS ¶¶67-70; Ex. 18. Dr. Goodman, Mr. Dandorph, and Dr. Krishnan supported it. RS ¶71; Ex. 18. Next day, Dr. DeCresce told Dr. Jokich to apologize to Dr. Grabler. RS ¶¶72-74. He emailed her an equivocal apology he admits was insincere. RS ¶¶74; Ex. 44. He never apologized to leadership or the Board and feels he has nothing to apologize for. RS ¶76; Ex. 4, 271:11-274:1.

Human Resources and outside counsel began planning the manner and timing of his removal. RS ¶77. On June 11, 2018, he emailed Dr. Goodman that he had attended a training

last month and felt "it is my duty to inform you that I am aware of serious discrimination issues and unfair employment practices that have occurred, and are occurring, at Rush involving at least gender, age, and national origin, which greatly impact our diversity goals." He asked to meet with Human Resources and Rush's Board Chair. RS ¶78; Ex. 46. Dr. Goodman paused the termination process and retained attorney Tom Johnson to investigate Dr. Jokich's allegations. RS ¶¶79-81; Ex. 13, 6:5-9; Ex. 49. Mr. Johnson interviewed him three times. RS ¶81; Ex. 48, 50. On July 29, 2018, Mr. Johnson wrote Dr. Goodman that Dr. Jokich had supplied nothing to suggest unlawful practices and that his real complaint appeared to be distress at the direction he saw Rush leaders as taking. RS ¶82; Ex. 50.

On August 8, 2018, Drs. DeCresce and Krishnan told Dr. Jokich he would be removed. They offered to let him resign under an agreement which would pay him some $1.3 million, make an agreed-on announcement of his departure, and give him a recommendation from Dr. Goodman. RS ¶¶84-85; Ex. 51. Otherwise he would be removed as Director of Breast Imaging and put on leave, his salary would drop in 60 days to $448,802 (a nonsupervisory breast imager level), and his FEA would not be renewed when it expired June 30, 2019. RS ¶86; Ex. 60, Ex. D. On August 21 he rejected that offer. RS ¶87. By letter of August 22, 2018, Dr. DeCresce removed him as Division Director and put him on leave. RS ¶88; Ex. 60, Ex. D. Sixty days later Rush lowered his salary to $448,802. On June 30, 2019, his employment ended. RS ¶89.

**The litigation.** On August 29, 2018, Dr. Jokich sued Rush for breach of contract in state court. Ex. 15. Two days later the court denied him a TRO; on September 11, 2018, the Appellate Court affirmed that ruling. Docket No. 18, pp. App. 249-50. On October 24, 2018, Dr. Jokich filed an EEOC charge (Ex. 60, Ex. A). Two days later he dismissed the state suit. He filed this suit November 29, 2018, alleging ADEA, Title VII, and IHRA retaliation claims and

realleging his state claims.  On Rush's motion, this Court dismissed several claims and narrowed

others, as discussed in the Argument.  *Jokich v. Rush Univ. Med. Ctr.,* No. 18-CV-1885, 2019

WL 1168106 (N.D.Ill. Mar. 13, 2019) (hereafter *Jokich*); Ex. 99 (denying motion to reconsider).

## ARGUMENT

## I.   SUMMARY JUDGMENT IS REQUIRED ON THE RETALIATION CLAIMS.

To prove retaliation under Title VII, the ADEA, and the Illinois Human Rights Act, Dr.

Jokich must prove (1) he engaged in protected activity, (2) he suffered an adverse action, and (3)

a causal connection exists between the activity and the action.  *Lewis v. Wilkie,* 909 F.3d 858,

866 (7th Cir. 2018); *Teruggi v. CIT Grp./Capital Fin., Inc.,* 709 F.3d 654, 659 (7th Cir. 2013)

(IHRA follows federal statutes).  The only "protected activity" the Complaint alleges is that Dr.

Jokich "complained of discriminatory treatment and systematic discriminatory practices by Rush

against women, older workers and employees of Mexican national origin."  Ex. 60, ¶¶1, 18-20.

As he confirmed to Judge Weisman, he means discrimination against others, not against himself.

Ex. 57, at 7.  The only adverse action his Complaint mentions is his removal.  *Id.* ¶¶16, 32-35.

### A.   Dr. Jokich engaged in no protected activity.

Dr. Jokich's deposition establishes that in every relevant instance, either he did not do

what his Complaint alleges, or if he did, it was not "protected activity."

**Dr. Griem.**  Dr. Jokich alleges he "repeatedly complained about discrimination against

women," particularly Dr. Griem.  Ex. 60, ¶18.  Undisputed evidence shows he did not.

- A letter of October 4, 2016 on Dr. Griem's behalf cited by his Complaint (Ex. 60, ¶18) says nothing about discrimination.  RS ¶95; Ex. 19.  His email to Drs. Goodman and Krishnan on April 10, 2017 *dismisses* the idea that the decision was motivated by discrimination.  RS ¶96; Ex. 20.

- He did *not* tell Dr. Goodman that Rush was discriminating against Dr. Griem.  He told him:  "You owe it to tell us the reason why you're not renewing her contract.  And if you don't give us a reason, we're going to assume it's a very bad reason

why you're not renewing her contract." He claims he was "implying age and gender discrimination," but admits he did not say so. RS ¶94; Ex. 4, 41:9-42:16.

Given these facts, Dr. Jokich's interventions for Dr. Griem before June 18, 2018 were not protected. First, "implying" discrimination is not protected activity. In *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000), a pregnant employee who had previously discussed pregnancy discrimination with her employer threatened to leave and criticized her supervisors, but did not mention pregnancy discrimination. She argued that a jury could infer that her supervisors really knew that her complaints centered on her belief of pregnancy discrimination. *Id.* at 1007. *Miller* disagreed. Although she did not have to use the words "pregnancy discrimination," she had "to at least say something to indicate her pregnancy is an issue." *Id.* at 1007-08. "An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints." *Id.* Similarly, *Wilcox v. Allstate Corp.*, No. 11 C 814, 2012 WL 6569729 (N.D.Ill. Dec. 17, 2012), granted summary judgment against a plaintiff who complained of "unequal treatment" and "a hostile and unacceptable work environment," but did not clearly connect the discrimination to age. "[M]erely complaining in general terms of discrimination, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient." *Id.* at \*14. The court relied on *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010), where the Seventh Circuit held: "Employers need not divine complaints from the ether, guessing at the subjective suspicions of employees. An aggrieved employee must at least report -- clearly and directly -- nonobvious policy violations troubling him so that supervisors may intervene." Many other cases hold the same.[1]

---

[1] *See, e.g., Pubentz v. Holder*, No. 10 C 7722, 2013 WL 812377 (N.D.Ill. Mar. 5, 2013), at \*14 (plaintiff did not indicate that her former supervisor "had engaged in any discriminatory conduct" and it "cannot be assumed that [plaintiff's supervisor] is clairvoyant about [plaintiff's] motivations so as to put her on

Second, Dr. Jokich not only had to complain of discrimination, but needed a *reasonable basis* for doing so. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 890-91 (7th Cir. 2004). This Seventh Circuit requirement aims to keep employees from making retaliation claims as "a tactical coercive weapon." *Id.* at 890. Many cases have foundered over this requirement.[2] Dr. Griem herself never complained to Rush of discrimination. RS ¶121; Ex. 4, 28:10-20; Ex. 62. Dr. Jokich has "no idea" why Rush non-renewed the contract with her employer. He testified, "There might have been good reasons for it but [I was] never told what they were." RS ¶120; Ex. 4, 195:4-11. That management declined to discuss with him a business decision about someone in another department was not a reasonable basis to think the decision was motivated by discrimination.

notice of [plaintiff's] subjective feelings of discrimination"); *Swinney v. Illinois State Police*, 332 F. App'x 316, 317-18 (7th Cir. 2009) (plaintiff complained she felt "harassed and intimidated" by her supervisor; summary judgment affirmed because "Although [plaintiff] did not need to use 'magic words' like 'sex' or 'gender discrimination,' she needed to say something to make clear…that her sex was an issue" and because "we do not consider what employers should have known about complaints, and instead hold them responsible for what the record shows they actually knew"); *Garza v. Illinois Inst. of Tech.*, No. 17 C 6334, 2018 WL 264198 (N.D.Ill. Jan. 2, 2018) at *1, *4 (meetings held with Latino faculty and staff "to discuss Latino-specific issues, including the lack of advancement opportunities and unfair treatment" were not protected because she did not allege that "*discrimination* against Latinos or any other unlawful employment practices were discussed at such meetings"); *Jajeh v. Cty. of Cook*, 678 F.3d 560, 570 n.5 (7th Cir. 2012) (vague complaints unrelated to religion or national origin are not statutorily protected).

[2] *See Lord v. High Voltage Software, Inc.*, No. 09 C 4469, 2013 WL 6009246, at **5-6 (N.D.Ill. Nov. 13, 2013), *aff'd*, 839 F.3d 556 (7th Cir. 2016) (summary judgment granted because of "failure to aver any facts from which a reasonable person could, within context, infer that the conduct underlying Plaintiff's claims was discriminatory for purposes of Title VII" (*id.* at *6); a good-faith subjective belief is insufficient (*id.* at *5*); *Jones v. Barton Staffing Sols., Inc.*, No. 13-CV-2316, 2013 WL 5663811 (N.D.Ill. Oct. 16, 2013) (one objectionable comment complained of by plaintiff "did not rise to the level of actionable sexual harassment, and thus plaintiff had not sufficiently alleged that "he reasonably or objectively believed that he was opposing sexual harassment or discrimination, the kind of which is prohibited by Title VII" (*id.* at *3)); *Nelson v. Realty Consulting Servs., Inc.*, 431 F. App'x 502, 506 (7th Cir. 2011) ("[g]iven the totality of the circumstances, the district judge correctly found that Nelson does not have the requisite good faith, reasonable belief that Victor was discriminated against in violation of Title VII"); *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 24 (D.C. Cir. 2013) (viewing the evidence most favorably to plaintiff, her complaints "were not…protected activity because, as the district court found, no reasonable employee could believe that the conduct about which she complained amounted to a hostile work environment under Title VII."

Third, Title VII and the ADEA do not protect assertions that Rush is discriminating against non-employees like Dr. Griem. *Wimmer v. Suffolk Cty. Police Dep't*, 176 F.3d 125, 135 (2d Cir. 1999) (complaining of discrimination against non-employees is not protected "because his opposition was not directed at an unlawful *employment practice* of his employer") (emphasis original); *Paulos-Johnson v. Advocate Trinity Hosp.*, No. 01 C 3639, 2002 WL 230783, at *4 (N.D.Ill. Feb. 15, 2002) (complaints of discrimination against Hispanic patients not protected); *Denham v. Saks, Inc.*, No. 07 C 694, 2008 WL 2952308, at *7 (N.D.Ill. July 30, 2008) (complaints of unequal treatment of African-American customers not protected).

**Purported complaints of discriminating against older physicians.** Dr. Jokich's Complaint alleges he "complained that Rush often demoted or terminated older physicians." Ex. 60, ¶19. He has named 11 physicians about whom he supposedly made such statements. RS ¶119. This allegation collapsed in his deposition, where he admitted he never complained to Rush of discrimination against *any* of them. RS ¶91; Ex. 4, 455:20-464:1. In fact, he admitted that before June 11, 2018, he never complained to *anyone* in authority of age, sex, or national origin discrimination against *anybody*. RS ¶¶90, 92, 93; Ex. 4, 36:6-42:10, 46:7-46:21.

He would have had no basis for such a complaint. He admitted he had no knowledge that any of these physicians *themselves* complained of discrimination, formally or informally (none did), and did not know what (if anything) Rush did to them or why. RS ¶¶120-121, 123-124; Ex. 4, 455:20-464:1. The only reason he could offer for thinking Rush might be discriminating against them was that "no one would tell me why they left." Ex. 4, 466:9-467:19.

**Unspecified statements about "retaliation" in April 2018.** As discussed above at 5-6, after Patience Nelson investigated the complaint of Drs. Madrigrano, O'Donoghue, and Grabler and generally found in Dr. Jokich's favor, he believed Rush leadership had "put them" up to

making the complaint, and in April 2018 asked Human Resources to meet to discuss "retaliation and other serious issues." This was not protected activity.

First, as explained earlier, the naked word "retaliation," without explaining retaliation for *what,* does not allege a violation of Title VII or the ADEA. See above at 10 and n. 1.

Second, he seems to have been referring in this email to retaliation against himself. But the Complaint says, and he told Judge Weisman, that he is alleging retaliation for complaining about unlawful action against *others*, not against himself. See above at 9; Ex. 57, at 7. He "may not amend his Complaint through arguments in his brief in opposition to a motion for summary judgment." *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir. 1996). In *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002), the Court, citing *Shanahan,* held that a retaliation plaintiff cannot avoid summary judgment by arguing a retaliation theory his Complaint nowhere mentions. Many other cases have held the same.[3]

Third, he had no reasonable objective basis to complain of retaliation. He had *prevailed* in Rush's investigation of the complaint against him. While Dr. DeCresce had recently put Dr. Grabler in charge of planning for breast imaging at the "offsites" that were under construction (see above at 6), Dr. Jokich could not have reasonably thought this shift of a small responsibility was unlawful. It did not affect his title or his pay, and Dr. Grabler had already been removed from his supervision. Shifting *any* responsibility, no matter how minor, to Dr. Grabler hurt his ego, but "not everything that makes an employee unhappy is an actionable adverse action."

---

[3] *See also Abuelyaman v. Illinois State Univ*., 667 F.3d 800, 813 (7th Cir. 2011); *Moore v. CN Transportation Ltd.*, No. 17-CV-6188, 2019 WL 7290727 (N.D.Ill. Dec. 30, 2019), at *14; *Pope v. United States*, No. 16-1059-SLD, 2017 WL 6523141, at *2 (C.D.Ill. Aug. 28, 2017); *Sanders v. Mid City Salon Res*., LLC, No. 06 C 3971, 2008 WL 244292, at *11 (N.D.Ill. Jan. 23, 2008); *Garza v. City of Chicago*, No. 99 C 391, 2000 WL 283910, at *4 (N.D.Ill. Mar. 14, 2000). He also cannot rely on alleged adverse actions that are not pled in the complaint. *Rahn v. Bd. of Trustees of N. Illinois Univ*., No. 09 C 3033, 2014 WL 11395169, at *4 (N.D.Ill. June 6, 2014), *aff'd*, 803 F.3d 285 (7th Cir. 2015); *Ballard v. Solid Platforms, Inc.*, No. 2:10 CV 238, 2012 WL 1066760, at *10 n. 3 (N.D.Ind. Mar. 27, 2012).

*Smart v. Ball St. U.,* 89 F.3d 437, 441 (7th Cir. 1996). "[A] transfer or reassignment of job responsibilities…is not materially adverse unless it represents a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009) (emphasis in original). "By and large a reassignment that does not affect pay or promotion opportunities lacks th[e] potential to dissuade and thus is not actionable." *Washington v. Ill. Dep't of Revenue,* 420 F.3d 658, 662 (7th Cir. 2005).

**Purported support for Norma Melgoza's claim.** Dr. Jokich alleges that he "voiced concerns about the lack of Hispanics in top executive positions at Rush, including Norma Melgoza," and that in mid-June 2018, he complained of discrimination against her. Ex. 60, ¶¶20, 21. Here is the relevant evidence about Dr. Jokich and Ms. Melgoza:

- Ms. Melgoza was an Associate Vice President whose position was abolished in a reorganization. She accepted a new position at no loss in pay, but sued Rush in November 2017 for national-origin and sex discrimination. RS ¶97; Ex. 52.

- She had a job interview with Dr. DeCresce on November 1, 2017. She claims he wore a mask of Donald Trump he kept along with other joke masks in his office, and says this was offensive to her as a Mexican-American. RS ¶¶97-98. Dr. DeCresce denies that the mask was a Trump mask or that he wore it in the interview. Ex. 6, 55:1-57:5, 60:4-63:22.

- Dr. Jokich says that after this interview, Ms. Melgoza told him about the mask incident, and that he told her to go to Human Resources and said to her that Dr. DeCresce should be fired. RS ¶99; Ex. 4, 393:23-394:17; Ex. 53.

- Ms. Melgoza went to Human Resources, which investigated the incident. The investigator, Lynn Wallace, met with Dr. Jokich. RS ¶99; Ex. 4, 452:9-453:7. According to Ms. Wallace's report, Dr. Jokich (1) told Ms. Wallace that he had not been present at the Melgoza-DeCresce interview, but that Ms. Melgoza told him Dr. DeCresce had worn a Trump mask, (2) told Ms. Wallace that if Dr. DeCresce did that, it was "unbelievable and unprofessional"; and (3) expressed no other concerns to Ms. Wallace about Dr. DeCresce and said he "likes to joke around and is known for his sense of humor." RS ¶¶99, 100; Ex. 53, pp. 2-3.

14

- Dr. Jokich admits that in the interview he did not tell Ms. Wallace he thought Ms. Melgoza had been discriminated against. RS ¶100; Ex. 4, 452:24-453:17.

- In a report of December 28, 2017, Ms. Wallace found Ms. Melgoza's complaint unsubstantiated. RS ¶98; Ex. 5, 133:12-134:19; Ex. 53. Her report was not distributed to Dr. DeCresce. He was not Dr. Jokich's supervisor at the time, and never knew Dr. Jokich had been interviewed. RS ¶¶101-02.

- On January 8, 2018, Ms. Melgoza's lawyers sent Rush's lawyers "Initial Disclosures" in her lawsuit, listing 112 persons with discoverable information, including Dr. Jokich. They did not indicate whether any witness, including him, was cooperating with Ms. Melgoza. RS ¶¶103-104; Ex. 54. Dr. DeCresce did not know she had named Dr. Jokich. RS ¶104; Ex. 6, 108:7-11; Ex. 16, ¶9.

- He told Patience Nelson in March 2018 that he believed Drs. Madrigrano, O'Donoghue and Grabler had complained about him, among other reasons, to dissuade him from supporting Ms. Melgoza's lawsuit. He admits he has no evidence for this belief. RS ¶¶126, 128; Ex. 4, 241:18-21, 242:11-243:5.

- Dr. Jokich says in May 2018, he mentioned the mask incident to his breast imagers and that he may also have discussed it with Dr. Byrd in June 2018. He could not recall discussing it with anyone higher. Dr. DeCresce had no knowledge of any such discussions. RS ¶105; Ex. 4, 455:3-19.

None of these facts shows any protected activity by Dr. Jokich. First, as the case law makes clear, he had no reasonable basis to believe the incident described by Ms. Melgoza was actionable, even assuming a Trump mask should offend Hispanics.[4] Second, he had no basis, reasonable or otherwise, to believe Rush leadership induced Drs. Madrigrano, O'Donoghue and Grabler to complain of his conduct to deter him from being a witness in Ms. Melgoza's lawsuit.

---

[4] *See Nichols v. Michigan City Plant Planning Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (racial epithet); *McPherson v. City of Waukegan*, 379 F.3d 430, 434-35, 439 (7th Cir. 2004) (asking the colors of plaintiff's and others' bras and underwear not actionable); *Baskerville v. Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995) (sexually-harassing comments over seven months could not reasonably be thought to add up to sexual harassment); *North v. Madison Area Ass'n for Retarded Citizens-Developmental Centers Corp.*, 844 F.2d 401, 409 (7th Cir. 1988) (two or three offensive statements that "*might* be considered as racial slurs" did not establish racial harassment); *Poullard v. McDonald*, 829 F.3d 844, 858-59 (7th Cir. 2016) (no claim from three incidents of harassment with at best "a tenuously arguable connection to race"); *Ford v. Minteq Shapes & Services, Inc.*, 587 F.3d 845, 846-48 (7th Cir. 2009) (no claim from co-worker's comments referring to plaintiff Ford as "black man" and "black African-American," Ford's supervisor's comment that "he didn't have to worry about losing his job because Minteq [employer] wanted to appear integrated[,]" and another supervisor's comment calling Ford a gorilla, and Minteq not letting Ford bring his grandchildren to work Christmas parties).

Third, he did not engage in protected activity when Ms. Melgoza's lawyers listed him as having discoverable information about her lawsuit. That was their activity, not his.

**Complaints that Rush was discriminating against patients.** Dr. Jokich alleges that "Rush took exception" to Dr. Jokich's statement in his May 22, 2018 email that 3D Tomosynthesis might harm minority and low-income patients at Rush Oak Park Hospital. Ex. 60, ¶29. Similarly, he told Patience Nelson that the three women had complained about his behavior "to dissuade him from going public with his opinion about tomosynthesis and minority women." RS ¶¶126-27; Ex. 4, 243:8-20. These statements were not protected. Title VII only protects complaints of discrimination against employees. See above at 12.

**The June 2018 complaint to Dr. Goodman asserting Rush's discrimination.** Dr. Jokich could provide Mr. Johnson no basis for these complaints. RS ¶¶82-83; Ex. 50.

## B. Dr. Jokich cannot establish a causal link between his purported protected activity and the removal decision.

### 1. Dr. Jokich has no evidence suggesting a causal link.

Dr. Jokich admits that no one at Rush said, and that he has never seen a document saying, that he was removed for complaining about discrimination or retaliation against *anyone*. Nothing in Rush's massive document production to him mentions such a reason. RS ¶36; Ex. 4, 46:14-47:18, 47:18-48:1. Undisputed facts militate *against* any such reason.

**Advocacy for Dr. Griem.** Dr. Jokich was one of three people who led the interventions on behalf of Dr. Griem, yet Rush did nothing to the other two. RS ¶41. The most common evidence of causal link in retaliation cases -- a short time gap between the protected activity and the removal -- is absent here. Nothing was done to him after his intervention of October 2016, and 13 months elapsed between the April 2017 intervention and the removal decision of May 22, 2018. That long gap raises no suspicion of causation. Even a short gap "will rarely be sufficient

in and of itself to create a triable issue" of causation. *Stone v. City of Indianapolis Pub. Utils. Div.,* 281 F.3d 640, 644 (7th Cir.2002); *Kidwell v. Eisenhauer*, 679 F.3d 957, 966-67 (7th Cir. 2012) (five-week gap showed no causation, particularly since "significant intervening events" occurred). Here "significant intervening events" sufficed to get him fired twice over.

**Unspecified statements about "retaliation" in emails of April 2018.** Dr. Jokich did not send these emails to Dr. DeCresce or his superiors. Dr. DeCresce had no idea Dr. Jokich had asked to meet with *anyone* to discuss "retaliation." RS ¶¶117-18; Ex. 16, ¶10.

**Supposed complaints about the mask incident.** Dr. DeCresce, who made the decision to remove Dr. Jokich, never knew (1) that Ms. Wallace interviewed Dr. Jokich in December 2017 about the mask incident; (2) that Dr. Jokich talked to anyone about the incident; or (3) that Dr. Jokich was listed by Ms. Melgoza's lawyers as having "discoverable information" about her lawsuit. RS ¶¶101-02, 105. Moreover, by Dr. Jokich's own account, he spoke to Dr. Byrd about it in June 2018, *after* the removal decision. RS ¶105.

**The June 2018 complaint to Dr. Goodman and Mr. Johnson.** It is undisputed, and Dr. Jokich himself alleges, that Dr. DeCresce decided in May 2018 on his removal, weeks earlier than this June complaint. It is also undisputed that when Dr. Goodman received the June 11 email, he *paused* a termination process already in motion. RS ¶¶66-67, 71, 79; Ex. 15, ¶¶93-95.

**2. Dr. Jokich cannot use *McDonnell-Douglas* in lieu of causal link evidence.**

Retaliation plaintiffs like Dr. Jokich who have no causal-link proof can try to fall back on *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973):

> [This method] allows the plaintiff to establish a *prima facie* case without proving a direct causal link by showing that (1) he engaged in a protected activity, (2) he performed his job duties according to his employer's legitimate expectations, (3) he suffered an adverse action, and (4) he was treated less favorably than similarly situated employees who did not engage in protected activity. * * * If the plaintiff can establish his *prima facie* case with this indirect method, the burden then shifts

to the employer to provide a legitimate, non-discriminatory reason for the adverse action. * * *  If the employer does so, the burden shifts back to the employee to prove that the employer's stated reason is mere pretext.

*Lewis v. Wilkie, supra,* 909 F.3d at 866 (citations omitted).  Dr. Jokich has no *prima facie* case.

First, as discussed above, he engaged in no protected activity.

Second, he was not meeting his superiors' legitimate expectations.  "The proper inquiry [on the "legitimate expectations" factor] mandates looking at [plaintiff's] job performance through the eyes of her supervisors at the time of her suspension and termination."  *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 689 (7th Cir. 2008).  It is undisputed that Dr. Jokich was a member of leadership who had been in growing conflict with his superiors; regarded most of them as poor leaders and was telling people so; had insolently told his boss the previous month that he *wasn't* his boss; had enraged key colleagues in the cancer service, including the Chair of Surgery, the two breast surgeons, and Dr. Grabler; and had, hours before the removal decision, publicly denounced his bosses and the Board.  See above at 4-7.  Behavior like this reliably leads to summary judgment against discrimination plaintiffs.  *See, e.g., Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir. 2018) (employee had "multiple confrontations with supervisors, coworkers, and patients"); *Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004) (employee had "confrontational and disrespectful attitude").

It is irrelevant that in June 2018 (*after* the decision to terminate him), Dr. Byrd, his clinical chair, gave him a good evaluation, and that next month the Medical Staff routinely reappointed him.  Ex. 60, ¶¶14-15.  Approval from persons other than Rush's top leadership creates no issue of fact on those top leaders' legitimate expectations, which were the ones he had to meet.  It is also irrelevant whether his actions, including his email of May 22, 2018, were aimed at improving patient care.  Rush will assume on this motion that his motives were good.

But the world is full of well-intentioned people who alienate their bosses and get fired. Courts will "not second-guess an employer's policies that are facially legitimate." *Foster v. Arthur Andersen, LLP*, 168 F.3d 1029, 1035 (7th Cir. 1999). It was facially legitimate for those who ran Rush to lose patience with a subordinate who stirred up turmoil and publicly attacked them.

Third, Dr. Jokich cannot show that a similarly-situated person was treated better. He must provide evidence of a person who was "subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Kuttner v. Zaruba*, 818 F.3d 970, 974 (7th Cir. 2016), *quoting Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617-18 (7th Cir. 2000). A comparator must be directly comparable "in all material respects...to eliminate other possible explanatory variables." *Perez v. Thorntons, Inc.,* 731 F.3d 699, 704 (7th Cir. 2013); *Williams v. Office of Chief Judge of Cook Cty. Illinois*, 839 F.3d 617, 626 (7th Cir. 2016). Dr. Jokich has no comparator, period. In the last thirty years at Rush, no other member of leadership at Rush launched a scathing public attack on executive leadership and the Board. RS ¶45; Ex. 16, ¶16.

Dr. Jokich recently argued that Dr. Griem (see above at 4, 9-12) is a "comparator." He asserted that "some fifteen years ago" she was accused of being "divisive," yet Rush "appears to have followed the disciplinary procedures set out in its employment policies to counsel Dr. Griem," while it "abruptly terminated Dr. Jokich for disruptive behavior without following its policies and procedures." Docket No. 111, at 12-13. No reasonable jury could accept this argument. First, in important ways, Dr. Griem and Dr. Jokich were treated the same. Rush did not try to revoke either's Medical Staff privileges or faculty membership (both remain members of the faculty). RS ¶¶42, 122. In both cases, Rush gave notice many months in advance under the relevant contract; neither person received appeal rights. *Id.* True, Dr. Jokich was put on

leave and she was not. On the other hand, Rush offered him a $1.3 million severance agreement. RS ¶¶84-85. It offered Dr. Griem nothing. RS ¶42.

Second, Dr. Jokich and Dr. Griem were situated utterly differently:

- She was not a Rush employee or member of management and was paid nothing. RS ¶37. He was an employed member of leadership, with a huge salary. RS ¶1.

- The decision about Dr. Griem was made by her Department Chair, Dr. Abrams, who had nothing to do with the decision to remove Dr. Jokich. RS ¶¶38, 69. Abundant case law cites that difference in rejecting alleged "comparators."[5]

- Dr. Griem's unspecified "divisive" behavior cited by Dr. Jokich happened, he says, "some 15 years" earlier. Equally abundant case law holds that events on which a comparator argument is based must occur in comparable time periods.[6]

As Judge Weisman tartly (no pun intended) observed about Dr. Griem, "We're not even looking at apples to apples. We're looking at apples to some vegetable because it's not even the same relationship that's being looked at." Ex. 57, at 32:14-22.

Since Dr. Jokich has no *prima facie* case under *McDonnell-Douglas,* there is no occasion for the Court to conduct a "pretext" analysis. *Barnes v. Humana Health Plans, Inc.,* No. 96 C 5212, 1997 WL 779094, at *8 (N.D.Ill. Dec. 11, 1997). In any event, given the evidence

---

[5] *See, e.g., Snipes v. Illinois Department of Corrections*, 291 F.3d 460, 463 (7th Cir. 2002) ("similarly situated" requirement "normally entails establishing that the two employees dealt with the same supervisor"); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690-91 (7th Cir. 2008) (citing *Snipes*, 291 F.3d at 463) ("[n]ot only is there no evidence that any of the three male employees reported to Richards, but in addition, Gates' 'evidence' of the men's alleged improper conduct fails to be functionally equivalent to Gates'"); *Ellis v. United Parcel Service, Inc.*, 523 F.3d 823, 826-27 (7th Cir. 2008) ("to be similarly situated, a manager must have been treated more favorably by the same decisionmaker that fired [] Ellis"); *Coleman v. Donahoe*, 667 F.3d 835, 847-48 (7th Cir. 2012) ( "same decisionmaker" requirement means same individual was responsible for the adverse decision).

[6] *See, e.g., Villanueva v. Wellesley Coll.*, 930 F.2d 124, 131 (1st Cir. 1991) (comparisons with events six to eight years before are "simply not probative"); *Bryant v. Aiken Reg'l Med. Ctrs., Inc.,* 333 F.3d 536, 546 (4th Cir.2003) (comparator "was not hired until several months after [plaintiff] filed charges of racial discrimination"); *Epps v. First Energy Nuclear Operating Co.,* No. 11-462, 2013 WL 1216858, at *19 (W.D.Pa. Mar. 25, 2013) (disciplinary incident involving the comparator was too remote in time" from plaintiff's incident over four years later to raise a reasonable inference of discrimination"); *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).

discussed above, no reasonable jury could find that Rush's articulated reason for removing him -- his confrontational behavior with colleagues and bosses -- was pretextual.

## II.    SUMMARY JUDGMENT IS REQUIRED ON THE CONTRACT CLAIMS.

### A.    Summary judgment must be rendered on all surviving FEA claims.

The Court dismissed the claims that Rush violated Dr. Jokich's FEA by lowering his salary and putting him on leave. *Jokich,* at *7. Undisputed facts sink the remaining FEA claims.

### 1.    Rush needed no "Cause" to nonrenew the FEA.

Dr. Jokich's Complaint alleges that Rush could non-renew his FEA only for "Cause" as defined in the FEA. Ex. 60, ¶¶72-73. Since all employed Rush physicians have FEAs, the theory would imply that every employed physician is entitled to employment for life unless Rush could prove the "Cause" definition of the FEA. Comments from Dr. Jokich's counsel in depositions suggest that Dr. Jokich has abandoned this theory, but if he still maintains it, summary judgment must be rendered against it. The FEA's unambiguous language settles that "Cause" is required only for mid-term termination, not for nonrenewal. Rush so showed on the motion to dismiss (Docket No. 17, at 8-10). The Court did not disagree; it raised different FEA issues discussed in the next two sections. *Jokich,* at **6-7. Since the contract language gives an answer, "the inquiry is over." *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420 (7th Cir. 1998).

Even if extrinsic evidence were allowable about how the parties interpreted the FEA, both Rush and Dr. Jokich interpreted it as *not* requiring Cause for nonrenewal. Katherine Struck, who drafted the FEA, worded it to assure that it could be non-renewed at the end of any one-year term without Cause. Ex. 12, 128:2-9. Dr. Jokich admitted he knew the FEA was only a "one-year contract." That was why he negotiated letter agreements guaranteeing renewal of its one-year term for multiple-year periods. See above at 1-2; RS ¶¶4-6.

The fact that Rush needed no "Cause" to nonrenew Dr. Jokich's FEA makes any argument that his behavior did not justify ending his employment beside the point.

**2.     Dr. Jokich has no claim for failure to give notice of a change of his duties under FEA Exhibit A.**

On the Motion to Dismiss, the Court, held that accepting the allegations of the Complaint as true, Rush changed Dr. Jokich's duties as defined on FEA Exhibit A by removing him as Director of Breast Imaging, without giving the 60 days' notice required by FEA §7 to amend Exhibit A. *Jokich,* at *7. Since the Court's decision raised that issue *sua sponte,* Rush did not have the opportunity to point out that any violation of FEA §7 caused Dr. Jokich no damages, which are "a necessary element of a breach of contract claim." *Horizon Fed. Sav. Bank v. Selden Fox & Assocs.*, No. 85 C 9506, 1988 WL 70473, at *5 (N.D.Ill. June 30, 1988). Damages "should put the injured party in the same position he would have been in had the contract been performed." *IFC Credit Corp. v. Nuovo Pasta Co.*, No. 91 C 7978, 1993 WL 303118, at *2 (N.D.Ill. Aug. 9, 1993). Had Rush given 60-days' notice of intent to change the duties on Exhibit A to those of a nonsupervisory breast imager, it still would have put him on paid leave immediately, as the Court ruled it was entitled to do; would still have paid his unreduced salary for the 60-day notice period; and would still have then lowered the salary, as the Court ruled it could. *Jokich* at *7.[7]

---

[7] The "notice period damages" cases are instructive here. *See Royal's Reconditioning Corp. v. Royal*, 293 Ill. App. 3d 1019, 1024, 689 N.E.2d 237, 240 (1st Dist. 1997) ("to put plaintiff in the position he would have been in had defendant given the required amount of notice of termination, plaintiff's lost-profits damages should have been limited to the contractual notice period of 30 days"); *Student Transit Corp. v. Board of Education,* 76 Ill.App.3d 366, 370, 395 N.E.2d 69, 71 (1st Dist. 1979) (in contract with a 60-day notice period for termination, plaintiff entitled to damages only for the 60 days after notification); *Hentze v. Unverfehrt,* 237 Ill.App.3d 606, 612, 604 N.E.2d 536, 540 (5th Dist. 1992) (limiting damages to 60-day notice period). Here, because Rush did not lower Dr. Jokich's salary during the 60-day notice period, he has *no* damages.

**3.    Dr. Jokich has no claim for "termination" as opposed to "demotion."**

In ruling on the motion to dismiss, the Court seemed to find an ambiguity in what "termination" means in the FEA.  The Court thought "termination" might mean termination from his *position,* so that it was possible that Rush was "terminating" him rather than merely giving him a "demotion."  *Jokich,* at *6.  However, the Court then said:  "[S]ection 3.2 of the FEA contemplates 'the right to terminate this Agreement,' not the right to 'terminate' an employee from a particular position."  *Id.* at *6 n. 10.  The Court was right:  the FEA uses the word "terminate" only in connection with terminating the *agreement itself*.[8]

No one asserts that Rush or Dr. Jokich terminated or purported to terminate the FEA.  Dr. Jokich never terminated the FEA; doing so would have ended his right to keep getting salary.  Likewise, Rush *continued* the FEA when it removed Dr. Jokich from his position.  Even assuming (which Rush respectfully denies) that Rush violated FEA §7 by amending Exhibit A's duties without giving 60-days' notice, violating a contract provision is not terminating the contract.  In short, the only "termination" issue is whether the *FEA* was terminated.  It was not.  It continued till expiration and was then nonrenewed, for which no Cause was required.

Moreover, Dr. Jokich would have no damages for being "terminated" rather than "demoted."  His damages would be the difference between what Rush paid him and what it would have paid him had it "demoted" rather than "terminated" him.  As shown in the previous

---

[8] See FEA §6 ("[i]n the event *this Agreement* is not renewed or *is terminated* in accordance with Section 7…"); FEA §7 ("[i]f agreement is not reached within this time period, then either Party may *terminate the Agreement*" upon 15-days' written notice; Terms and Conditions  §3, caption ("Termination of  Faculty Agreement");  text ("[t]his *agreement may be terminated* as follows"), §3.1 ("*this Agreement may be terminated*  by mutual agreement…"); §3.2 ("Rush shall have the right *to terminate this Agreement* immediately [for Cause]"); §3.3 ("Faculty Member shall have the right to *terminate this Agreement*…"); §3.4 ( "Rush may *terminate this Agreement*…"); §3.5 ("upon *termination of this Agreement*…").  Ex. 65 (emphasis added in all cases).

section, if Rush had notified him on August 22, 2018 that 60 days hence, his Exhibit A would be amended to change his duties to nonsupervisory breast imager, and then had lowered his salary 60 days later because of that amendment, he would have been paid exactly what he was paid.

### 4. Dr. Jokich has no claim based on the Hospital Licensing Act clause.

Pursuant to 210 ILCS 85/10.8, Dr. Jokich's FEA requires that Rush "shall not unreasonably exercise control, direct, or interfere with [his] exercise and execution of his or her professional judgment in a manner that materially adversely affects [his] ability to provide quality care to patients." Ex. 63, p. B-2, §1.4. Dr. Jokich alleged that Rush violated this provision by keeping him from practicing, and alternatively by imposing conditions on his communications with patients while he was on his paid leave. Ex. 60, ¶¶78-90.

The Court dismissed these claims, with one exception: it thought that Dr. Jokich "likely does not have access to patients' medical files and other data which could impair his ability to exercise his clinical judgment when providing a diagnosis." *Jokich,* at *8. Dr. Jokich made no such contention. Docket No. 22. In fact, he *had* that access throughout his leave. RS ¶146. Moreover, the Protocol on communicating with patients while on leave provided that if they called Rush seeking to talk to him, Rush would take their number and send him a message to call them, and that he would advise Dr. Grabler of the substance of his contact with the patient. Docket No. 18, pp. App. 348-49. The Court upheld this provision, which assured that Rush would have a record of treatment Dr. Jokich rendered while on leave but still employed by Rush. *Jokich,* at *8. Dr. Jokich admits that Rush told him of 10 to 15 patients who wished to speak to him, that other patients had his cell phone number and called it, and that in all such cases, he *deliberately did not call the patients back*. RS ¶148; Ex. 4, 310:11-312:13. It is undisputed that he never contacted Dr. Grabler about any such patients, much complained he could not access

medical data about them. *Id.* Had he done so, she would have checked into his remote access or sent any needed records directly. RS ¶149. But rather than deal with a woman who, he insists, had "humiliated" him (see above at 7), he let his patients' inquiries go unanswered.

**B.      The Court should grant summary judgment on Dr. Jokich's claim based on the August 12, 2016 Letter.**

Dr. Jokich's Complaint asserts that the August 2016 Letter binds Rush, gave him at least a four-year term, and was breached when Rush ended his employment on June 30, 2019. Ex. 60, ¶¶55-70. On the motion to dismiss, the Court gave him the chance to show that Rush is barred from enforcing "the condition precedent that Dr. Jokich's compensation would have to be approved by the Compensation Committee." *Jokich* at *6. He cannot make this showing.

**1.      Dr. Jokich cannot prove implied waiver.**

His main theory to enforce the August 2016 letter is implied waiver. "Conditions precedent may be waived when a party to a contract intentionally relinquishes a known right either expressly or by conduct indicating that strict compliance with the conditions is not required … Such conduct might include continuing to accept the breaching party's performance and the benefits thereof after learning of the breach." *Jokich,* at *5, *quoting Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992). The Court is correct that such conduct *can* prove implied waiver. But Dr. Jokich faces a heavy burden. The conduct he invokes must prove Rush *actually intended* to waive the condition precedent (Comp Committee approval), because as the Court said, *any* waiver is the *intentional* relinquishment of a known right. Moreover, the conduct that shows that waiver must be "clear, unequivocal and decisive" (*Jokich,* at *5), and "inconsistent with any intention other than to waive [the right]." *Home Ins. Co. v. Cincinnati Ins. Co.,* 213 Ill.2d 307, 821 N.E.2d 269, 282 (2004).

Here the condition precedent is an approval the Board specifically withheld. The Board is Rush's governing body. Management could not overrule the Board's disapproval unless the Board said it could. *See Glass v. Kemper Corp.*, 949 F.Supp. 1341, 1352 (N.D.Ill. 1997), *aff'd*, 133 F.3d 999 (7th Cir. 1998) (refusing to enforce an employment contract for which board approval was required and was never obtained, so there "there was no contract for [defendant] to breach"); *Cora v. Rancilio Macchine Per Caffe*, No. 01 C 3613, 2003 WL 21654152 (N.D.Ill. July 14, 2003) at *4-6 (refusing to enforce company CEO's promise to make plaintiff CEO of a subsidiary, since the appointment was subject to board approval that was never obtained); *Southwest Forest Indus., Inc. v. Sharfstein*, 482 F.2d 915, 925-26 (7th Cir. 1972) (contract requiring board approval to renew was unenforceable when no approval was obtained).

It is undisputed that the Comp Committee never changed its October 21, 2016 decision to reject the August 2016 Letter, and that no member of the Committee, the Board, or management ever told Dr. Jokich that the Committee had changed or would change that decision. RS ¶30; Ex. 2, 246:11-20; Ex. 4, 155:11-156:5. This Board decision was no mere trifle that management could ignore if it pleased. Comp Committee approval of high-paid physicians' contracts is serious business, required by anti-kickback laws. Dr. Jokich *knew* Committee approval was serious business, since it had to approve his 2013 letter agreement. He knew it would have to approve the August 2016 Letter too, because the Letter said so. See above at 2-3.

In short, the only relevant intent to waive the condition precedent of Board approval of the August 2016 Letter is the *Board's* intent. It had no such intent. It never reconsidered its rejection of the August 2016 Letter or authorized management to ignore that rejection.

Lacking evidence that the Board intended to waive the condition precedent, Dr. Jokich falls back on evidence of what *management* did and did not do. He cites the fact that after he

signed the August 2016 Letter, Rush did three things required by that Letter: it paid him his base salary; it gave him and the other physicians in his Division certain enhanced fringe benefits; and it paid him a 10% bonus in October 2017 for his work during FY 2016 (July 1, 2016 to June 30, 2017). Ex. 4, 160:9-165:17. No reasonable jury could find that these actions provide "clear, decisive and unequivocal" evidence of the Board's intent to reverse its previous rejection of the August 2016 Letter, or show these actions were inconsistent with any other intention. Instead, all three actions were entirely consistent with the August 2016 Letter never becoming effective.

*Continued payment of Dr. Jokich's base salary.* Such payment proves nothing about whether Rush intended to be bound by the August 2016 Letter, because it was independently required by his underlying FEA. See above at 2; RS ¶¶4, 5.

*Continued enhanced fringe benefits for him and his Division physicians.* These benefits consisted of more vacation and continuing medical education time, and greater allowance for dues and continuing education, than the standard benefit for employed Rush physicians. RS ¶33. Dr. Jokich negotiated these enhanced benefits for himself and his group when he returned to Rush in 2001, and they have been continuously afforded ever since. RS ¶¶33-34. Those enhanced benefits were never specified in his underlying faculty employment agreements (including the FEA he signed in 2012). The first additional letter agreement to mention them was the one he signed in 2007. RS ¶33; Ex. 67, ¶4; Ex. 68, p. 1.

Even after this benefit began being specified in his letter agreements, Rush continued them in periods when no letter agreement was in effect. The first such period began on June 30, 2013, when the letter agreement he signed in 2007 and extended in 2009 expired by its own terms. RS ¶32. For the next seven months, Dr. Jokich haggled with management on a new letter agreement. RS ¶32; Ex. 101. During that negotiation, Rush's Dean informed him in writing that

in the absence of a letter agreement, his only contract with Rush was his underlying FEA. Ex. 101. After unsuccessfully holding out for more than Rush was offering him, Dr. Jokich signed a new letter agreement on January 24, 2014. RS ¶32; Ex. 68. Thus, for nearly seven months, Dr. Jokich's only agreement with Rush was his FEA. Yet Rush continued during that period to afford him and his Division physicians their enhanced benefits. Another such period began June 30, 2019, when Dr. Jokich's Rush employment ended. Since then, as this lawsuit attests, Rush has taken the position that no contract whatsoever exists between it and Dr. Jokich. Yet Rush has continued to pay the remaining physicians in his Division enhanced fringe benefits. RS ¶35.

In short, Rush was free to pay and did pay Dr. Jokich and his Division physicians these enhanced fringe benefits even when no agreement with Dr. Jokich required it to do so, and it still pays Division physicians these benefits. These enhanced benefits are prevalent nationwide for breast imagers. Wholly aside from any agreement with Dr. Jokich, failure to pay them would have made it difficult for Rush to recruit or retain such imagers. Ex. 98, ¶2. This explains in particular why Rush paid the benefits throughout FY 2017 (July 1, 2016 through June 30, 2017), as well as thereafter. Even though management knew that the Comp Committee had rejected the August 2016 Letter, nothing required management to court problems by cutting off enhanced benefits it had been paying the Division physicians for years.

*Payment of bonus for FY 2016.* Dr. Jokich was paid (in October 2017) his bonus for FY 2017 (the year from July 1, 2016 through June 30, 2017), but the reason had nothing to do with Rush management thinking that the August 2016 Letter was in effect. The reason was that Rush's Dean, Dr. Krishnan, thought that the *amended* letter agreement, which the Comp Committee had approved on June 14, 2017, was in effect. As discussed above at 4, an employee in the Dean's office sent Dr. Jokich the amendment on June 26, 2017 to sign and return. He

admits he found it unacceptable and did not sign or return it, but just "sat on it."  RS ¶29.  He

told no one he had not returned a signed agreement.  Dr. Krishnan learned that fact only in 2018

when Rush and its counsel were investigating Rush's relevant contractual obligations.  RS ¶29;

Ex. 93, ¶5; Ex. 11, 22:8-24.  Dr. Krishnan signed off on a FY 2016 bonus in fall 2017 thinking it

was due under the Committee-approved amendment.  Ex. 93, ¶5.  After he and other Rush

leaders realized that Dr. Jokich had not accepted the amendment, they declined to award Dr.

Jokich bonuses for FY 2018 or FY 2019.  RS ¶89.

### 2. Dr. Jokich cannot use estoppel or the covenant of good faith to prevent enforcement of the condition precedent.

The Court's ruling on the motion to dismiss left Dr. Jokich a sliver of hope to use

estoppel or the covenant of good faith to enforce the August 2016 Letter.  The Court did so

because it thought the Complaint left it unclear whether "Rush was "operating under the FEA

while it sought Compensation Committee approval." *Jokich* at *6 n. 9 (emphasis added).  The

discovery record now shows indisputably that Rush *was always* operating under the FEA, both

during the periods when a letter agreement was in effect and in periods when a letter agreement

had expired and no successor letter agreement had yet been reached.  This was true as a matter of

law (from the terms of the FEA and the letter agreements), and as discussed above, Rush

reminded Dr. Jokich during negotiations in 2013-14 that in the absence of signing, his only

agreement with Rush was his FEA.  Ex. 101.

More generally, the undisputed facts show that Dr. Jokich fails all three elements of

estoppel: (1) a misrepresentation; (2) reasonable reliance on that misrepresentation; and (3)

detriment.  *Fed. Deposit Ins. Corp. v. Rayman,* 117 F.3d 994, 1000 (7th Cir. 1997).

*Misrepresentation.*  Dr. Jokich admits no one ever said the condition precedent of Board

approval would be waived.  RS ¶24.

*Reasonable reliance.* Even if he believed that management intended to treat the Board's disapproval of the August 2016 Letter as a nullity, that belief would have been unreasonable as a matter of law, because the tail does not wag the dog. In *Glass v. Kemper Corp., supra,* because the plaintiff was told in writing that the employment terms would require board approval, it was *per se* unreasonable for him to believe that a manager "had ultimate authority to enter into a binding employment agreement with him." 949 F.Supp. at 1349-50. This is the rule everywhere. "When a third party has notice that approval by the corporation's board of directors is requisite to bind the corporation to a transaction of a particular type, it is not reasonable for the third party to believe that the president or chief executive officer (CEO) may bind the corporation through unilateral action." Restatement (Third) of Agency §3.03 cmt. e (2006).

*Detriment.* Dr. Jokich has never suggested that anything Rush did or did not do about the August 2016 Agreement made him do anything different than he did. He in fact has only himself to blame for losing a four-year agreement. He could have accepted the amendment of June 2017 that the Board approved. However, he rejected it. There is little doubt about why he did. He knew his own productivity was low, and he was uneasy about whether he would be able to meet the amendment's productivity metric, a metric the Board had insisted on.

### 3. The draft termination letter from Rush's counsel creates no issue of fact on the enforceability of the August 2016 Letter.

Dr. Jokich has concocted an argument about the August 2016 Letter based on a draft termination letter that Rush never sent to him. In May 2018, Rush retained George Galland to advise how Dr. Jokich should be terminated. On June 6, 2018, Mr. Galland drafted a proposed termination letter. Ex. 104. The draft letter discussed whether Rush was obligated to renew his FEA based on the August 2016 Letter. The letter was labeled "DRAFT -- June 6, 2018 PRIVILEGED AND CONFIDENTIAL -- ATTORNEY-CLIENT PRIVILEGE DOCUMENT"

and indicated that it was meant for the "LETTERHEAD OF DEAN KRISHNAN." *Id.*, p. 1. It was sent to Rush's leadership for consideration on June 6, 2018, but was never sent to Dr. Jokich. *Jokich v. Rush Univ. Med. Ctr.*, No. 18 C 7885, 2020 WL 154895, at *1 (N.D.Ill. Apr. 1, 2020) (Jantz, M.J.) (hereafter *Jokich II*). The draft letter reflected no awareness that the Comp Committee had disapproved the August 2016 Letter and that Dr. Jokich had rejected an amendment to the Letter. The termination letter actually given to Dr. Jokich on August 22, 2018 (Ex. 60, Ex. D, p. 2) was entirely different. It made clear that the August 2016 Letter never became binding, and why not. *Id.*

The draft letter cannot stave off summary judgment on the August 2016 Letter claim. The assumptions in that letter do not change the undisputed facts of what the Comp Committee, Rush management, and Dr. Jokich *did*. Because of those facts, the August 2016 Letter never became binding on Rush, no matter what Rush's counsel may have thought early in his engagement. Since Dr. Jokich first saw that draft letter long after his employment ended, it did not induce him to do anything, he has no argument that the letter affected his behavior or gave him any expectation about the enforceability of the August 2016 Letter.[9]

More generally, the draft letter is inadmissible. Dr. Jokich seems to think that because it was written by Rush's attorney and was disclosed in discovery, it is admissible under Federal Rule of Evidence 801(d) as an "opposing party's statement." The assumption is wrong. The Seventh Circuit has held that "[a]n attorney *may be* the agent of his client for purposes of Rule

---

[9] Judge Jantz described how this otherwise privileged draft was turned over to Dr. Jokich in discovery. Rush retained Tom Johnson in June 2018 to investigate, on an attorney-client-privileged basis, Dr. Jokich's belated allegations that Rush was discriminating against various people. Rush gave Mr. Johnson the draft letter as background information. When Dr. Jokich later sued Rush, Rush waived the privilege as to Mr. Johnson's report and used it in opposition to Dr. Jokich's unsuccessful motion for a TRO. When Dr. Jokich later requested documents relating to Mr. Johnson's investigation, Rush produced the draft June 6 letter, since it had given it to Mr. Johnson. *Jokich II*, at **1-2. In denying Dr. Jokich's second motion to compel, Judge Jantz held that Rush had not effectuated a "subject matter waiver" by giving Mr. Johnson the draft letter or turning it over in discovery. *Id.* at **2-5.

801(d)(2)(D)." *U. S. v. Harris*, 914 F.2d 927, 930-31 (7th Cir. 1990) (original emphasis).  But

*Harris* warned that "the unique nature of the attorney-client relationship…demands that a trial

court exercise caution in admitting statements that are the product of this relationship."  *Id.* at

931.  It warned that "'the free use of prior [statements] may deter counsel from vigorous and

legitimate advocacy'" and hence "a more exacting standard must be demanded for admission of

statements by attorneys under Rule 801(d)(2)(D)."  *Id.* (citation omitted).  In *U.S. v. Sanders*, 979

F.2d 87 (7th Cir. 1992), the Seventh Circuit "caution[ed] the government that it should only offer

this sort of evidence in rare cases and where absolutely necessary, in order to avoid impairing the

attorney/client relationship, chilling full disclosure by a defendant to his lawyer, and deterring

defense counsel from vigorous and legitimate advocacy."  979 F.2d at 92.

  *Harris* and *Sanders* admitted attorney statements to non-client third parties, where the

attorney knew that the statement would go to them and would be read as the position of the

client.  Different considerations are at play in a *draft* letter, sent confidentially to the client to see

whether the attorney's understanding of the matter is accurate and his proposed presentation of

the client's position is acceptable.  In *Candle Corp. v. Boole & Babbage, Inc*., 1985 WL 1087794

(C.D.Cal. Aug. 2, 1985), the court denied admission under Rule 801(d) of an unsigned draft

complaint and a letter from the drafter asking for comments.  *Id.* at **5-6.  The court noted that

"the trustworthiness of an unsigned draft of a complaint which was not approved is especially

troublesome" and that "the statement made in the draft complaint, viewed in conjunction with

counsel's unanswered request for the client's review for accuracy, raises a substantial question

about whether it was within the scope of the agent's authority for purposes of exemption from

the hearsay rule."  *Id.* at *6.

The present case is indistinguishable from *Candle Corp.* There is no evidence that Rush signed off on the draft letter; to the contrary, the termination letter which Dr. DeCresce (not Dr. Krishnan, the proposed sender of the draft letter) sent to Dr. Jokich two months later reflected a different understanding of the facts and whether the August 2016 letter had taken effect. It is irrelevant that Dr. Jokich obtained the draft letter in discovery, just as it was irrelevant that the other side got hold of the draft complaint in *Candle Corp.* Here, as in *Candle Corp.*, an attorney's impressions of a case, formed shortly after his or her retention, are just that: impressions. They may be formed when key persons have not yet been talked to, or reflect misunderstandings by the attorney. This is why attorneys first ask clients to review proposed communications to an adversary, as counsel did here.

In sum, the Court should grant summary judgment on the claim that the August 2016 Letter guaranteed Dr. Jokich at least a four-year term, because the Letter never took effect.

Similarly, summary judgment must be rendered against his claim for two annual bonuses (Ex. 60, Count VI). That claim is based solely on the August 2016 Letter. Ex. 60, ¶¶146-54. Since the Letter never went into effect, the bonus claim fails.

**C.      Summary judgment is required on the remaining Bylaws claim.**

The Court dismissed Dr. Jokich's main claim under the Bylaws -- that Rush had revoked his staff privileges, thereby requiring compliance with the Bylaws' procedures for staff privilege proceedings. *Jokich* at **9-11. His remaining Bylaws claim was that Rush violated §10.3-2(c), entitled "term of office," which provides: "A division...director shall be appointed and shall serve solely at the discretion of the Department Chairperson." The Court declined to dismiss this claim because there were "no allegations in the complaint related to whether Dr. Byrd opposed

the removal of Dr. Jokich from his director position or who Dr. Jokich reported to in that

position." *Jokich,* at *11 (emphasis added). The discovery record has now supplied these facts:

- Rush is a "matrix" organization in which a person may report to more than one person. RS ¶129; Ex. 2, 66:11-17. Heads of divisions which do cancer care would have reporting relationships both to the Rush Cancer Center and its director, as well as to a department head. *Id.*

- The Breast Imaging Division was in the Department of Diagnostic Radiology. That Department's Chair, Dr. Byrd, annually evaluated radiologists in her Department, including Dr. Jokich and the breast imagers. RS ¶131. Other than these reviews, Dr. Byrd had no regular contact with Dr. Jokich or breast imagers. RS ¶¶132-33; Ex. 9, 24:24-25:21, 63:3-7, 137:4-7. According to her, the administrative line for Dr. Jokich's division reports "mainly to the dean and who he's set up as their administrative line." She knew Dr. Krishnan had put Dr. DeCresce in charge of that line. RS ¶134; Ex. 9, 36:18-23.138:16-19.

- Dr. Byrd was on vacation when Dr. DeCresce removed Dr. Jokich and put him on leave. When she returned, Dr. DeCresce called her and told her what he had done. She raised no objection. RS ¶136; Ex. 9, 136:14-141:3, 147:11-152:14, 152:22-153.9; Ex. 6, 220:3-20. Dr. Jokich admits he has no evidence that Dr. Byrd objected to his removal. RS ¶137; Ex. 4, 175:7-11.

- She had not *expected* to be consulted about the removal: "You have to understand that I was not really directly involved in that administrative line and what was going on. I had a different role, and so the actual decision making or whatever came through that administrative line, and then they hired someone.… [I]t was not like I was really overseeing and people were talking to me about what was going on in the breast imaging." RS ¶139; Ex. 9, 161:4-16.

- Dr. Krishnan supervised clinical Department Chairs, including Dr. Byrd. He approved Dr. DeCresce's decision to remove Dr. Jokich. See above at 7. He never received any disagreement from Dr. Byrd over the removal of Dr. Jokich. Had she disagreed, he would have ordered her to remove him. RS ¶144-145.

Given these undisputed facts, Dr. Jokich asserts that §10.3-2(c) was violated simply

because Dr. Byrd was not involved in the decision, even though (1) she never had supervisory

authority over Dr. Jokich as Division Director and had never been involved in how he ran his

Division; (2) her boss, Dr. Krishnan, had assigned Dr. Jokich to be supervised by Dr. DeCresce;

(3) she did not object to the removal and did not expect to be consulted about it; and (4) Dr.

Krishnan and his boss, Dr. Goodman, supported the removal and would have ordered Dr. Byrd to fall in line had she resisted. Contracts should not be interpreted to produce such "absurd results." *Beanstalk Grp., Inc. v. AM Gen. Corp.*, 283 F.3d 856, 860 (7th Cir. 2002). The manifest purpose of §10.3-2(c) is to tell Division Directors that they have no tenure -- that they "serve solely at the discretion" of their superiors. Dr. Jokich's interpretation of the provision would turn standard institutional governance upside down.

## <u>CONCLUSION</u>

Rush respectfully requests the Court to grant it summary judgment on all claims the Court did not previously dismiss.

Respectfully submitted,

/s/ George F. Galland, Jr.
George F. Galland, Jr.
One of the Attorneys for Defendant

George F. Galland, Jr.
ggalland@lawmbg.com
Benjamin Blustein
bblustein@lawmbg.com
Matthew Owens
mowens@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

<u>CERTIFICATE OF SERVICE</u>

       Lisa Mecca Davis certifies that she caused a copy of the foregoing Memorandum to be served upon all counsel of record, by this Court's electronic-filing system, this 13th day of May, 2020.


                        /s/ Lisa Mecca Davis
                        Lisa Mecca Davis