IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PETER JOKICH, M.D., FSBI, FACR, | ) | |
| | ) | |
| Plaintiff, | ) | No. 18-cv-7885 |
| | ) | |
| v. | ) | The Honorable Joan H. Lefkow |
| | ) | |
| RUSH UNIVERSITY MEDICAL CENTER, | ) | Magistrate Judge Beth W. Jantz |
| | ) | |
| Defendant. | ) | |

## RUSH'S LOCAL RULE 56.1(a) STATEMENT

Pursuant to Local Rule 56.1(a), Rush, in support of its Motion for Summary Judgment, submits this statement of material facts as to which there is no dispute.  It cites to numbered exhibits (cited "Ex. __") submitted herewith.

**I.      UNDISPUTED FACTS ON THE PARTIES AND JURISDICTION.**

1.      Plaintiff Peter Jokich is a physician specializing in breast imaging.  He worked at Rush between 1989 and 1999, spent two years at the University of Chicago, and returned to Rush in 2001 as section head of mammography and Associate Professor of Radiology Ex. 4, 350:13-351:24, 355:11-356:6, 364:13-17.  By 2017, his title was Director of the Division of Breast Imaging, which had eight full-time breast imaging physicians in addition to him.  Ex. 97.  He considered himself a member of medical leadership at Rush, because he was a division director, and participated in the monthly medical directors council meetings where all the physician leaders at Rush got together.  Ex. 4, 440:1-12.

2.      Defendant Rush University Medical Center ("Rush") is an Illinois not-for-profit corporation and an academic medical center.  Ex. 2, 22:20-23:3, 95-24-96:24.  The Board of

Trustees is the governing body of Rush.  Ex. 2, 246:24; Ex. 4, 85:18-86:1.  Management persons

who dealt with Dr. Jokich on behalf of Rush include, among others:

- Larry J. Goodman, M.D., at the time CEO of Rush and President of Rush University, reporting to Rush's Board (Ex. 2,  46:11-47:16, 59:6-7, 63:20-21);

- Thomas Deutsch, M.D.,  Dean of Rush Medical College from 2002 through October 2015, reporting to Dr. Goodman (Ex. 3, 5:12-18);

- Ranga Krishnan, M.D., the Dean from October 2015 through early 2019, reporting to Dr. Goodman (Ex. 2, 103:9-21);

- Michael Dandorph, President and Chief Operating Office, reporting to Dr. Goodman (*Id.* 64:23-65:12);

- Mary Ellen Schopp, Senior Vice President and Chief Human Resources Officer, reporting to Mr. Dandorph (Ex. 5, 15:4-13, 30:20-23);

- Robert DeCresce, M.D., then Acting Director of the Rush University Cancer Center, reporting to the Dean, Dr. Krishnan (Ex. 2, 120:9-122:2);

- Sharon Byrd, M.D. Chair of the Department of Diagnostic Radiology and Nuclear Medicine, reporting to the Dean (Ex. 9, 26:18-27, 39:19-20);

- Antonio ("Tony") Bianco, until August 2017 the President of Rush University Medical Group, the practice group of employed Rush physicians (Ex. 4, 97:16-23);

- Katharine Struck, Deputy General Counsel until July 2017, afterwards Vice President for Integrated Solutions and Optimization and reporting to the Dean (Ex. 12, 5:16-7:18, 6:6-9:2).

3.      Dr. Jokich filed a charge with the EEOC alleging unlawful retaliation under the

ADEA and Title VII on October 22, 2018, less than 300 days after he was notified on August 20,

2018 that he was being removed from his position, and the EEOC subsequently issued a right to

sue letter.  Answer to First Amended Complaint, ¶10.

II.   **UNDISPUTED FACTS RELATING TO DR. JOKICH'S CLAIM THAT
      RUSH IS BOUND BY THE LETTER AGREEMENT OF AUGUST 12, 2016.**

   A.   **Dr. Jokich's Faculty Employment Agreement
        (FEA) and his multiyear agreements.**

4.     At all times during his employment by Rush, Dr. Jokich had an underlying

standard employment agreement with a one year term.  Between 2001 and 2012, this underlying

agreement was called a "Faculty Effort Allocation and Compensation Agreement" (FEACA);

like all faculty members, he had to execute a new FEACA every year.  All such agreements had

an exhibit specifying his base salary. In all of them, he inserted a provision that in the event of

conflict between its provisions and those of whatever letter agreement he had at the time (see

below, ¶6), the provisions of the letter agreement would control.  Ex. 42, 66, 100, 101, 102; Ex.

3, 31:23-32:15.

5.     In 2012, Rush introduced a new form of "Faculty Employment Agreement"

(FEA).  Dr. Jokich signed his FEA, on June 18, 2012.  It did not have to be replaced every year,

since it provided one-year terms which renewed each year unless either party gave 120 days

advance written notice.  Neither Rush nor Dr. Jokich gave such notice until Rush did so on

August 22, 2018.  Ex. 4, 150:22-151:10; Ex. 4 and Exhibit 4 thereto.  His FEA had an exhibit

specifying his base salary.  It had no provision providing him or the physicians in his Division

enhanced benefits (see below, ¶7).  Ex. 63.

6.     Dr. Jokich disapproved of the fact that these underlying faculty employment

agreements provided only one-year terms.  Ex. 4, 162-10-19; Ex. 13, 90:19-91:1; Ex. 64, p. 2.  In

2001, 2007, and 2013-14, he negotiated separate letter agreements providing multi-year terms.

Ex. 65, 67, 68.  He inserted a handwritten provision in his 2012 FEA specifying that in the event

of conflict between the FEA and the letter agreement in effect at the time, the latter would control. Ex. 63, p. B-7.

7.      The 2012 FEA specified only Dr. Jokich's base compensation; it did not speak to the issue of what, if any, bonus he would receive. Ex. 63, Ex. B. Nor did his FEA specify that members of the Breast Imaging Division would receive enhanced fringe benefits over what Rush faculty members generally received. *Id.*

**B.      Compensation Committee review of physician contracts at Rush.**

8.      Rush's Board of Trustees conducts business through roughly a dozen standing committees, including the Compensation and Human Resources Committee ("the Comp Committee"). Ex. 2, 91:23-92:16. The Comp Committee reviews contracts for highly paid physicians, using Sullivan, Cotter & Associates to advise it. Ex. 14, 6:15-7:6; Ex. 70, 71. According to Sullivan Cotter, a body of law referred to as "Stark" or "Anti-Kickback" provides that relationships between tax-exempt institutions and physicians must be fair market value and commercially reasonable. If not, the institution can incur treble-damage penalties. Ex. 14, 10:9-11:1.

9.      Sullivan Cotter uses a three-step test to judge if compensation is fair market value. Ex. 14, 13:22-14:4. First, if proposed compensation for a physician within his or her specialty is at the 75th percentile or below by national standards, it will opine that absent unusual circumstances, that compensation is fair market value. *Id.* 14:17-23. Second, if the compensation is above the 75th percentile, there must be a strong relationship between pay and the physician's clinical productivity. *Id.* 15:4-15. Third, if the physician's compensation fails the first or second tests, Sullivan Cotter offers no fair market value opinion, and tells Rush it

4

must present "business judgment factors" and let the Board decide whether the proposed compensation is a sound business judgment. *Id.* 15:16-16:11.

10. Because of these rules, Rush management's policy is that any proposed contract whose compensation is over the 75th percentile can be submitted to the Comp Committee for approval, while anything over the 90th percentile must be submitted to it. Ex. 11, 31:2-12.

11. Sullivan Cotter uses "Work Relative Value Units" (RVUs) to measure productivity. It considers this metric the "industry standard." *Id.* 20:15-21:4, 22:8-19. Many physicians, including Dr. Jokich, dislike being measured by RVUs, but their use is deeply embedded at Rush and other hospitals. Ex. 6, 116:9-117:8, Ex. 16, ¶11.

12. Rush tracks RVUs of its employed physicians and uses them to determine significant parts of their compensation and to judge their performance. Rush also assigns each a "Full Time Equivalent" percentage (FTE), the percentage of full time the physician is supposedly spending treating patients. Ex. 16, ¶11. Other things being equal, a lower FTE would lead to a lower expectation on what number of RVUs is expected from a given clinician. *Id.*

**C. In 2013, the Comp Committee, with Dr. Jokich's knowledge, considers and approves his proposed three-year letter agreement.**

13. In 2013, the Comp Committee considered a proposed letter agreement for Dr. Jokich. Sullivan Cotter advised the Committee that the agreement's total potential compensation exceeded the 95th percentile for persons in his specialty, that Dr. Jokich's productivity by national standards was less than the 10th percentile, and that the Committee should therefore review the business factors submitted by management to justify the agreement. Ex. 70, pp. 2-3; Ex. 14, 39:19-40:12.

14. At the Committee's meeting of June 27, 2013, management argued that special business factors justified the proposed agreement, and the Committee approved it. Ex. 72. Dr.

Deutsch sent Dr. Jokich a slightly revised version, saying it had not changed "the base compensation that as you know was approved by the Board because it benchmarks above the 90th percentile." Ex. 4, 89:22-91:24; Ex. 73. The three-year letter agreement which Dr. Jokich signed likewise said, "As you are aware, your total achievable compensation benchmarks above the 90th percentile and has been approved by the board." Ex. 4, 92:4-93:6, 95:1-96:12; Ex. 74.

> **D.** **Dr. Jokich and Dr. Krishnan sign a new proposed multiyear letter agreement on August 12, 2016, expressly conditioned on subsequent approval by the Comp Committee.**

15. In January 2016, Dr. Krishnan sent Dr. Jokich a proposed two-year letter agreement which stated that its proposed compensation arrangement "will have to be approved by the Compensation Committee of the Board of Trustees." Ex. 76. According to Dr. Jokich, Dr. Krishnan showed him a document specifying his total compensation, told him of the internal requirement that total compensation reaching the 90th percentile required Comp Committee approval, and said that although Dr. Jokich's new contract didn't reach that level, it would be "probably a good idea" to get his contract approved by the Board, because "Even people at the 70th and 80th percentile, the OIG [Office of Inspector General] is becoming very concerned about these things, and so Rush is starting to pay attention to these things." Ex. 4, 88:10-89:18.

16. On August 12, 2016, Dr. Krishnan and Dr. Jokich signed a letter agreement keeping him as Director of Breast Imaging through at least June 30, 2020. It contained the January proposal's sentence about approval by the Compensation Committee of the Board of Trustees. Ex. 77, p. 1; Ex. 4, 105:12-107:1.

> **E.** **The Committee rejects the proposed August 12, 2016 letter and requires it to be renegotiated to include a productivity metric.**

17. Management submitted the August 12, 2016 letter agreement to the Comp Committee for approval at its meeting of October 21, 2016. Sullivan Cotter advised the

Committee that Dr. Jokich's proposed total compensation "exceeds Sullivan Cotter's FMV guidelines." It reported that total compensation "approximates the 90th percentile of the market, and pay for administrative and clinical services approximates the market's 95th and 82nd percentiles, respectively," and that using a 0.80 FTE figure for Dr. Jokich, his productivity was below the 10th percentile. Ex. 14, 39:19-40:12; Ex. 78. It therefore advised that "strong business judgment factors should be identified" to justify such high clinical compensation not supported by productivity. Ex. 14, 44:15-45:4, 54:23-55:18; Ex. 78.

18. On October 21, 2016, the Comp Committee refused to approve the agreement, asking management to develop and embed pre-determined metrics in Dr. Jokich's contract and to review them with the Committee in 2017. Ex. 78, p. 4; Ex. 12, 52:18-53:1, 53:10-21; Ex. 11, 41:22-43:13; Ex. 70.

**F. Rush management negotiates with Dr. Jokich on an amended offer letter; he repeatedly acknowledges the need to satisfy the Comp Committee.**

19. Immediately after the Comp Committee rejected the August 12, 2016 letter agreement, Dr. Krishnan instructed Dr. Bianco, Ms. Schopp, and Ms. Struck to construct "clear deliverables for Jokich and his group." Ex. 12. 9:22-10:8, 11:5-7; Ex. 79. On December 6, 2016, Megan Butler, a Rush Human Resources employee (Ex. 12, 46:9-12), sent Dr. Bianco and Ms. Struck materials from the Comp Committee meeting and said "predetermined plan and growth objectives (quantitative in nature)" were needed for an "amended offer letter" to be reported back to the Committee, which would meet in March, June, September and October 2017. Ex. 80. On February 7, 2017, Dr. Krishnan told Dr. Bianco and Ms. Struck to "help get the final deliverables lined up for Peter Jokich as requested by the board." Ex. 81.

20. In email correspondence between March 20 and March 26, 2017, Dr. Jokich, Dr. Bianco, and Ms. Struck repeatedly referred to the Comp Committee and the need to get its

approval for his agreement. Thus, on March 20, 2017, Dr. Bianco proposed a non-RVU productivity metric in anticipation of meeting the following week "to discuss your contract and general productivity of the group." Ex. 83. On March 21, 2017, he told Dr. Jokich, "As you know, we are working on developing these [productivity] metrics as requested by the compensation committee of the board." *Id.*

21.     On March 21, 2017, Dr. Jokich emailed Ms. Struck and Dr. Bianco, suggesting that Rush should make him "vice-president of breast imaging or of the breast cancer service line to justify my administrative time and innumerable meetings of the comp committee of the Board…. It's only a title, which you could use to benchmark and justify the salary." Ex. 84. He proposed making him a department chair "so that there are no more comps and no compliance issues," a proposal Ms. Struck told him "wouldn't help from a comp perspective" or "eliminate the comp analysis." *Id.* On March 26, 2017, in an email to Ms. Struck, he said, "Please let me know if you need anything else to give to the compensation committee of the Board. I would be happy to appear before them myself if that would be helpful, so that I could answer any questions." Ex. 85. In another email of that date to Ms. Struck, he suggested giving up some of his bonus to "drop my total compensation below the 90th percentile, so that we don't have to worry about all of this potential legal nonsense in regards to my contract?" Ex. 86. Ms. Struck replied that in the "amended offer letter" they would "need to address productivity." Ex. 87. In his next email to Ms. Struck of March 26, 2017, Dr. Jokich stated, "What does my group's vacation and dues/CME dollars have to do with the comp committees' charge to you and Ranga [Krishnan]?"and "I think that you need to figure out some lawyerly way to satisfy the comp committees' request." Ex. 88, p. 1.

22.     On April 9, 2017, COO Michael Dandorph asked where things stood with Dr. Jokich's contract.  Dr. Bianco replied, attaching a proposed amended offer letter for Dr. Jokich that needed to be discussed with Dr. Krishnan before being given to Dr. Jokich.  Dr. Bianco said that Dr. Jokich had disputed RVUs as benchmarks for productivity; that in response, Dr. Bianco had developed a different system to measure productivity; that even by that system, Dr. Jokich remained the least productive of the breast imagers; and that Dr. Jokich disputed Dr. Bianco's FTE percentage of 80%.  Dr. Bianco asserted that "I do believe we compromised as much as we possibly can." Ex. 89.

23.     On April 19, 2017, after further discussions within management, Dr. Krishnan authorized Dr. Bianco to send to Dr. Jokich an amended offer letter, which Dr. Bianco emailed to Dr. Jokich the following day, April 20, 2017.  Ex. 90, 91.  The letter read:

> Dr. Jokich:
>
> In accordance with Rush's Physician Compensation Policy, the Compensation Committee of the Board of Trustees reviewed the compensation and incentive arrangement outlined in my letter to you dated August 12, 2016 (the "Initial Offer Letter"). I presented the business rationale for the proposed compensation structure to the Committee and there was extensive dialogue surrounding the potential risk of contract extension without established pre-determined metrics that you must maintain to receive the proposed compensation. In short, the Committee decided that we must establish a pre-determined plan and growth objectives that are quantitative in nature and that will be reported back to the Committee at their June meeting. The Committee will need to approve this plan before we are able to finalize it and will mandate that your performance under the plan be tied to your annual compensation.  Taking the Committee's specific recommendations into account, I have been working with Dr. Bianco to develop the following plan:
>
> > •     Your productivity must be at least at 95% of the mean for your Division during Fiscal Years 2017-2020 in order to be eligible for incentive compensation for those years, which will be calculated based on your clinical 0.80 FTE. You had the opportunity to analyze and modify the metric to be utilized (described below), which takes into consideration the total number of clinical readings and the time dedicated

to each reading modality. Failure to meet the productivity goal during Fiscal Years 2018-2020 will trigger automatic review of your base salary, which will be subject renegotiation upon renewal in Fiscal Years 2021-22.

- It is expected that you will provide oversight of the operational processes that involve quality and safety of the studies performed. Dr. Bianco will work with you to provide suitable administrative and operational support.

- It is expected that you will work with Dr. Bianco and other leaders to support the development and implementation of breast imaging units at RUMG's ambulatory sites.

- It is expected that you will identify your successor by the end of CY2018. Once we agree on your successor, you will be responsible for mentoring this individual in collaboration with Dr. Bianco to make sure he/she is supportive of the institution's strategic plan for the Division of Breast Imaging and able to execute on it. You will also need to develop a transition plan by the end of FY19.

These metrics will be added to the defined goals for fiscal years 17-20 on page two of the Initial Offer Letter, and you will continue to be responsible for completion of a long-term (five year) strategic plan for the Division of Breast Imaging in FY17, and meeting the volume, quality, operational, programmatic and/or financial goals in the long-term strategic plan in subsequent years.

There are also changes to the benefits your faculty will receive for vacation and CAME support as described on page two of the Initial Offer Letter. Faculty members will receive the benefits as described on page two of the Initial Offer Letter in FY17; however, to preserve consistency across the medical group and all the other medical specialties, they will receive the standard Rush faculty benefit package for the following fiscal years they are employed at Rush. The standard Rush faculty package includes 26 vacation days and 6 holidays, in addition to 90 consecutive sick days. It also includes the standard health insurance, a cash balance pension plan, and life insurance as described in the 2017 Benefits Guide. Section of Breast Imaging faculty will receive $4,000 annually for professional expenses, such as travel, books, societal dues, etc. In addition, the Department will pay faculty members' Medical Staff membership dues and their malpractice insurance will be provided at the level equivalent to their clinical practice.

Productivity for you and your group will be assessed annually by totaling the number of hours of direct clinical activity according to the following schedule:

Screening = 10 min
Diagnostic = 30 min
USG = 20 min at RUMC; 10 min ROPH
Stereotaxic = 90 min
USG guided biopsy = 60 min
Localization = 60 min
MRI = 60 min
MRI biopsy = 120 min
IOE = 60 min
Comparisons = 10 min
Tech repeats = 15 min

Pete, you and your group continue to be incredibly valuable to the success of Rush University Medical Center and are highly appreciated. These changes are being made pursuant to the recommendations of Rush's Compensation Committee, which must approve compensation exceeding the 90th percentile of blended market data. I hope that you can appreciate this process which serves to protect the institution from regulatory risk.

Please indicate acceptance of this letter as an amendment to the Initial Offer Letter by signing below.

Sincerely,

Ranga Krishnan, MB, ChB
Dean, Rush Medical College

Read and Accepted:

Peter M. Jokich, M.D. (date)

Ex. 90.

24.     On April 20, 2017, after receiving the proposed amended offer letter, Dr. Jokich wrote Dr. Krishnan (copying Dr. Goodman), stating that "The amended offer is unacceptable to me and is insulting and disrespectful to me and to all of the senior breast imaging physicians in the group." Ex. 21. Dr. Jokich felt this way among other reasons because he thought that the productivity metric didn't take account of all the work that he had to do. He also felt insulted because the proposed letter asked him to identify his successor by the end of calendar year 2018. Ex. 4, 141:17-143:11.

25.     On June 8, 2017, Megan Butler sent Dr. Bianco, Ms. Struck, Dr. Krishnan, and Mr. Dandorph a draft amended offer letter that would be presented to the Comp Committee at its meeting of June 14, 2017, along with a proposed power point presentation that would show the Committee how the amended letter satisfied the Committee's charge to management at its October 2016 meeting.  Ex. 92.  The draft was identical to the draft Dr. Jokich had been sent and had rejected on April 20, 2017.  Cf. Ex. 21 with 92, pp. JOKICH 3358-3366.

26.     Before the June 14 meeting, management made two further changes to Ex. 92. Ex. 12, 110:10-17; Ex. 93, ¶¶2-3.  First, it lowered Dr. Jokich's FTE percentage from 0.80 to 0.60.  Second, it removed a paragraph that would have reduced certain enhanced fringe benefits that his breast imagers had previously been receiving (see ¶34 below).  Cf. Ex. 92, pp. JOKICH 3358-3366 with Ex. 94, pp. 2-3.

### G.     The Compensation Committee approves an amended proposed offer letter, but Dr. Jokich refuses to accept it or sign it.

27.     The Compensation Committee met on June 14, 2017 and approved the proposed amended offer letter.  Ex. 12, 100:4-101:7, 102:5-104:10, 109:14-110:4; Ex. 95, 96.  On June 26, 2017, Emily Eisenkramer, who worked in the Dean's Office, emailed Dr. Jokich:  "Your new offer letter and structure has been approved by the Rush Board of Trustees.  Please find attached a version for you to sign off on.  Once signed, I will get Dr. Krishnan to sign and send a copy to you.  Please let me know if you have any questions or concerns."  Ex. 4,149:12-20; Ex. 94; Ex. 2, 195:18-22.

28.     The approved letter sent to Dr. Jokich for signature by Ms. Eisenkramer read:

Dr. Jokich:

In accordance with Rush's Physician Compensation Policy, the Compensation Committee of the Board of Trustees reviewed the compensation and incentive arrangement outlined in my letter to you dated August 12, 2016 (the "Initial Offer

Letter"). I presented the business rationale for the proposed compensation structure to the Committee and there was extensive dialogue surrounding the potential risk of contract extension without established pre-determined metrics that you must maintain to receive the proposed compensation. In short, the Committee decided that we must establish a pre-determined plan and growth objectives that are quantitative in nature and that will be reported back to the Committee at their June meeting. The Committee will need to approve this plan before we are able to finalize it and will mandate that your performance under the plan be tied to your annual compensation.

Taking the Committee's specific recommendations into account, I have been working with Dr. Bianco to develop the following plan:

☐ Your productivity must be at least at 95% of the mean for your Division during Fiscal Years 2017-2020 in order to be eligible for incentive compensation for those years, which will be calculated based on your clinical 0.60 FTE. You had the opportunity to analyze and modify the metric to be utilized (described below), which takes into consideration the total number of clinical readings and the time dedicated to each reading modality. Failure to meet the productivity goal during Fiscal Years 2018-2020 will trigger automatic review of your base salary, which will be subject renegotiation upon renewal in Fiscal Years 2021-22.

☐ It is expected that you will provide oversight of the operational processes that involve quality and safety of the studies performed. Dr. Bianco will work with you to provide suitable administrative and operational support.

☐ It is expected that you will work with Dr. Bianco and other leaders to support the development and implementation of breast imaging units at RUMG's ambulatory sites.

☐ It is expected that you will identify your successor by the end of CY2018. Once we agree on your successor, you will be responsible for mentoring this individual in collaboration with Dr. Bianco to make sure he/she is supportive of the institution's strategic plan for the Division of Breast Imaging and able to execute on it. You will also need to develop a transition plan by the end of FY19.

These metrics will be added to the defined goals for fiscal years 17-20 on page two of the Initial Offer Letter, and you will continue to be responsible for completion of a long-term (five year) strategic plan for the Division of Breast

Imaging in FY17, and meeting the volume, quality, operational, programmatic and/or financial goals in the long-term strategic plan in subsequent years.

Productivity for you and your group will be assessed annually by totaling the number of hours of direct clinical activity according to the following schedule:

> Screening = 10 min
> Diagnostic = 30 min
> USG = 20 min at RUMC; 10 min ROPH
> Stereotaxic = 90 min
> USG guided biopsy = 60 min
> Localization = 60 min
> MRI = 60 min
> MRI biopsy = 120 min
> IOE = 60 min
> Comparisons = 10 min
> Tech repeats = 15 min

Pete, you and your group continue to be incredibly valuable to the success of Rush University Medical Center and are highly appreciated. These changes are being made pursuant to the recommendations of Rush's Compensation Committee, which must approve compensation exceeding the 90th percentile of blended market data. I hope that you can appreciate this process which serves to protect the institution from regulatory risk.

Please indicate acceptance of this letter as an amendment to the Initial Offer Letter by signing below.

Sincerely,

Ranga Krishnan, MB, ChB
Dean, Rush Medical College

Read and Accepted: _____
Peter M. Jokich, M.D. (date)

Ex. 94.

29.     Dr. Jokich did not sign or return the letter.  He "just didn't answer" it.  Ex. 4,

149:21-150:4; Ex. 15, ¶¶53, 54, 55.  He regarded it as "basically the same letter that [he] had

earlier said [he] wouldn't sign."  Ex. 4, 149:24-150:1.  He may not have told anyone he had

declined to sign it.  *Id.*  150:2-8.  Dr. Krishnan was not told Dr. Jokich had not signed the

amendment approved by the Comp Committee and only learned this fact after the decision to terminate him was made in 2018.  Ex. 93, ¶5; Ex. 11, 22:8-24.  He signed off on Dr. Jokich's FY 2016 bonus in fall 2017, believing it was being paid under the amendment approved by the Comp Committee.  Ex. 93, ¶5.

30.     No member of the Comp Committee, of the Board itself, or of executive management told Dr. Jokich that the Committee would accept the August 12, 2016 original offer letter as his contract with Rush.  Ex. 4, 155:11-156:5.  The Comp Committee never indicated it would accept the proposed letter agreement of August 12, 2016 it had disapproved in October 2016.  Ex. 2, 246:11-20.

31.     No Rush management official, whether Dr. Goodman, the Dean, or anyone in leadership, has the authority to do something that the Board's Comp Committee has said should not be done.  *Id.* 246:24-247:6; Ex. 11, 44:18-19.  Dr. Goodman cannot imagine any circumstances under which any official, any executive of Rush University Medical Center would think they could waive the requirement of board approval contained in the letter of August 12th, 2016.  Ex.2, 247:7-12.

**H.     Facts relevant to Dr. Jokich's "implied waiver" theory.**

32.     Dr. Jokich's FEA, which he signed in 2012, provided an annual base salary of $659,815 through an "Exhibit A" attached to the FEA.  Ex. 63, p. JOKICH 1523-1533.  Rush did not amend that Exhibit or change his base salary at any time until October 2018, when it was lowered as described below in ¶89.  Dr. Jokich's letter agreement of 2007 (as extended for two additional years in 2011) expired by its terms on June 30, 2013.  Ex. 67.  Negotiations for the letter agreement that would replace it were not concluded until Dr. Jokich signed the new letter agreement on January 24, 2014.  Ex. 68, 103.

33.     When Dr. Jokich returned to Rush in 2001 (see above, ¶1), he negotiated with Dr. Goodman certain benefits that were greater than the standard benefits for Rush faculty, including 8 weeks of vacation and continuing medical education (CME) time and up to $8,000 a year for CME, dues and educational funds.  Ex. 3, 12:17-14:13. These enhanced benefits were paid throughout his time at Rush.  Ex. 98, ¶2; Ex. 4, 162:2-10.  These enhanced benefits for him and his breast imagers were specified in the letter agreements he signed in 2007 and on January 24, 2014 (Ex. 67, 68) and in the Letter Agreement he signed on August 12, 2016 (Ex. 77).

34.     During the seven-month period between June 30, 2013 and January 24, 2014, a period when the previous letter agreement had expired and no new letter agreement had yet been signed by Dr. Jokich (see ¶32 above), Rush did not change the enhanced fringe benefits for the breast imaging faculty.  Ex. 98, ¶2.

35.     Nor has Rush lowered these benefits after July 1, 2019.  *Id.*

## III.    UNDISPUTED FACTS ABOUT DR. JOKICH'S CLAIM OF RETALIATION UNDER TITLE VII, THE ADEA, AND THE ILLINOIS HUMAN RIGHTS ACT.

### A.    Dr. Jokich knows of no statements or documents saying his termination was motivated by retaliation.

36.     No one in management at Rush told Dr. Jokich that the reason he was terminated from his position as Director of Breast Imaging was retaliation for complaining about discrimination or retaliation against others at Rush.  Ex. 4, 47:07-47:17. He has never seen an email, text, or other document that says or implies he was terminated from his position in retaliation for complaining about discrimination or retaliation at Rush.  *Id.* at 47:18-48:1.

**B.      Between 2016 and the time Dr. DeCresce decided to terminate him, Dr. Jokich became disenchanted with Rush and most of its top leaders and had conflicts with colleagues and superiors.**

**(1)      The nonrenewal of the contract with Dr. Griem's employer.**

37.      Dr. Katherine Griem was a radiation oncologist employed by a corporation called Nuclear Oncology, which had a contract with Rush to provide services at Rush.  She was a clinician who held no position in management.  Ex. 16, ¶15.  The contract had a restrictive covenant that prevented Dr. Griem from working at Rush Oak Park Hospital.  *Id.* 91:3-92:14.

38.      The Chair of the Department of Radiation Oncology, Dr. Ross Abrams, gave 17 months' notice to Nuclear Oncology that it did not intend to renew that contract when it expired.  Ex. 6, 86:12-18.  Dr. Jokich was very upset about this decision.  He and 14 colleagues signed a letter to Dr. DeCresce urging the retention of Dr. Griem in October 2016.  Ex. 19.  He, Dr. Melody Cobleigh, Dr. Thomas Witt, and one other colleague met with Dr. DeCresce to discuss the letter.  Ex. 6, 88:23-90:12.

39.      In April 2017, Dr. Jokich, Dr. Cobleigh and Dr. Witt emailed Dr. Goodman (Ex. 20) and met with him and Dr. Krishnan to again protest the decision about Dr. Griem.  Dr. Goodman and Dr. Krishnan declined to discuss the reasons for the decision with them on confidentiality grounds, and the decision was not reversed.  Ex. 15, ¶¶25-27; Ex. 4, 41:12-42:4, 55:11-58:11, 192:9-24; Ex. 11, 76:11-17.4, 55:11-58:10, 192:9-24; Ex. 19, 20.

40.      Dr. Jokich was "very, very disappointed" in Dr. Goodman, Mr. Dandorph, and Dr. Krishnan, talked with "everybody" about his disagreement, repeatedly voiced his concerns about physicians being disrespected and physician burnout, and sent a number of e-mails to "everybody" about that.  Ex. 4, 193:10-21, 198:7-17.

41. Rush took no action of any kind against Dr. Cobleigh or Dr. Witt, who signed Ex. 19 and 20 along with Dr. Jokich, and who attended his meeting with Dr. Goodman to advocate for Dr. Griem. Ex. 16, ¶15.

42. When Dr. Griem's employer was given notice that its contract would not be renewed (which would end Dr. Griem's ability to provide services at Rush), no action was taken against Dr. Griem's medical staff membership and she was not eligible for any kind of due process review of that decision. *Id.* She was not offered severance in connection with her departure from practice at Rush. Ex. 16, ¶9.

43. Dr. DeCresce respected Dr. Jokich as a physician and believes he did a lot of good things for Rush. Ex. 6, 95:23-96:5. Nonetheless, he believed that in the Griem episode, Dr. Jokich had acted inappropriately, because he was a member of management who had intervened outside the chain of command in something that was not his business. *Id.* 102:21-103:15.

### (2) Conflicts with Dr. Bianco.

44. Dr. Jokich vehemently disagreed with Dr. Bianco on how his productivity should be measured. *Id.* 97:24-100:21, Ex. 6, 109:10-110:13; *supra,* ¶¶12-16. He was angered by Dr. Bianco's assignment of a woman named Shwanda Mays to provide administrative support in the Division of Breast Imaging. Ex. 4, 202:3-203:13, 206:4-207:4, 207:22-209-13; Ex. 22, 23, 24.

45. Dr. Jokich believed that Dr. Bianco was doing a "piss-poor job" of running Rush University Medical Group and said so to "a lot of people," meaning "anybody who would listen." *Id.* 198:22-199:13. Dr. DeCresce was present on an occasion where Dr. Jokich treated Dr. Bianco so disrespectfully (in Dr. DeCresce's view) that Dr. DeCresce, who was a past president of the Medical Staff, urged him to report Dr. Jokich to the Medical Staff. Ex. 6, 109:8-116:14.

18

### (3) Disenchantment with top executive leadership.

46.      By early 2018, Dr. Jokich had significant concerns about the direction Rush's

leaders were going. Ex. 4, 211:06-14. On January 28, 2018, he emailed a friend: "Rush is

becoming more of a hot mess. They keep picking the wrong people for leadership roles, which

leads to bad decisions and bad morale. I think working physicians at Rush should have half the

seats on the board of trustees to straighten everything out from the top down." *Id.* 211:18-

212:24; Ex. 26. Among the "wrong people" he was referring to were Mr. Dandorph, Dr.

Krishnan, Dr. DeCresce, Dr. Deutsch, Dr. Bianco, and Patricia Nedved, the administrative

director of the Rush Cancer Center. Ex. 4, 212:25-215:10, 217:2-17; 222:4-223:10.

### (4) Conflict with Dr. Grabler.

47.      Dr. Jokich opposes an imaging technology called 3D Tomosynthesis. Ex. 4,

254:13-16; 263:5-9. Dr. Paula Grabler, the breast imager at Rush Oak Park Hospital, supported

3D Tomosynthesis and persuaded that hospital in 2014 or 2015 to purchase it. Dr. Jokich

believed that she did this "without my approval" and "went behind my back" to do it; that she

"undercut my authority"; and that she was "aiming for [my] job." *Id.* 258:25-259:2, 259:21-24,

442:18-443:23. In October 2017, without telling Dr. Grabler, he complained about her to the

Dean's Office official who handled bonuses, initially refusing to sign off on a bonus for her. Ex.

69. He later approved it when she raised it with him. Ex. 7 (Grabler Dep.) 110:10-112:21.

48.      In March 2018, Dr. Krishnan told Dr. Jokich that he was having Dr. DeCresce

take over the supervision of Dr. Jokich. Ex. 4, 185:20-188-20; Ex. 27; Ex. 6, 121:1-9.

According to Dr. Jokich, Dr. Krishnan said he was pulling Dr. Grabler out from his supervision

because of the fact that she had joined with two other women in complaining about Dr. Jokich

and a Human Resources investigation had been started (see below, ¶¶50-54) and Dr. Jokich

"would be dealing with some of the issues here." Ex. 4, 422:11-423:16.

49.     No change occurred to Dr. Jokich's title or compensation from removing Dr.

Grabler from his supervision. Ex. 16, ¶¶ 3, 6.  Dr. Jokich assumed that Dr. Krishnan was "doing

him a favor almost." Ex. 4, 423:8-11.  Nonetheless, he was insulted by the change.  He believed

it was motivated by nepotism, since she is married to a Rush Vice President, Dr. David Ansell,

but he has no evidence for that belief.  Ex. 4, 217:25-219:15, 428:9-19; Ex. 28.

### (5)     The complaint by breast surgeons and Dr. Grabler against Dr. Jokich.

50.     On February 9, 2018, Dr. Jokich wrote several emails to the Chair of the

Department of Surgery (Dr. Alfonso Torquati), with copies to Dr. Goodman and Dr. Krishnan,

urging him to find a replacement for Dr. Thomas Witt, a breast surgeon who had retired.  In one

of the emails, he said:

> The breast imaging radiologists work the closest with the breast surgeons (closer
> than others on the team), since we find and diagnose almost all of the breast
> cancers at Rush (usually small and early stage) through our imaging efforts; and
> then, based on all of our imaging findings, contribute the most to the decision on
> whether the patient should have a lumpectomy or mastectomy. Also, we perform
> all of the pre-operative wire and Saviscout localizations for these nonpalpable
> small cancers. The surgeons could not exist without us. This is markedly different
> from the old days, when the surgeons were the only game in town, since they
> were the only ones who diagnosed and treated breast cancer (before
> mammography, chemo, RT, and hormonal therapies).
>
> We also know which surgeons are "good" and which are not, based on how many
> needle localized lesions they miss in surgery (since we read the specimen
> mammograms from the OR), how many lesions are at the very edge of the
> specimen, how many patients end up with positive margins, and how many
> mastectomy patients have recurrences. Is the Surgery Department tracking these
> things? Are they discussed at your M and M conferences? This almost never
> happened when Tom Witt was our main breast surgeon. Times have changed. My
> faculty are very concerned. We could care less about surgical departmental
> politics. And for the record, our patients take our advice on who to see for breast
> surgery. We direct most of these referrals, since our patients trust us to send them
> to the best surgeon...not their primary care doctor, who has no clue. You need to

listen to our concerns, for the good of our patients and for the long-term good of the institution.

I am not stuck on Dean Godellas. Just find us another Tom Witt. Please...and quickly. I have been speaking on this for more than a year, and am very frustrated (as I'm sure you can tell).

Ex. 30; Ex. 4, 224:2-238:19; Ex. 31.

51.     At this time, Rush's two main breast surgeons were Dr. Andrea Madrigrano and Dr. Cristina O'Donoghue.  Dr. Torquati told Dr. Jokich he was displeased by Dr. Jokich's presumption in writing these emails.  Ex. 30.  Dr. Torquati showed Dr. Madrigrano the email and required her to gather data to refute any implication that their care was substandard.  RS ¶8, 9:7-11:3, 40:2-6, 30:15-31:1, 33:3-11, 50:21-51:6.  She did.  Her data showed that their complication rates were well within national standards and that in several measures their rates were more favorable than those of Dr. Witt had been.  *Id.* 14:13-17:11, 25:17-30:12.

52.     Dr. Madrigrano and Dr. O'Donoghue, joined by Dr. Grabler, then met with Katharine Struck to discuss how they felt Dr. Jokich was treating them.  Ex. 8, 59:16-60:13.  They said they didn't want to make a big deal out of it and were just asking if she could help them make this environment less toxic and more bearable.  Ex. 12, 112:16-113:15.  In this meeting, an observation was made that Dr. Jokich's behavior was only directed toward women.  *Id.* 113:24-114:4.

53.     Ms. Struck told Human Resources what the women had told her.  Human Resources hired an outside investigator, Patience Nelson.  During her interview with Dr. Jokich, he claimed he was being targeted for "future retaliation" because (1) he had supported Dr. Griem, (2) he might be called as a witness in a lawsuit filed against Rush by Norma Melgoza, and (3) Rush wanted to "keep him from going public" about his belief that Rush Oak Park

21

Hospital was exposing "ethnic minority women" to increased levels of radiation through 3D Tomosynthesis. Ex. 32, p. 7.

54. On April 9, 2018, Ms. Nelson issued a report which found that Dr. Jokich had not committed "disruptive conduct" as defined in a Rush policy or the Medical Staff bylaws; said she was "inclined to believe" him when he claimed he had not meant to disparage the breast surgeons' competence; and found he had not acted out of bias toward women. *Id.,* pp. 7-8. She also rejected Dr. Jokich's claim of being targeted for retaliation, finding that he had not engaged in "protected activity," his allegations about what motivated the women's complaints were "speculative," and he had not experienced "adverse action." *Id.* p. 8. She recommended that "the leadership of Surgical Oncology, General Surgery and Breast Imaging meet to determine how they can best provide the remedial actions that Complainants [Madrigrano, O'Donoghue, and Grabler] seek and redress underlying tensions." *Id.*

55. Dr. DeCresce then told Dr. Jokich that he wanted to set up a meeting with the breast surgeons. Ex. 4, 245:25-246:6, 248:17-249:9; Ex. 33. Dr. Jokich replied, calling Dr. DeCresce's email "accusatory" and saying "I feel like I am being set up or being slandered as uncollaborative." Despite having been told on March 7, 2018 by Dr. Krishnan that he was now reporting to Dr. DeCresce, Dr. Jokich said, "I have never been officially notified that you, a pathologist, are 'in charge' of breast imaging at RUMC or ROPH [Rush Oak Park Hospital]. Therefore, I will continue to operate under the assumption that Dr. Sharon Byrd, Chairperson of the Department of Diagnostic Radiology and Nuclear Medicine, is still in charge." Ex. 33.

**(6)    Other conflicts with Dr. Grabler.**

56. Rush has numerous "offsite" facilities away from its main campus. In spring 2018, Rush was opening offsite facilities in the South Loop and at Oak Brook. Planning was in

22

progress to make breast imaging available at these two locations.  Ex. 16, ¶7.  Dr. Jokich had

written in July 2017 to a vendor of imaging equipment to Rush that he had been "cut out of the

planning loop for some reason and don't know what the big shots at Rush have in mind for the

future off-sites."  Ex. 4, 210:6-211:1; Ex. 25.

57.　　After taking over supervision of Dr. Jokich in March 2018, Dr. DeCresce was told

that the individuals involved in the planning for South Loop and Oak Brook were having a

difficult time dealing with Dr. Jokich.  Dr. DeCresce told Dr. Jokich that Dr. Grabler would

handle the planning for breast imaging at those two locations.  Ex. 6, 158:18-159:6.

58.　　No change occurred to Dr. Jokich's title or compensation as a result.  Ex. 16, ¶8.

Nonetheless, he was furious and says he was "in shock" that Rush leadership "would behave this

way."  Ex. 4, 219:16-221:15; Ex. 33.  Dr. DeCresce was told that Dr. Jokich continued trying to

inject himself into planning at the two offsites.  Dr. DeCresce found that the people at the offsites

were confused, and told them that all final decisions would be made by himself.  Ex. 6, 161:16-

162:3.  Dr. Grabler found that the planning function that was given to her for the two offsites

required a small percentage of her total time, both before and after Dr. Jokich was put on paid

leave. Ex. 17, ¶3.

59.　　Lisa Stempel, M.D. was a breast imager who had worked under Dr. Jokich for

many years.  Ex. 10, 83:13-16.

60.　　Dr. Grabler asked her to participate in a phone call about patient complaints that

had been received about workflow at one of the already-open offsite facilities (Lakeview).  Dr.

Stempel told Dr. Jokich she was going to be on the phone call, and after it took place told him

what had been said on the call.  After the call, several emails were sent as a result and Dr. Jokich

was furious that Dr. Stempel was part of the email chain and told her she shouldn't be talking to

23

Dr. Grabler.  Dr. Stempel had admired and enjoyed working for him, but found him difficult to work for during his last months at Rush, and cited this episode as an example.  *Id.* 86:15-92:9.

**C.  Dr. Jokich's email to 60 persons attacking Rush's leadership and Board of Trustees precipitates an immediate removal decision by Dr. DeCresce, which was immediately supported Rush's top leadership.**

**(1)  Dr. Grabler is invited, with Dr. Jokich's knowledge, to present on 3D Tomosynthesis.**

61.  In July 2017, Ruta Rao, M.D., a medical oncologist at Rush, invited Dr. Grabler to give a presentation on 3D Tomosynthesis at one of the weekly lunchtime breast conferences the Rush cancer service holds.  Dr. Grabler accepted in an email she copied Dr. Jokich on.  Ex. 17, ¶2; Ex. 35.

62.  Dr. Jokich never told Dr. Grabler not to give such a presentation.  Ex. 4, 255:2-24.

63.  On May 17, 2018, Dr. Jokich and 54 other persons were notified by email that Dr. Grabler would be speaking about Tomosynthesis at the weekly conference of May 21, 2018.  Ex. 4, 253:5-254:12; Ex. 38.  After being notified, Dr. Jokich did nothing to stop the presentation or ask her not to give it.  Ex. 4, 255:2-256:9.

64.  Dr. Grabler presented on 3D Tomosynthesis as planned, using PowerPoint slides and slides images of cancers she had found with 3D Tomosynthesis.  Ex. 7, 138:17-138:23; Ex. 39.  She addressed criticisms of 3D Tomosynthesis and discussed her data from a year of using it at Rush Oak Park.  Ex. 39.

65.  Dr. Jokich attended the presentation but asked no questions.  Ex. 4, 263:10-17; Ex. 6, 169:15-16.  She made no personal remarks about Dr. Jokich.  Ex. 4, 257:7-10.  He regarded it as a reasonable presentation.  *Id.,* 263:18-264:2.  Nonetheless, he believes it was done to humiliate him in a public setting and that she should have asked his permission to give it.  *Id.* 254:17-255:1, 270:10-271:2.

> **(2)** **Dr. Jokich sends an email to 60 persons in response to Dr. Grabler's presentation, but does not send it to her.**

66. The following day, May 22, 2018, at 12:44 p.m., Dr. Jokich sent an email to 60 persons at Rush, including Dr. Goodman, Mr. Dandorph, Dr. Krishnan, and Dr. DeCresce. He did not send it to Dr. Grabler, even though the email responded to her presentation. The email denounced 3D Tomosynthesis, which he called a "marketing gimmick" and suggested that it was potentially harmful to "our primarily minority and low-income population" at Rush Oak Park Hospital. It concluded:

> It is a sad state of affairs when at the "new" Rush, administrators, business people, non-clinical nurses and lawyers, and ultimately the Board of Trustees, are making all the major decisions based on money and business concerns, and not the working physicians, who are the only ones, it appears, concerned with what is truly best for our patients, and who really have the Rush mission embedded in our hearts, which is to improve the health of the communities that we serve. This is one of the major reasons why the physician burnout rate at RUMG is now at 43% (plan to leave the institution within the next two years).

Ex. 40.

> **(3)** **Dr. DeCresce immediately decides Dr. Jokich should be terminated, and his superiors support his decision.**

67. Dr. DeCresce decided to terminate Dr. Jokich as Director of Breast on May 22, 2018, shortly after he saw Dr. Jokich's email of that date. Ex. 18; Ex. 4, 54:6-21; Ex. 15, ¶¶93-95; Ex. 1, ¶2; Ex. 6, 175:8-176:16. He testified that he considered it "a very unprofessional attack on a colleague that completely violated the Rush I CARE values," and that he felt that "people who express things like [the things Dr. Jokich had written about the board of trustees] should not be in a position of authority in an organization." Ex. 6, 75:9-12, 176:4-13.

68. Since at least 1991, when Dr. DeCresce came to Rush, there has never been any other physician (or non-physician) in a position of leadership who issued a public attack on the

top leaders of the institution and on its Board of Trustees of the kind that Dr. Jokich issued in his

email of May 22, 2018.  Ex. 16, ¶16.

69.     As Acting Director of the Rush Cancer Center who had been designated Dr.

Jokich's supervisor, Dr. DeCresce had the authority to make a final recommendation to remove

Dr. Jokich, subject to the approval of Dean Krishnan, COO Michael Dandorph, and CEO Dr.

Larry Goodman.  Ex.  11, 16:13-21**;** Ex. 6, 176:17-177:7.  Dr. Ross Abrams, Chair of Radiation

Oncology, had no input into Dr. DeCresce's decision to remove Dr. Jokich.  Ex. 16, ¶17.

70.     At 3:50 p.m. on May 22, 2018, Dr. DeCresce emailed Dr. Krishnan, his boss:

> At this point you may have seen Dr. Jokich's latest outburst concerning his
> colleagues.  I attended the conference which was quite well attended.  He had the
> opportunity to ask questions of Dr. Grabler but apparently felt that a personal
> email attack was a better way to address the content of her presentation.  I
> honestly think he's had more than enough opportunity to reflect on his behavior
> but apparently is unable to change probably because he thinks he is right all of the
> time.  I plan to meet with him tomorrow and tell him his behavior is unacceptable
> and that an apology is in order.  I would say that in many ways his behavior is the
> antithesis of the [Rush] ICARE values.  I believe it is time for a change in
> mammography.  Pete' attitude is quite negative toward anyone who disagrees
> with him and that is not going to change.  If we want to be a leading cancer center
> we need individuals who will work together to achieve the goal.  Pete is not one
> of these people.  Please let me know when we can meet to discuss this issue.  I
> don't think too many people are going to come to his defense.

Ex. 18.

71.     Dr. DeCresce's bosses approved his decision.  Ex. 6, 177:16-178:7; Ex. 18; Ex.

11, 121:16-122:2, 123:9-22.  On May 26, 2018, Dr. DeCresce, having obtained his superiors'

approval, informed Rush's Vice President for Human Resources, of the reasons why he had

decided to remove Dr. Jokich and why he would not thereafter fill Dr. Jokich's position.  Ex. 45.

**(4)     Dr. Jokich was and is unrepentant about the May
22, 2018 email and its attack on Rush leadership.**

72.     When Dr. DeCresce saw Dr. Jokich's email of May 22, 2018, he immediately

emailed him that it had been "completely inappropriate" and they needed to meet.  Ex. 41.  They

met next day.  Dr. Jokich denied that the email had been inappropriate, saying, "No, it was my

response to Paula Grabler's presentation that was given without consulting with me, and she was

-- it was a humiliating situation where I was put into where I'm her boss, and I'm her division

chief, and this is somebody under me giving a presentation about things that I don't agree with,

and I think that that was what was totally inappropriate." Ex. 4, 275:17-276:5.

73.     He said he did not send the email to Dr. Grabler, because "She never came to

these conferences." Ex. 6, 172:10-22.  When asked, "This was an e-mail, it was all about her

talk, and you had not intended that she receive, correct?" Dr. Jokich responded:  "I really didn't

have any opinion either way about that." Ex. 4, 277:12-21.

74.     After being told by Dr. DeCresce to apologize to Dr. Grabler, Dr. Jokich emailed

her on May 23, 2018:  "I am sorry that you feel that my written response to your 3D

Tomosynthesis talk was offensive.  I am not sure how you saw it, since your name was not on

the recipient list.  I simply wanted to avoid having a debate in public during a patient care

conference.  My apologies." *Id.* 276:17-20; Ex. 44.  Dr. Jokich wrote this apology only because

Dr. DeCresce ordered him to, and otherwise would have never apologized.  Ex. 4, 277:22-25.

Dr. DeCresce described it as a "weasel-word apology." Ex. 6, 174:1-2.  Dr. Grabler did not

accept it.  Ex. 7, 169:10-13.

75.     It did not occur to Dr. Jokich that executive leadership and the Board might be

offended by his May 22 email.  He thought "they would come to me and say, 'Why don't you

voice your concerns?  Why are you so unhappy?'  And somebody would finally listen to me.

27

That was my point.  And I had been not listened to for so many years, and I had been disrespected, and I had been just really humiliated in a lot of different situations, and this was the final straw to me.  And so basically I just said what I thought."  Ex. 4, 271:11-272:4.

76.     He never apologized to any member of executive leadership and feels he has nothing to apologize for.  *Id.* 272:14-20.  He never apologized to any member of the Board of Trustees either.  As he viewed it, "I would say that this is one of those things where:  Will somebody please come to talk to me and listen to my concerns, because you've been humiliating me and degrading me for a long time?"  *Id.* 272: 21-274.1.  He was likewise unapologetic in the one conversation he had with Dr. Goodman after he wrote the May 22, 2018 email.  Ex. 4, 294:8-298:23.

> **D.      After receiving Dr. Jokich's email of June 11, 2018, charging Rush with discriminatory practices, Dr. Goodman puts the termination process on hold while the charges are investigated.**

77.     As of May 22, 2018, when Dr. DeCresce decided that Dr. Jokich should be terminated and his superiors supported his position, it was the job of Mary Ellen Schopp, Vice President for Human Resources, to assure that the removal would be effectuated in compliance with Rush's obligations to him.  Outside counsel was also brought in to advise Rush on the manner and timing of termination.  Ex. 5, 201:19-203:19; Ex. 11, 135:10-17.

78.     On June 11, 2018, Dr. Jokich sent the following email to Dr. Goodman:

> I attended the mandatory Rush anti-harassment training presented by Patience Nelson, J.D., last month. Since I am now very educated on the subject of harassment and discrimination, I feel that it is my duty to inform you that I am aware of serious discrimination issues and unfair employment practices that have occurred, and are occurring, at Rush involving at least gender, age, and national origin, which greatly impact our diversity goals. I would, therefore, like to request a meeting with you to discuss these issues, and other serious concerns, which impact quality patient care and organizational morale.  I have made several requests to meet with Shanon Shumpert and Mary Ellen Schopp from Human Resources together, and even asked that Mr. Goodyear, our chairman of the Board

of Trustees be present, but there has been no date set for a meeting, despite the fact that my first meeting request was made many weeks ago. Please forward this email to Mr. Goodyear.  You know that I love Rush, and raise my concerns so that we don't lose what has been created here over the past several  decades...an incredible culture which puts excellence in patient care above all else.

Ex. 4, 48:7-13; Ex. 46.

79.     When Dr. Goodman received Dr. Jokich's email of June 11, 2018, he "hit the pause button" on Dr. Jokich's termination, because he didn't know what Dr. Jokich's complaints were, wanted to understand the detail about them and make sure they heard them, and "if he had true knowledge about incidents of wrongdoing or prejudiced behavior on the part of Rush, that was important to hear." Ex. 2, 250:10-22.

80.     Dr. Goodman emailed Dr. Jokich the following day:

We take such issues very seriously.  Your concerns will be investigated through the appropriate areas which include compliance (Cynthia Boyd) and/or HR (Mary Ellen Schopp, one of your addressees).  They will reach out to you to schedule a meeting to follow up and obtain more detail.  For your information, our Board is kept informed concerning any compliance issues, our diversity goals and strategies, and Rush's quality of care regularly.  I appreciate your thoughts concerning the positive culture and emphasis on high quality patient care which I certainly share.

Ex. 47.

81.     Rush retained Thomas Johnson, a Chicago attorney, to investigate Dr. Jokich's allegations.  Ex. 13, 6:5-9; Ex. 49.  Mr. Johnson interviewed Dr. Jokich twice in person and a third time by phone, and received extensive emails and other documents from him, including a two-page summary of his grievances against Rush, a document he did not give to anyone at Rush before June 11, 2018.  Ex. 4, 58:18-59:25; Ex. 28.  That document does not mention age discrimination or any of the specific physicians he later claimed to have told Rush were victims of age discrimination.

82.     On July 29, 2018, Mr. Johnson wrote Dr. Goodman to report his conclusions. Among other things, he reported that Dr. Jokich had provided no evidence to support a retaliation claim against himself under the employment discrimination laws. Mr. Johnson concluded that "by his own account, Dr. Jokich has not provided any specific evidence that he opposed perceived acts of discrimination or harassment, or participated in any way on behalf of victims of such conduct," and therefore had not engaged in "protected conduct" under the employment discrimination laws. Ex. 50, p. 1.

83.     He further reported that "Even in the cases of Dr. Griem and Ms. Melgoza, Dr. Jokich had no personal knowledge or evidence of discrimination against these women, and conceded that he had not participated in or supported such a claim." *Id.*

**E.     After Mr. Johnson's report, Rush proceeded to remove Dr. Jokich.**

84.     After Mr. Johnson sent his report, Drs. DeCresce and Krishnan met with Dr. Jokich on Wednesday, August 8, 2018. Dr. DeCresce began with words to the effect that "You're not happy with us, and we're not happy with you, so it's time for us to part ways." Ex. 4, 280:12-281:9. Dr. Jokich was told he could resign under an agreement and needed to show it to a lawyer. *Id.* 285:23-286:8.

85.     The agreement, which he would have 21 days to consider, among other provisions would have paid him at his then-current salary of $659,818 until June 30, 2020, let him take any other job; provided an agreed-on departure announcement, given him a good recommendation from Dr. Goodman, and contained a mutual nondisparagement provision. Ex. 51.

86.     Dr. DeCresce and Dr. Krishnan told Dr. Jokich what would happen if he rejected the agreement. *Id.*, 289:6-14. They initially said that the coming Friday (August 10) would be his last day at work, but he asked and they agreed to let him work until August 17, when a

previously scheduled two-week vacation would start. They said they were sorry things had come to this and hoped he would take the severance offer, but that the choice was his. *Id.* 292:22-293:4.

87. On August 21, 2018, Dr. Jokich's attorney wrote Rush's counsel and informed him that Dr. Jokich was "not accepting the Separation Agreement and Release tendered to him on August 8, 2018 in its present form." Ex. 15, Exhibit 6 thereto, p. 5.

88. On August 22, 2018, Dr. DeCresce wrote Dr. Jokich that in light of his rejection of Rush's offer, he was removed from his position; that pursuant to section 7 of his FEA, his salary would be lowered 60 days after his receipt of the letter to $448,802, and that when his then-current one-year term under the FEA expired on June 30, 2019, it would not be renewed. Ex. 15, Exhibit 4 thereto. The following day, Rush's counsel replied to Dr. Jokich's counsel, explaining Rush's reasons for declining to negotiate further. Ex. 15, Exhibit 5 thereto.

89. Rush lowered Dr. Jokich's salary 60 days after the DeCresce letter to $448,802, and did not renew his FEA when its term expired on June 30, 2019. At that point Dr. Jokich ceased to be an employee. Ex. 16, ¶12. Rush did not pay Dr. Jokich any bonus for the Fiscal Year 2018 (July 1, 2017 through June 30, 2018), or for the Fiscal Year 2019 (July 1, 2018 through June 30, 2019). Answer to First Amended Complaint, ¶¶146-154.

**F. Facts relevant to whether Dr. Jokich engaged in "protected activity."**

**(1) Dr. Jokich never directly complained before June 11, 2018 to anyone of discrimination at Rush.**

90. Before June 11, 2018, which was three weeks after the decision to terminate him had been made, Dr. Jokich never told any of the following executive leaders that Rush had discriminated against anybody on the basis of age, sex, race, or national origin: Dr. DeCresce, Dr. Krishnan, Dr. Ansell, Cynthia Barginere; Carl Bergetz (Rush's General Counsel), Dr.

Deutsch, Ms. Schopp, Bruce Elegant (CEO at Rush Oak Park Hospital), or Dr. Omar Lateef (then Chief Medical Officer). Ex. 4, 36:6-42:11.

91.     He never told Rush that any of the following persons had been discriminated against by Rush on the basis of their age: Dr. James Young, Dr. William Schwer, Dr. Robert March, Dr. Marshall Goldin, Dr. Howard Strasser, Dr. Dan Deziel, Dr. Anna Spagnoli, Dr. Steven Lewis, Dr. Michael Tharp. *Id.,* 455:20-464:1.

92.      Dr. Jokich never said directly to Dr. Goodman that he believed that Rush was discriminating against anybody on the basis of age or sex or race or some [other forbidden category]. *Id.* 36:22-37:9.

93.     In meetings with Mr. Dandorph, Rush's COO, Dr. Jokich says he "raised issues about senior physicians leaving," but that "I didn't use the words 'age discrimination' at the time," and that he also talked to him about Dr. Griem's leaving (see above, ¶¶37-40). Ex. 4, 37:5-37:16. There was no other person in authority at Rush to whom Dr. Jokich said, at any time prior to June 11, 2018, that Rush was discriminating on the basis of age or national origin. *Id.* 46:7-46:21.

**(2)    Dr. Jokich's claim of an "indirect" complaint of discrimination in connection with Dr. Griem.**

94.     Dr. Jokich asserts he complained "indirectly" in 2016 and 2017 about discriminatory conduct by Rush against Dr. Griem. *Id.* 36:14-37:1. He says that in the meetings he and colleagues had with Dr. Goodman and Dr. DeCresce or Dr. Krishnan about Dr. Griem (see ¶22 above), he told Dr. Goodman:

> "You owe it to us to tell us why this esteemed colleague of ours, who we've worked together for years and years, why she was not renewed, you owe it to us," and they essentially -- Dr. Goodman said it's confidential, and I said to Dr. Goodman, "If you don't tell us, you owe it to us to tell us, because we're the leaders of the breast cancer service line. You owe it to tell us the reason why

you're not renewing her contract. And if you don't give us a reason, we're going to assume it's a very bad reason why you're not renewing her contract," and I was implying gender and age discrimination."

Ex. 4, 41:09-42:11. He admitted he did not say the reason was discrimination. *Id.*

95. Before the first meeting with Dr. Goodman in October 2016 about Dr. Griem, Dr. Jokich and a number of colleagues signed and sent a letter dated October 4, 2016 to Dr. DeCresce expressing support for Dr. Griem. This letter did not mention discrimination of any kind. Ex. 19.

96. Before the second meeting with Dr. Goodman in April 2017 about Dr. Griem, Dr. Jokich and three other colleagues sent a five-page, single-spaced email to Dr. Goodman and Dr. Krishnan. Ex. 20. Its only reference to "discrimination" was the italicized words in the following passage:

> There seem to us to be a finite number of reasons why an individual would be terminated from Rush's medical staff and faculty: (1) inadequate training or credentials; (2) substandard performance (e.g., poor outcomes, malpractice claims, etc.); (3) inadequate clinical volume; (4) inadequate "citizenship" contributions to the Institution; (5) violation of medical staff / institutional by-laws; (6) some other untoward action or inappropriate behavior toward colleagues, staff, or patients; *(7) discrimination (e.g., age, gender) against the individual being terminated;* or (8) an act of retribution against that individual by a superior.
>
> In the case of Dr. Griem, reasons (1) - (5) can be ruled out by even the most cursory review of her record and the absence of any complaint of by-laws violations lodged against her. Regarding reason (6), if she has been alleged to have acted inappropriately in a manner justifying termination, she has a right to be given notice of the specifics of that allegation and to mount a defense against it, if she so chooses. We have the relevant procedures afforded by Rush's grievance process in place just for that purpose. Yet there has been no such notice given and no such due process afforded her; only vague references made to some, as yet, unsubstantiated action on her part at some unspecified time in the past. *Regarding reason (7), we would like to think that Rush's commitment to diversity would rule out that reason on its face.* Regarding reason (8), we just don't know; but regrettably must consider it if no substantiated charge of inappropriate behavior is brought forth. After all, all business related conflicts were resolved over four

months ago when Dr. Griem agreed to resign from her private group and join RUMG.

*Id.* pp. 3-4 (emphasis added). The letter concluded:

> Dr. Griem remains unaware of what malfeasance she is alleged to have committed that has led to her termination; and all involved in this matter have been advised that she is unaware. Yet multiple opportunities to remedy this failure of communication have gone unaddressed. This is not only a failure of due process; it is a failure of civility to an esteemed colleague and 30 year member of our staff. Unfortunately, anxiety and speculation often rush to fill voids of information. Among the breast service line physicians of all disciplines who have known Dr. Griem for decades and who work with her daily, one could not overestimate the degree of anger, shock, and distrust that has filled this specific void of information. *And it is the speculation of some among us that this action against Dr. Griem is either an act of retribution against her or represents an exaggerated, or even fabricated, assertion of wrongdoing on her part,* which curiously and paradoxically has not met the bar for a formal complaint or sanction against her, but has apparently met the bar for her termination. Given the resolution of the business conflicts and the failure to notify Dr. Griem of what other matter would justify her termination, *it is difficult not to view this action against her as a capricious act which, but for grace, could be visited upon any of us in the future.*

*Id.,* p. 4 (emphasis added).

### (3) Dr. Jokich's claim of supporting Norma Melgoza's claim of discrimination.

97. Norma Melgoza was an Associate Vice President of Rush who in 2017 lost her position in a reorganization and accepted a position at the Director level at no loss on salary. She was assigned to report to another Vice President named Leo Correa, who, like her, is of Hispanic origin; Dr. Jokich in fact believed him, correctly, to be Hispanic. Ex. 4: 477:19-478:5; Ex. 16, ¶9. On November 27, 2017, Ms. Melgoza filed a lawsuit accusing Rush of violating the Equal Pay Act and Title VII in various respects. Ex. 52. Dr. DeCresce denies that the mask was a Trump mask or that he wore it in the interview. Ex. 6, 55:1-57:5, 60:4-63:22.

98.     Lynn Wallace, a Rush Human Resources official, together with her supervisor, Mary Ellen Schopp, investigated the complaint.  On December 28, 2017, Ms. Wallace issued a report finding the mask accusation unsubstantiated.  Ex. 5, 133:12-134:19; Ex. 53.

99.     Ms. Wallace interviewed Dr. Jokich on December 7, 2017 during that investigation.  According to her report, he told her (a) he had not been present at the interview between Ms. Melgoza and Dr. DeCresce but that she had told him what had supposedly happened at the interview; (b) he told Ms. Melgoza that if Dr. DeCresce had done with the mask what Ms. Melgoza claimed, it would have been "unbelievable and unprofessional;" and (c) he and Ms. Melgoza had had no further discussion about the incident since that conversation.  Ex. 53

100.     According to Ms. Wallace's report, Dr. Jokich expressed no other concerns about Dr. DeCresce and told Ms. Wallace that Dr. DeCresce likes to joke around and is known for his sense of humor. Ex. 54, pp. 2-3.  .  Dr. Jokich admits he never told Ms. Wallace he thought that Ms. Melgoza had been discriminated against. Ex. 4, 452:24-453:17.

101.     Ms. Wallace's report was not distributed to Dr. DeCresce.  Ms. Schopp has no reason to believe he would have been told that Dr. Jokich was interviewed.  Under normal circumstances she would not have circulated a report like Ms. Wallace's to someone was not Dr. Jokich's supervisor at the time.  She has no knowledge that any of Rush's top executives saw the report or saw that Dr. Jokich had been interviewed.  Ex. 5, 198:6-199:11.

102.     Dr. DeCresce never knew Dr. Jokich had been interviewed in connection with Ms. Melgoza's complaint until he was shown the report in 2020 in connection with this lawsuit.  Ex. 16, ¶9.  He does not know if Ms. Melgoza mentioned this alleged incident to Dr. Jokich.  Ex. 6, 69:13-16.

103.    On January 8, 2018, Ms. Melgoza's lawyers sent Rush's lawyers her "Initial Disclosures" in her lawsuit pursuant to F. R. Civ. P. 26(a).  Ex. 1, ¶5; Ex. 103.  They listed 112 specific persons at Rush who supposedly had knowledge of discoverable information about Ms. Melgoza's claim.  *Id.*  They said Dr. Jokich had knowledge of

> Allegations in the Complaint regarding Melgoza's salary and Rush's payment of salaries to similarly situated employees; Melgoza's qualifications, experience, and job performance; Melgoza's requests to advance within the organization; Rush's available opportunities and open executive positions and Rush's procedures for filling same; Rush's demotion of Melgoza and offer of separation package; statements by Dr. Bianco regarding termination of Melgoza's employment and removal of operational duties that were part of Melgoza's portfolio.

*Id.,* p. 8.  The document does not assert that Dr. DeCresce knew anything about the mask incident.

104.    Dozens of other witnesses on this list were described, often in verbatim identical terms, as having knowledge of these subject matters.  Nothing indicated whether any witness, including Dr. Jokich, was cooperating with Ms. Melgoza or her lawyers.  *Id.*  Dr. DeCresce did not know until he learned it in the present lawsuit that Ms. Melgoza's lawyers had identified Dr. Jokich as a person having discoverable information.  Ex. 6, 108:7-11; Ex. 16, ¶9.

105.    Dr. Jokich told Mr. Johnson in June 2018 that he had not supported Norma Melgoza's lawsuit, had not been deposed, had not written on her behalf, had not engaged in the administration about her, had not supported her claim, and knew nothing about her complaint other than that she was Hispanic and had been "double demoted."  Ex. 13, 47:18-23, 100:16-101:5; Ex. 50, p. 1.  Dr. Jokich claims that in May 2018, he mentioned the Trump mask incident in a meeting of his breast imagers.  Ex. 4, 453:18-455:1.  Dr. DeCresce had no knowledge of any such meeting or statements by Dr. Jokich at it.  Ex. 16, ¶9.  Dr. Jokich thinks he may have discussed the mask incident with Dr. Sharon Byrd in June 2018 during his annual evaluation.  He

could not recall discussing it with anyone higher.  Ex. 4, 455:3-19.  Dr. DeCresce had no

knowledge of any such discussion if it occurred.  Ex. 16, ¶9.

> ### (4)    Statements about unspecified "retaliation" in requests to meet with Human Resources after he was exonerated by Ms. Nelson's report.

106.    After Ms. Nelson issued a report on the three women's complaint against Dr.

Jokich (see above, ¶¶50-54), Dr. Jokich emailed Shanon Shumpert (a Rush Human Resources

official who had overseen Ms. Nelson's investigation) on April 18, 2018 and April 20, asking to

meet.  He attached an email from Patricia Nedved announcing that Dr. Grabler would have

oversight for all breast imaging sites other than on the down town campus.  Ex. 53; see above,

¶¶56-58.

107.    Ms. Shumpert replied:  "Dr. Jokich, as you know, the investigation was closed

and the complaint was unsubstantiated.  Is your request for a meeting related to the investigatory

finding?  Retaliation?  If it is not, I would suggest that you your HR partner, Fiona Sliwicki, for

assistance." Ex. 57.

108.    Dr. Jokich replied the same day, saying:  "It is about retaliation and other very

serious matters that were brought to light during this process."  He again asked to meet with Ms.

Shumpert and her boss, Mary Ellen Schopp, Vice President for Human Resources, as soon as

possible.  He did not explain what he meant by "retaliation."  *Id.*

109.    Ms. Schopp did not know what if he was referring to retaliation against himself or

against others, or to retaliation under laws such as the employment discrimination laws, or what

the alleged act of retaliation consisted of.  She concluded she should meet with him to find out

what he meant.  Ex. 5, 199:12-200:23.

110.     Ms. Shumpert replied on April 20, 2018 to Dr. Jokich that she could meet with him the next week.  On April 25, 2018, Dr. Jokich replied that his wife and daughter had been in a car accident and he would reach out shortly.  Ex. 58, 57.

111.     On May 10, Dr. Jokich emailed Ms. Shumpert (with a copy to Ms. Schopp) asking for a meeting with her and Ms. Schopp and asking that Bill Goodyear, Chair of Rush's Board of Trustees, be there to discuss "retaliation and other very serious matters at Rush." Again, he did not explain what he meant by "retaliation."  He said he would be out of town until May 16, 2018.  Ex. 58.

112.     Ms. Shumpert replied on May 10, 2018:  "Dr. Jokich, I am amenable to meeting with you to discuss your complaint of retaliation, assuming it is related to the recent investigation that was concluded by Patience Nelson. In fact, depending on the discussion, it may be more appropriate that Patience conduct the follow up, but, I will be better positioned to determine that when/if we meet." *Id.*

113.     On May 22, 2018, 26 minutes before he sent the email to 60 persons at Rush about Dr. Grabler's tomosynthesis talk, Dr. Jokich emailed Mary Ellen Schopp:  "Please let me know when you and I can meet, either next week or the week after.  I am available any afternoon except next Tuesday, and can even stay into the evening any day.  I have several serious issues to bring to your attention."  He did not further elaborate.  Ex. 59.

114.     Ms. Schopp then emailed Ms. Shumpert on May 22, 2018, asking:  "Should I be meeting with him?  Did you two ever connect?"  Ms. Shumpert replied that Dr. Jokich had never responded to her, and suggested that he be told they could meet on May 30, 2018, when Ms. Shumpert would be back in town from a trip.  Ms. Schopp then suggested because of her schedule that they meet on May 31, 2018.  *Id.*

115.    That same day, May 22, 2018, Dr. Jokich sent the email to 60 persons described above, and Dr. DeCresce decided the same day to remove him.  See ¶66 above.  As of that date, Dr. Jokich, Ms. Schopp and Ms. Schumpert had not yet been able to set a date for meeting.  Ex. 5, 204:9-23.

116.    The meeting Dr. Jokich was requesting with Ms. Shumpert, Ms. Shopp and Mr. Goodyear did not take place.  Ex. 4, 46:6-47.2.  When Dr. Jokich sent his June 11, 2018 email to Dr. Goodman, Thomas Johnson was retained to find out what Dr. Jokich was complaining about.  Ex. 5, 205:8-21.

117.    None of the above emails from Dr. Jokich to Ms. Schopp and/or Ms. Shumpert was sent by Dr. Jokich to Dr. DeCresce.  Ex. 58, 59.  Ms. Schopp did not discuss with Dr. DeCresce these emails or Dr. Jokich's requests to meet.  Ex. 16, ¶10.

118.    Dr. DeCresce had no knowledge of these emails or Dr. Jokich's requests to meet with Ms. Schopp, Ms. Schumpert, or Mr. Goodyear their contents when he decided on May 22, 2018 to terminate Dr. Jokich.  He had no knowledge that Dr. Jokich was alleging that any form of "retaliation" had occurred.  *Id.*

### G.    Dr. Jokich had no reasonable basis to complain of discrimination or retaliation at Rush.

#### (1)    Supposed complaints of discrimination against others than himself.

119.    During this lawsuit, Dr. Jokich has mentioned the following physicians as persons against whom Rush might have discriminated:  Dr. Griem, Dr. Jacob Rotmensch, Dr. Michael Tharp, Dr. James Young, Dr. William Schwer, Dr. Robert March, Dr. Howard Strassner, Dr. Ajay Nehra, Dr. Anna Spagnoli, Dr. Marshall Goldin, Dr. Daniel Deziel and Dr. Steven Lewis.  Ex. 61, ¶26; Ex. 60, ¶19; Ex. 4, 23:17-24.

39

120.     Dr. Jokich has "no idea" why Rush had decided not to renew the contractual arrangement with Dr. Griem or her employer, and admits "There might have been good reasons for it but [I was] never told what they were." Ex. 4, 195:4-11.

121.     He has no knowledge as to why Dr. Tharp left Rush, or why Dr. Rotmensch left Rush.  He has no knowledge that Drs. Nehra, Schwer, March, Golden, Young, Strassner, Deziel, Spagnoli, or Lewis were the victims of any kind of discrimination. *Id.* 34:10-36:5.  He had and has no knowledge that any of them, or Dr. Griem, complained to Rush, formally or informally, that they were discriminated against in any way because of age, sex, or national origin.  *Id.* 28:10-31:11.

122.     Although Dr. Griem ceased practicing at Rush after her employer's contract was not renewed, she still is a faculty member at Rush and even serves on the Rush Faculty Council. Ex. 11, 77:15-78:7.

123.     In response to a Request for Documents from Dr. Jokich, Rush reported that other than Dr. Jokich, no physician at Rush who has left his or her employment, or lost his or her privileges as members of the Rush medical staff from January 1, 2014 to the present, has made a complaint against Rush (internal or otherwise) alleging that Rush was culpable of age-, national origin- or sex-based discrimination.  Ex. 62.

124.     In response to a Request for Documents from Dr. Jokich, Rush reported that no Rush-employed physician other than Dr. Jokich, and no member of the Rush Medical Staff other than Dr. Jokich, has made any written grievances or requests for hearing brought by any Rush-employed physician or member of the Rush medical staff from January 1, 2014 to the present that accused Rush management of retaliation.  *Id.*

125.     The only person that Dr. Jokich knows to have filed a complaint of discrimination against Rush at any time before he left is Norma Melgoza, a non-physician. Ex. 4, 31:23-32:24. According to Mr. Johnson's report to Dr. Goodman, Dr. Jokich told him in June 2018 that he didn't have any knowledge about her claims.  He said he had looked at part of her complaint.  Ex. 13, 43:19-21.

### (2)     Complaint to Ms. Nelson of "future retaliation."

126.     Dr. Jokich told Patience Nelson in her investigation of March and April 2018 that he believed that the three women's complaints against him had been made to prepare for "future retaliation" against him for supporting Dr. Griem, and/or to dissuade him from supporting Norma Melgoza's lawsuit, and/or to dissuade him from going public about his opinion about Tomosynthesis and minority women.

127.     Dr. Jokich admits he had no basis for these assertions.  He had the "impression . . . that a number of the leaders of Rush put these women [Drs. Madrigrano, O'Donoghue and Grabler] up to [complaining about him]," but has no evidence for that impression.  Ex. 4, 241:18-22.  He does not know who the people who supposedly put them up to it would have been.  *Id.* 242:8-10.

128.     He has no evidence for his statement that the filing of the complaint by these women had something to do with the fact that he might be called as a witness to testify in Ms. Melgoza's lawsuit.  *Id.,* 242:11-243:5.  He had no evidence for his statement that these women had filed this complaint to dissuade him from going public with his opinion about tomosynthesis and minority women.  *Id.* 243:8-20.

## IV.    UNDISPUTED FACTS RELATING TO DR. JOKICH'S CLAIM THAT RUSH VIOLATED §10-3.2 OF THE MEDICAL STAFF BYLAWS.

### A.    Dr. DeCresce was Dr. Jokich's boss; Dr. Byrd's role with respect to him was limited to doing annual evaluations.

129.    Rush is a "matrix" organization in which a person may report to more than one person. Ex. 2, 66:11-17. This is typical in academic settings. *Id.* 83:1-5. As a matrix-type organization, division heads who were heads of divisions that did cancer care would have reporting relationships both to the cancer center and its director, as well as a department head. Ex. 3, 40:6-10.

130.    In February 2018, Dr. Krishnan told both Dr. Jokich and Dr. DeCresce that henceforward Dr. Jokich would report to Dr. DeCresce. Ex. 6, 129:20-23; Ex. 4, 186:10-188:14; Ex. 27.

131.    The Breast Imaging Division was in the Department of Diagnostic Radiology. Ex.3, 25:3-26:8. That Department's Chair, Dr. Sharon Byrd, did annual evaluations of all radiologists in her Department, including Dr. Jokich and the breast imagers who worked in his Division, and also did a periodic evaluation for them known as an "OPPE." Ex. 9, 33:24-34:2.

132.    However, as Chair of Diagnostic Radiology, Dr. Byrd had nothing to do with Dr. Jokich in his capacity as Division Director of Breast Imaging, because it had, and in her experience always had had, a different "administrative line":

> I was the chair of the department, so all physicians have to be in some kind of department. So the breast imagers were in the diagnostic radiology department. They were in that department before I even came to Rush. There was a special arrangement that had been made – and this is what I was told. I was not at Rush when things happened, and the breast imagers who used to be part -- some of them part of Affiliated [Radiology, the private professional corporation which at one time had an exclusive contract to provide radiology services at Rush], they left, and then they were brought back to Rush in the Rush system as salaried employees, but they had to be in a department. They're radiologists, and so they were put in the radiology department, but it was a different kind of arrangement.

42

It wasn't the same arrangement with the radiologists that were part of the private group that were Affiliated. They were not part of Affiliated. They were part of the radiology department, but they weren't part of Affiliated. They had a separate administrative line. They answered to that line, and this was all negotiated previously before I came, before I came to Rush, before I became chair.

*Id.* 24:24-25:21.

133.    Other than the OPPEs and annual reviews, Dr. Byrd had no regular contact with Dr. Jokich with regard to their respective duties and responsibilities, or with the breast imagers in general. *Id.* 63:3-7, 137:4-7. Their offices were in different buildings, and the breast imagers worked in a different place than the other radiologists. *Id.* 63:8-18. She had no involvement in negotiating contracts with breast imagers. They had their own deal with Rush and she wasn't part of that at all. *Id.* 59:17-60:1.

134.    She is uncertain of who the administrator is for the breast imagers, because "again, the breast imaging is separate. They have a separate line, administrative line." *Id.* 36:4-8. That line reports "mainly to the dean and who he's set up as their administrative line." *Id.* 36:18-23. She knew that Dr. Krishnan had placed Dr. DeCresce in charge of the administrative line to the breast imagers. *Id.,* 138:16-19.

135.     Because she has no administrative relationship to breast imaging, Dr. Byrd had nothing to do with, for example, breast imaging setup at offsite locations (see above, ¶¶56-58). Ex. 9, 54:17-55:1. When Dr. Jokich submitted a five-year plan in 2016 for the Division of Breast Imaging, he did not submit it to Dr. Byrd. He says he "may have discussed" it with her at his annual review, but is not certain whether he reviewed it with her before he sent it in. Ex. 4, 178:2-15.

**B.      Dr. Byrd raised no objection to the removal of Dr. Jokich.**

136.    Dr. Byrd was not involved in the decision to terminate Dr. Jokich.  Ex. 9, 161:18-22.  She was on vacation in August 2018 when Dr. DeCresce removed Dr. Jokich from his position and placed him on paid administrative leave.  After she returned, Dr. DeCresce called her sometime around August 26, 2018 and told her what he had done.  She raised no objection. *Id.* 136:14-141:3, 147:11-152:14, 152:22-153.8; Ex. 6, 220:3-20.

137.    Dr. Jokich has no evidence that Dr. Byrd registered any objection to his removal when she was told about it by Dr. DeCresce.  Ex. 4, 175:7-11.

138.    When she talked to Dr. DeCresce, Dr. Byrd did not ask him why he had removed Dr. Jokich, because:

> Well, obviously they knew what was going on, and they were going to talk to the breast imagers.  So at that time, I was doing clinical work.  I was on call.  I really didn't have the time to be on the phone unless it was a clinical case that I was doing or there was some problems or whatever.  So I felt in due time, I would find out, and as long as there wasn't anything serious in the sense of people were dying or whatever, that if they said they'd get back and let the breast imagers know and that -- I was not going to have a phone conversation in the reading area with him over any details.  I was in a reading area.  I was at my workstation.  I was reading cases and doing procedures, so -- [Interrupted by next question].

Ex. 9, 150:11-151:1.

139.    Dr. Byrd in fact never found out in detail what the problems had been with Dr. Jokich.  She explained:

> I'm not really certain what the problems were.  You have to understand that I was not really directly involved in that administrative line and what was going on.  I had a different role, and so the actual decision making or whatever came through that administrative line, and then they hired someone.  It was hired through that administrative line.  Then I had to then credential the person, make sure the person had the credentials and everything.  So you have to remember, it was not like I was really overseeing and people were talking to me about what was going on in the breast imaging.

*Id.* 161:4-16.

140.    When Dr. Jokich negotiated with Dr. Goodman when he returned to Rush from the University of Chicago, he insisted on "an arrangement where I will -- me and my faculty will be employed physicians and not part of the private group, and I would need to have control of every aspect of the operation, the professional end, the technical administrative end, and I would be allowed to hire everybody from the front desk and secretaries to the physicians. And I would have, like, free rein to do what it took to build the best breast imaging operation, and I think Dr. Goodman's words were 'in the country.'" Ex. 4, 361:20-362:7.

141.    Dr. Byrd did not expect to appoint whoever would replace Dr. Jokich as Division Director: "It is who is appointed by the person who's in charge of that administrative line. That administrative line answers to Dr. DeCresce, and at that time, DeCresce answered to the dean, so they made that decision." *Id.* 163:5-12.

142.    Katharine Struck, who worked for the Dean and is now chief administrative officer of the Cancer Center, knew that Dr. Jokich had negotiated an arrangement with Dr. Goodman and Dr. Deutsch in which Dr. Byrd was not involved with administrative issues of the Division of Breast Imaging, and that she was happy not to be. Dr. Byrd continues not to be involved with that Division in any way, and has "zero participation" in these issues. Ex. 12, 179:5-8.

143.    Dr. Goodman and Dr. Deutsch told Katherine Struck that Dr. Jokich did not report to Dr. Byrd. For purposes of his employment, decisions relating to equipment, any sort of capital, and operating decisions would not go to Dr. Byrd. Employment-related decisions relating to him would go to the Dean, and then the Dean asked Dr. DeCresce as the acting cancer center director to handle some of that. *Id.* 179:8-180:6.

144.    While he was Dean, Dr. Krishnan was the direct supervisor of all clinical Department Chairs, including Dr. Byrd, and had frequent meetings and conversations with them. Ex. 93, ¶6.

145.    Once Dr. Krishnan and Dr. DeCresce met with Dr. Jokich on August 8, 2018 to tell him he was being removed as Division Director, Dr. Krishnan never received any indication of disagreement from Dr. Byrd over the action that had been taken.  Ex. 93, ¶7.  He would not have expected such disagreement, for she had never had any role in supervising Dr. Jokich, whether before or after Dr. Krishnan made Dr. DeCresce Dr. Jokich's supervisor in early 2018. *Id.*  Had she objected, he would have overruled her and would have expected her to follow his order.  But she did not, so no such order was necessary.  *Id.,* ¶8.

## V.    UNDISPUTED FACTS RELATED TO DR. JOKICH'S CLAIM OF VIOLATION OF THE HOSPITAL LICENSING ACT.

146.    When Dr. Jokich was placed on administrative leave, he retained his Rush email account and his access to it with two occasional glitches that were immediately corrected when his counsel brought them to Rush's attention.  Ex. 48.  Radiologists can access radiographic images and other medical records remotely by an app that gets them access to the EPIC system Rush uses for electronic medical records.  Dr. Jokich's access to EPIC was maintained throughout his paid leave.  Ex. 17, ¶4.

147.    The Protocol on his communications with patients on leave provided that if patients called Rush wishing to contact him, Rush would take their number and send Dr. Jokich a message to call them; that he could then give them any advice he wished; and that he would then advise Dr. Grabler of the substance of his contact with the patient.  Docket No. 18, pp. App. 348-349.

148.     Dr. Jokich has admitted that he was informed through this mechanism of 10 to 15 patients who wished to speak to him, that other patients who already had his cell phone number called him directly, and that in all such cases, he deliberately did not call the patients back.  Ex. 4, 310:11-312:13.  Asked why not, he said that "According to this [paragraph of the Protocol}, I was not allowed to speak to patients without going through Dr. Grabler." *Id.,* Ex. 4, 312:15-17. Then he asserted that "I could not access images and I could not access the mammograms or the ultrasounds or the reports, I really could give the patients no medical advice.  I wasn't allowed to." Ex. 4, 313:25-315:5.

149.     Dr. Jokich never contacted Dr. Grabler (who was Acting Division Director while he was on his paid leave) about any patient who had contacted him, much less contacted her to say that he could not access medical data or records about the patient.  Had he done so, Dr. Grabler would have asked Rush's IT Department to straighten out any problem with his remote access to EPIC, or would have provided him the records he needed directly.  Ex. 17, ¶4.

/s/ George F. Galland, Jr.
George F. Galland, Jr.
One of the Attorneys for Defendant

George F. Galland, Jr.
ggalland@lawmbg.com
Benjamin Blustein
bblustein@lawmbg.com
Matthew Owens
mowens@lawmbg.com
Miner, Barnhill & Galland, P.C.
325 N. LaSalle St., Ste. 350
Chicago, IL 60654
312.751.1170

## CERTIFICATE OF SERVICE

Lisa Mecca Davis certifies that she caused a copy of the foregoing Statement to be served upon all counsel of record, by this Court's electronic-filing system, this 13th day of May, 2020.


/s/ Lisa Mecca Davis
Lisa Mecca Davis