# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| PETER JOKICH, M.D., FSBI, FACR,    ) | |
|         ) | |
|     Plaintiff,    ) | |
|         ) | |
|     v.    ) | Case No. 18 C 7885 |
|         ) | |
| RUSH UNIVERSITY MEDICAL CENTER,    ) | Judge Joan H. Lefkow |
|         ) | |
|     Defendant.    ) | |

## OPINION AND ORDER

Peter Jokich, M.D., brings this lawsuit against Rush University Medical Center ("Rush"), alleging that Rush retaliated against him for complaining about discrimination against older workers in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, *et seq.* ("the ADEA") (Count I), women and employees of Hispanic and Mexican national origin in violation of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII") (Count II), and all these groups in violation of the Illinois Human Rights Act, 775 Ill. Comp. Stat. 5/1-101 ("the IHRA") (Count III). He also asserts claims for breach of contract based on his employment agreements (Counts IV and VI) and the Rush Medical Staff Bylaws (Count V). Before the court is Rush's motion for summary judgment on all remaining[1] claims. For the following reasons, the motion is granted as to all federal claims.[2] The court relinquishes jurisdiction over Counts IV through VI.

---

[1] The court has already dismissed Jokich's sub-claims under (1) Count IV, alleging Rush lacked contractual authority to lower Jokich's salary and place him on paid leave' and (2) Count V, alleging Rush impinged on Jokich's clinical privileges. (Dkt. 40.)

[2] The court has jurisdiction over the federal claims under 42 U.S.C. §§ 2000e-5(f)(3) and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Venue is proper in the

## I. Compliance with Federal Rule of Civil Procedure 56 and Local Rule 56.1

Before summarizing the material facts, the court addresses both parties' accusations that the other has not complied with Federal Rule of Civil Procedure 56 and its local companion, LR 56.1. Jokich understandably complains that Rush's 149 assertedly undisputed facts and 104 exhibits are sufficiently numerous to suggest that this is not a case for summary judgment. Beyond that, however, Rush's Federal Rule 56(c)(1)(A) and LR 56.1(a)(2) statement of facts complies with those rules.

Jokich, by contrast, repeatedly fails to respond to Rush's statement of facts as required by LR 56.1(b)(3) and (e)(2). The rules require the party opposing summary judgment to file a "concise response to the movant's statement." Local Rule 56.1 "is not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon* v. *Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000) (interpreting the local rule that was later renumbered as L.R. 56.1). Further, LR 56.1 forbids the non-moving party from setting forth non-responsive additional facts in its response to the statement of material facts. *De* v. *City of Chicago*, 912 F. Supp. 2d 709, 714–15 (N.D. Ill. 2012). Jokich's responses are often

---

Northern District of Illinois pursuant to 28 U.S.C. § 1391. Jokich filed a charge of discrimination on October 22, 2018 and received a right to sue letter on December 14, 2018. (*See* dkt. 17 at 3–4.)

[3] The disputed facts in this Background section are stated in a light favorable to Jokich. Rush's Rule 56.1 Statement of Facts (dkt. 135) is abbreviated as "DSOF." Jokich's Rule 56.1 Statement of Additional Facts (dkt. 150) is abbreviated as "PSOF." Jokich responded to Rush's Statement of Facts at dkt. 149 ("PRDSOF") and Rush responded to Jokich's Statement of Additional Facts at dkt. 160 ("DRPSOF").

argumentative, evasive, and replete with additional assertions even though he has filed his own separate statement of additional facts authorized by LR 56.1(b)(3)(C).[4]

District courts are "entitled to expect strict compliance with Rule 56.1." *Ammons* v. *Aramark Unif. Servs., Inc.*, 368 F.3d 809, 817 (7th Cir. 2004). The court has wide discretion in dealing with non-compliance. *See De*, 912 F. Supp. 2d at 711–16. Here, the court has endeavored to separate wheat from chaff and discern the material facts in order to advance disposition of this aging case. The following facts are undisputed unless otherwise noted.

## II.   Material Facts

### A.   Jokich's career at Rush and employment contracts

Rush is a not-for-profit tax-exempt corporation whose governing Board of Trustees conducts business through roughly a dozen standing committees, including a Compensation and Human Resources Committee ("the Comp Committee"). (DSOF ¶¶ 2, 8.)

Jokich is a nationally recognized physician specializing in breast imaging. (DSOF ¶ 1; PSOF ¶ 1.) He was recruited to Rush in 1989, worked there until 1999, left for two years to join the University of Chicago, and returned to Rush in 2001 on the purportedly express condition that he would begiven "free reign [*sic*]… to build the best breast-imaging operation… in the country." (PSOF ¶ 1.)

---

[4] For example, Rush states, "Dr. [Sharon] Byrd was not involved in the decision to terminate Jokich. She was on vacation in August 2018 when DeCresce removed Jokich from his position and placed him on paid administrative leave. After she returned, DeCresce called her sometime around August 26, 2018 and told her what he had done. She raised no objection." (DSOF ¶ 136.) In response, Jokich attacks the statement as "gross mischaracterization of the record," adding argumentative assertions about the validity of DeCresce's "purported" termination and reasons why Byrd did not object. (PRDSOF ¶ 136.) It would seem simple enough to admit the first and second sentences inasmuch as there appears to be no dispute that Byrd was not involved and was on vacation at the time. And since Jokich alleges that DeCresce unlawfully terminated him (the basis of the lawsuit) and contends that only Byrd had that authority, the failure to give a direct answer is perplexing.

As of 2017, Jokich had received excellent reviews from his Department Chair, Dr. Sharon Byrd, and no negative performance issues were ever noted. (PSOF ¶ 3.) His title at Rush was Director of the Division of Breast Imaging. (DSOF ¶ 1.) In short, he was a prized member of Rush's medical faculty until the controversy at the heart of this litigation arose.

Throughout the years, Jokich maintained employment agreements with Rush, one of which was known as the Faculty Employment Agreement and others known as Letter Agreements that enriched his salary and benefits more than the standard Faculty Employment Agreement. Because the court will dismiss Jokich's contract claims as a result of this Opinion, the details of the contractual relationship need not be explored in detail. Suffice it to say, for the purpose of the federal anti-discrimination laws, Rush was and is an employer and Jokich was employed by Rush at all relevant times.

**B. Jokich's controversy at Rush and termination**

The parties lay out infinite detail about a deteriorating relationship between Dr. Robert DeCresce, the Acting Director of the Rush Cancer Center, and Jokich that need not be entirely included here. The onset appears at some point in 2016. DeCresce informed Jokich that he would not renew a contract with a company that employed Dr. Katherine Griem, a breast imaging physician who Jokich highly valued. (PSOF ¶ 19.) Jokich vehemently resisted the decision and organized other members of his department to oppose it. (PSOF ¶ 20–26.) DeCresce was unmoved and, further, refused to disclose to Jokich his reasons for the decision. (PSOF ¶ 23.) Jokich believed this business decision failed to prioritize patient care. (PSOF ¶ 26.) DeCresce disliked Jokich's failure to follow the chain of command. (PSOF ¶ 26.)

Another relevant set of facts concerns another employee, Norma Melgoza, formerly an Associate Vice President at Rush, who (in shorthand terms) had been demoted and in November

2017 filed a Title VII and Equal Pay Act lawsuit in this court. Jokich contends that he supported Melgoza's case and Rush retaliated against him for doing so.

1.      **Jokich's relationship to Melgoza's case**

On November 1, 2017, Melgoza interviewed with DeCresce for a position at Rush. During the interview, DeCresce put on a Trump mask (which DeCresce denies, although he admitted that he had such a mask in his office, and one might wonder why Melgoza would fabricate). Melgoza felt intimidated and very upset by DeCresce's behavior. After the interview, she had a scheduled meeting with Jokich and reported this incident to him. Jokich told her it was offensive and DeCresce should be fired, and he advised her to report the incident to Human Resources. (PRDSOF ¶ 97.)

Melgoza complained to Human Resources, and Lynn Wallace from that department investigated the complaint. Wallace interviewed Jokich on December 7, 2017 and on December 28, 2017 issued a report concluding that the complaint could not be substantiated. According to her report, Jokich told her that (a) he had not been present at the interview between Melgoza and DeCresce, but Melgoza had told him what had happened; (b) he told Melgoza that if DeCresce had put on the mask as Melgoza claimed, it would have been "unbelievable and unprofessional"; and (c) he and Melgoza had had no further discussion about the incident since that conversation (PRDSOF ¶ 99.)

According to the report, and Jokich does not deny, Jokich expressed no other concerns about DeCresce and told Wallace that DeCresce likes to joke around and is known for his sense

of humor. (PRDSOF ¶ 100.) Jokich admits he never told Wallace he thought Melgoza had been discriminated against.[5] (PRDSOF ¶ 100.)

The report reflects that it was sent to Mary Ellen Schopp, Rush's Chief Human Resources Officer. (DSOF, Ex. 53.) Schopp testified that the report would not in the normal course have gone to DeCresce (DSOF ¶ 101–02), and DeCresce denies knowing of it until he was informed in connection with this lawsuit. (Jokich disputes this but has no evidence substantiating his denial). (PRDSOF ¶ 101–02.)

On January 8, 2018, pursuant to Federal Rule of Civil Procedure 26(a), Melgoza's lawyers sent Rush's lawyers their "Initial Disclosures" in Melgoza's lawsuit. They listed 112 specific individuals at Rush who had knowledge of discoverable information about Ms. Melgoza's claims or defenses, including Jokich. (DSOF ¶ 103.) They stated that Jokich had knowledge of allegations in the complaint regarding Melgoza's salary and Rush's payment of salaries to similarly situated employees; her qualifications, experience, and job performance; her requests to advance within the organization; Rush's available opportunities and open executive positions and Rush's procedures for filling same; Rush's demotion of Melgoza and offer of separation package; statements by Dr. (Antonio) Bianco regarding termination of Melgoza's employment and removal of operational duties that were part of Melgoza's portfolio. (*Id*.) The Initial Disclosures did not specifically assert that either DeCresce or Jokich knew anything about the mask incident.

---

[5] Jokich disputes Rush's assertion that he never told Wallace he thought Melgoza had been discriminated against. He states that he told Wallace that he believed DeCresce's behavior was "absolutely ridiculous" and was "one of the most inappropriate things [he] ha[d] ever heard of." Jokich asserts that these words "clearly express[ed] his belief that Dr. DeCresce had engaged in behavior that was in fact discriminatory. (PRDSOF ¶ 100) As explained below, implied complaints of discrimination are insufficient to amount to protected activity. Furthermore, what Wallace reported about the meeting is what matters.

## 2.     Breast surgeon hiring requests and complaint

On February 9, 2018, Jokich wrote several emails to Dr. Alfonso Torquati, Chair of the Department of Surgery, with copies to Drs. Larry Goodman, the CEO of Rush, and Krishnan, urging them to find a replacement for Dr. Thomas Witt, a breast surgeon who had retired. (DSOF ¶ 50.) In one email, Jokich wrote:

> The breast imaging radiologists work the closest with the breast surgeons (closer than others on the team), since we find and diagnose almost all of the breast cancers at Rush (usually small and early stage) through our imaging efforts[s] … This is markedly different from the old days, when the surgeons were the only game in town, since they were the only ones who diagnosed and treated breast cancer (before mammography, chemo, RT, and hormonal therapies).
>
> We also know which surgeons are 'good' and which are not, based on how many needle localized lesions they miss in surgery (since we read the specimen mammograms from the OR), how many lesions are at the very edge of the specimen, how many patients end up with positive margins, and how many mastectomy patients have recurrences. Is the Surgery Department tracking these things? Are they discussed at your M and M conferences? This almost never happened when Tom Witt was our main breast surgeon. Times have changed. My faculty are very concerned. We could [*sic*] care less about surgical departmental politics. And for the record, our patients take our advice on who to see for breast surgery. We direct most of these referrals, since our patients trust us to send them to the best surgeon … not their primary care doctor, who has no clue. You need to listen to our concerns, for the good of our patients and for the long-term good of the institution.
>
> I am not stuck on Dean Godellas. Just find us another Tom Witt. Please … and quickly. I have been speaking on this for more than a year, and am very frustrated (as I'm sure you can tell).

(*Id*.)

At this time, Rush's two main breast surgeons were Dr. Andrea Madrigrano and Dr. Cristina O'Donoghue. (DSOF ¶ 51.) Torquati showed Jokich's email to Madrigrano and instructed her to gather data to refute any implication that their care was substandard. (DSOF ¶ 51.)

Soon thereafter, Madrigrano and O'Donoghue, along with Dr. Paula Grabler, the breast imager at Rush Oak Park Hospital ("the three women physicians"), met with Katharine Struck, a Vice President at Rush, for "guidance"[6] concerning their relationship with Jokich. (PRDSOF ¶ 52.) Although they "had issues" with Jokich, none of these physicians directly attributed Jokich's conduct towards them as discrimination based on gender. (PSOF ¶42.) Struck then had a conversation with the Human Resources Department. (DSOF ¶ 52.) Human Resources hired an outside investigator, Patience Nelson, to investigate whether Jokich had engaged in disruptive conduct and whether gender discrimination was at play. (PSOF ¶ 43; DSOF ¶ 53.)

During Nelson's interview of him, Jokich stated that he had not discriminated against the three women physicians but, rather, Rush had encouraged them to fabricate complaints against him (a) because he had organized petitions to be signed in support of Griem; (b) to dissuade him from testifying in support of Melgoza's ongoing discrimination lawsuit against Rush; and (c) to deter him from going public with his opinion that Rush Oak Park was exposing ethnic minority women to increased levels of radiation by using 3D Tomosynthesis without their consent. (PRDSOF ¶ 53.)

In March 2018, Krishnan informed Jokich to report to DeCresce, rather than Byrd (DSOF ¶ 130) (although Jokich maintained that Byrd remained his supervisor).[7] (PRDSOF ¶ 69.)

On April 9, 2018, Nelson issued her report, which identified the issues as whether Jokich had (1) engaged in disparagement of the three women physicians' reputations by criticizing patient outcomes without supporting data; (2) created a disruptive environment by criticizing the competencies of female breast surgeons to others; and (3) treating one or more of them

---

[6] Madrigrano dep. at 60, ll. 6-13 (DSOF, Ex. 8.)

[7] Since both he and DeCresce were Directors, thus apparently of the same rank, Jokich likely believed that being told to report to DeCresce was improper.

differently because of gender. (DSOF, Ex. 32.) Nelson concluded that Jokich had not committed "disruptive conduct" as defined by Rush policy or the Medical Staff Bylaws; she was "inclined to believe" Jokich when he claimed he had not meant to disparage the breast surgeons' competence; and Jokich had not acted out of bias toward women. (DSOF ¶ 54.)

Nelson's report also rejected Jokich's assertion of retaliation, finding that he had not engaged in "protected activity"; his allegations about what motivated the women's complaints were "speculative"; and he had not experienced "adverse action." (*Id*.)[8] She recommended that "the leadership of Surgical Oncology, General Surgery[,] and Breast Imaging meet to determine how they can best provide the remedial actions that Complainants seek and redress underlying tensions." (*Id*.)

Jokich had been in charge of Rush's four offsite breast imaging facilities. (PSOF ¶ 44.) On April 20, 2018, without informing Jokich in advance, Dr. DeCresce placed Grabler in charge of planning for breast imaging at two offsite locations under development, South Loop and Oak Brook. (PSOF ¶ 45; DSOF ¶¶ 56–58.) On April 17, Patricia Nedved, a nurse administrator sent out an email to staff announcing the change. (PSOF ¶ 45.)

Jokich felt humiliated and considered it a demotion. (PSOF ¶ 46.) On April 18 and 20, 2018, he emailed Shanon Shumpert, the Rush human resources official who had overseen Nelson's investigation, to request a meeting. (DSOF ¶ 106.) He attached the email announcing that Grabler would have oversight for all breast imaging sites other than on the downtown campus. (DSOF ¶ 106.)

---

[8] The court infers that Nelson was examining the retaliation issue under anti-discrimination laws, even though Jokich thought he was being set up for other reasons as well as a role he might play in Mendoza's case.

Thereafter, several emails were exchanged concerning setting a meeting. In one communication, Jokich confirmed that he wanted to meet "about retaliation and other very serious matters that were brought to light during this process." He did not explain what he meant by "retaliation."[9] (DSOF ¶ 108.) Shumpert replied on April 20, 2018 to Jokich that she could meet with him the next week. (DSOF ¶ 110.) On April 25, 2018, Jokich replied that he could not meet next week but would reach out to set a time. (DSOF ¶ 110.)

On May 8, 2018, Jokich called a special meeting of the physicians in the Division of Breast Imaging. During that meeting, Jokich "told nearly everyone" that he had been demoted after he was cleared of the "meritless gender discrimination claim" and could not be fired on that basis. He told them of Melgoza's report that DeCresce had worn a Trump mask during her interview, that he had recently-acquired information about discrimination laws, and he intended to file a formal complaint with Human Resources. (PSOF ¶ 36.)

On May 10, 2018, Jokich again emailed Shumpert (copying Schopp) asking for a meeting and asking that Bill Goodyear, Chair of Rush's Board of Trustees, be there to discuss "retaliation and other very serious matters at Rush." (DSOF ¶ 111.) Again, he did not explain what he meant by "retaliation." (DSOF ¶ 111.) Shumpert indicated her willingness to meet but a date and time were not set. (DSOF ¶ 112.)

### 3. Jokich's criticism of Grabler's tomosynthesis presentation

On May 21, 2018, at a weekly Rush multidisciplinary breast conference, Grabler gave a talk on tomosynthesis, 3D digital x-ray mammography that creates 2D- and 3D-like pictures of breasts. (DSOF ¶ 64.) She addressed criticisms of the imaging device and presented data from her year of using it at Rush Oak Park. (DSOF ¶ 64.) Jokich attended but said nothing. (DSOF ¶

---

[9] Since Jokich had just received word that Grabler had been reassigned, a reasonable inference is that he was upset about that change. This is not a material fact.

64.) Grabler made no personal remarks about him, and he admits it was a "reasonable presentation." (DSOF ¶ 65.)

Jokich and Grabler had a history of disagreement about the use of tomosynthesis, and she did not consult with him before her presentation. (PSOF ¶¶ 47–49.) Jokich believed Grabler's slide presentation was intended to humiliate him in a public setting because it was known that he was critical of tomosynthesis. (DSOF ¶ 65.)

The next day, on May 22 at 12:19 p.m., Jokich emailed Schopp: "Please let me know when you and I can meet, either next week or the week after. I am available any afternoon except next Tuesday, and can even stay into the evening any day. I have several serious issues to bring to your attention." (DSOF ¶ 113.)[10] Twenty-six minutes later, he sent an email to 60 people at Rush, including Goodman, Krishnan, and DeCresce:

> In response to Grabler's questioning whether 3D/tomo is a business gimmick or marketing gimmick to increase market share, I do believe that it is pushed by community hospital CEO's to increase volume and revenues, with very little patient benefit and potentially patient harm (double the radiation dose).
>
> * * *
>
> It is a sad state of affairs when at the 'new' Rush, administrators, business people, non-clinical nurses and lawyers, and ultimately the Board of Trustees, are making all the major decisions based on money and business concerns, and not the working physicians, who are the only ones, it appears, concerned with what is truly best for our patients, and who really have the Rush mission embedded in our hearts, which is to improve the health of the communities that we serve. This is one of the major reasons why the physician burnout rate at RUMG is now at 43% (plan to leave the institution within the next two years).

(DSOF ¶ 66; PSOF ¶ 47.)

At 4:50 p.m., DeCresce wrote an email to Krishnan:

> At this point you may have seen Jokich's latest outburst concerning his colleagues. I attended the conference which was quite well attended, He had ample opportunity to ask questions of Grabler but apparently felt a personal email attack was a better

---

[10] Schopp, in an email conversation with her colleagues, suggested May 31. (DSOF ¶ 114.)

way to address the content of her presentation. I honestly think he's had more than enough opportunity to reflect on his behavior but apparently is unable to change probably because he thinks he is right all of the time. I plan to meet with him tomorrow and tell him that his behavior is unacceptable and an apology is in order. I would say in many ways his behavior is the antithesis of the ICARE values.

I believe it is time for a change in mammography. Pete's attitude is quite negative towards anyone who disagrees with him and that is not going to change. If we want to be a leading cancer center we need individuals who will work together to achieve the goal. Pete is not one of those people. Please let me know when we can meet to discuss this issue. I don't think too many people are going to come to his defense.

(DSOF, Ex. 18.)

At 6:37 p.m., Goodman wrote to DeCresce and Krishnan:

I'm certainly happy to meet, but I totally support your judgement concerning the individuals that report to you. I appreciate the heads up and I'm sorry to hear that Peter continues to display behaviors inconsistent with our values and what we expect from leaders. It really is unfortunate given his important role in developing this service. Nevertheless, those accomplishments do not exempt him from the expectations we have today. I am out of the country this week but can meet next week if you want. Because I am away I thought I should weigh in to be clear that I support holding him accountable - as we would anyone else.

(DSOF, Ex. 18.)

On June 11, Jokich sent an email to Goodman, Schopp, and Dr. David Ansell (Senior Vice

President of Health Equity):

I attended the mandatory Rush anti-harassment training presented by Patience Nelson, J.D., last month.[11] Since I am now very educated on the subject of harassment and discrimination, I feel that it is my duty to inform you that I am aware of serious discrimination issues and unfair employment practices that have occurred, and are occurring, at Rush involving at least gender, age, and national origin, which greatly impact our diversity goals. I would, therefore, like to request a meeting with you to discuss these issues, and other serious concerns, which impact quality patient care and organizational morale.

I have made several requests to meet with Shanon Shumpert and Mary Ellen Schopp from Human Resources together, and even asked that Mr. Goodyear, our chairman of the Board of Trustees be present, but there has been no date set for a meeting, despite the fact that my first meeting request was made many weeks ago. Please forward this email to Mr. Goodyear. You know that I love Rush and raise

---

[11] The training occurred on April 25, 2018. (PSOF ¶ 53.)

my concerns so that we don't lose what has been created here over the past several decades … an incredible culture which puts excellence in patient care above all else.

(PSOF ¶ 55.)

According to Goodman, when he received Jokich's June 11 email, he "hit the pause button" on Jokich's termination because he did not know what his complaints were, wanted to understand the detail about them and make sure they heard them, and "if he had true knowledge about incidents of wrongdoing or prejudiced behavior on the part of Rush, that was important to hear." (DSOF ¶ 79.)[12]

On June 18, Jokich filed a formal complaint with Rush, alleging, among other things, (a) gender and age discrimination against Griem, and retaliation in relation thereto; (b) gender and national origin discrimination and harassment against Melgoza, and retaliation in relation thereto; and (c) false accusations of gender discrimination brought to Rush's human resources department. He named the following individuals as culpable in these and other acts of discrimination and retaliation: Goodman, Krishnan, Schopp, Nedved, Struck, DeCresce, and others. (PSOF ¶ 55.)

Goodman emailed Jokich the following day:

We take such issues very seriously. Your concerns will be investigated through the appropriate areas which include compliance (Cynthia Boyd) and/or HR (Mary Ellen Schopp, one of your addressees). They will reach out to you to schedule a meeting to follow up and obtain more detail. For your information, our Board is kept informed concerning any compliance issues, our diversity goals and strategies, and Rush's quality of care regularly. I appreciate your thoughts concerning the positive culture and emphasis on high quality patient care which I certainly share.

(PSOF ¶ 80.)

---

[12] Jokich disputes this testimony as implausible. (PRDSOF ¶ 79.)

Rush retained an attorney, Thomas Johnson, to investigate Jokich's complaint. Johnson interviewed Jokich several times and reviewed extensive emails and other documents. (DSOF ¶ 81.) On July 29, Johnson reported his conclusion that Jokich had not provided any evidence to support a retaliation claim under the employment discrimination laws. In relevant part, Johnson determined that Jokich had not provided any specific evidence that he objected to perceived acts of discrimination and therefore did not engage in protected activity. (DSOF ¶ 82.)[13]

### C. Jokich's termination

On August 8, 2018, DeCresce and Krishnan met with Jokich and told him it was time to part ways: He could resign under an agreement or face termination. (DSOF ¶¶ 84, 86.) DeCresce and Krishnan tendered Jokich a separation agreement, which he had 21 days to consider, and, among other provisions, offered to pay Jokich his then-current salary of $659,818 until June 30, 2020, allow Jokich to take any other job,[14] agree on a departure announcement, write a recommendation, and agree to mutual confidentiality and non-disparagement provisions. (PRDSOF ¶ 85.)

On August 21, Jokich's counsel wrote to Rush's counsel that Jokich was not accepting the separation agreement in the present form. (DSOF ¶ 87.) On August 22, DeCresce wrote Jokich that, in light of his rejection of Rush's offer, he was removed from his position; that pursuant to section 7 of his Faculty Employment Agreement, his salary would be lowered 60 days after his receipt of the letter to $448,802; and when his then-current one-year term under the

---

[13] Jokich implies that Johnson was not impartial because he was on retainer with Rush and argues that his investigation was superficial because he based his opinion only on the emails and documents Jokich provided. (PSOF ¶¶ 60–62.) Johnson's opinion appears only admissible and relevant to the timing of the termination.

[14] What was meant by "any other job" is not clear, as Jokich understood that he was being "pushed out" at Rush. (PRDSOF ¶ 85.)

FEA expired on June 30, 2019, it would not be renewed. (DSOF ¶ 88.) The following day, Rush's counsel replied to Jokich's counsel, explaining Rush's reasons for declining to negotiate further. (DSOF ¶ 88.)

On August 23, 2018, via letter, DeCresce removed Jokich from his position as Director of the Division of Breast Imaging, reduced his salary by more than $200,000 (on 60 days' notice), placed him on administrative leave, and purported to terminate his contract as of July 1, 2019 even though his contractual term of employment did not expire until June 30, 2020 at the earliest. (PSOF ¶ 56.)[15]

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505 (1986). To determine whether any genuine issue of material fact exists, the court must look beyond the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c). In doing so, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare*, 629 F.3d at 704. At the same time,

> [w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. And although we must, for purposes of summary judgment review, draw any inferences from the record in

---

[15] Rush disputes Jokich's interpretation of his employment contract. The court accepts Jokich's version for the purpose of the motion.

favor of the plaintiff, we are not required to draw every conceivable inference from the record. We need draw only reasonable ones.

*Gleason* v. *Mesirow Financial, Inc*., 118 F.3d 1134, 1146 (7th Cir. 1997) (cleaned up[16]) (citing, *inter alia*, *Matsushita Electric Industrial Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1355–56 (1986)).

The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548 (1986). In response, the non-moving party cannot rest on their pleadings alone but must designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324, 106 S. Ct. 2548; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). If a claim or defense is factually unsupported, it should be disposed of on summary judgment. *Celotex Corp.*, 477 U.S. at 323–24, 106 S. Ct. 2548.

## ANALYSIS

## I.    Retaliation Claims

Jokich claims that Rush retaliated against him for complaining about discrimination against older workers, women, and employees of Hispanic and Mexican national origin, in violation of the ADEA, Title VII, and the IHRA. The Seventh Circuit uses the same standard to evaluate claims of retaliation under all three statutes. To prevail on a retaliation claim, the plaintiff must prove that (1) he engaged in a statutorily protected activity; (2) he suffered from an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lewis* v. *Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018); *Wetzel* v. *Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 868 (7th Cir. 2018) (noting same test for Title VII and ADEA);

---

[16] *See Brownback* v*. King*, 141 S. Ct. 740, 748 (2021) (using "cleaned up" to signify omission of citations, quotation marks, insertions, or parentheses), a much more efficient (and now officially sanctioned) signal to check original text if desired.)

*Teruggi* v. *CIT Grp./Capital Fin., Inc.,* 709 F.3d 654, 659 (7th Cir. 2013) (noting IHRA follows federal statutes).[17] As Rush concedes the second element, to obtain summary judgment, Rush must demonstrate that Jokich has insufficient evidence to go to the jury on the first or third element.

## A. Protected activity

Under section 704 of Title VII, 42 U.S.C. § 2000e-3(a), it is "an unlawful employment practice for an employer … to discriminate against any of his employees … because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this [title]."

Crediting Jokich's subjective belief and reasonableness thereof, he engaged in protected activity when he wrote to Goodman, Schopp, and Ansell on June 11, 2018 specifically asserting that he was being retaliated against because of his support for Melgoza, who had a pending Title VII claim in this court. *See Beamon* v. *Hewitt Associates, LLC*, No. 03 C 794, 2004 WL 2038169, at *6 (N.D. Ill. 2004) (Plaintiff's involvement in internal investigation of fellow employee's sexual harassment complaint was protected activity where plaintiff subjectively believed she was participating in a complaint of sexual harassment and her belief was objectively reasonable.)[18] He also engaged in protected activity when he formally complained on June 18.

---

[17] In *Ortiz* v. *Werner Enterprises*, 834 F.3d 760, 763 (7th Cir. 2016), the court explained that "direct" and "indirect" methods of proof are "just means to consider whether one fact ... caused another ... and therefore are not 'elements' of any claim." District courts are cautioned "not to split evidence into categories of 'direct evidence' and 'indirect evidence,' but to instead evaluate the evidence as a whole to determine if it "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.* at 764–65.

[18] He also expressed his opposition to the departure of Griem and that a false allegations of sex discrimination had been made against him by the three women physicians. Concerning Griem, there is no evidence that Jokich's objection to Griem's departure was based on his belief that she was being

Thus, if there is sufficient evidence to submit to a jury that the decision to terminate was based on the June 2018 protected activity, summary judgment must be denied. And because Rush contends that it made the decision to "part ways" with Jokich immediately after his May 22 email, the court also must examine whether Jokich's statements before May 22 amount to protected activity.

Rush argues that Jokich's generic averments to retaliation in his emails in April and May 2018, following the Nelson investigation, are not protected activity, citing *Montgomery* v. *Am. Airlines, Inc.*, 626 F.3d 382, 392 (7th Cir. 2010) ("Employers need not divine complaints from the ether, guessing at the subjective suspicions of employees. An aggrieved employee must at least report—clearly and directly—nonobvious policy violations troubling him so that the supervisors may intervene."), and *Miller* v. *Am. Family Mut. Ins. Co.*, 203 F.3d 997, 1007–08 (7th Cir. 2000) ("An employee, of course, need not use the words 'pregnancy discrimination.' But she has to at least say something to indicate her pregnancy is an issue.").

---

discriminated against. To the contrary, on April 10, 2017, Jokich, sent an email to Goodman and Krishnan requesting an explanation for Griem's termination. The email stated among numerous possibilities that age and gender discrimination might be a reason but unlikely due to Rush's commitment to diversity. (DSOF ¶ 96.) In addition, Jokich has presented no evidence that Griem's separation was, in fact, discriminatory, nor that Griem made any allegation of unlawful discrimination. Thus, he could not have participated in any discrimination claim concerning her. Therefore, the evidence does not support a finding that Jokich engaged in protected activity concerning Griem.

Similarly, Jokich's complaint that he was being retaliated against for complaining about the departure of older physicians is not supported. Jokich admitted in his deposition that he did not make any complaints to Rush about age discrimination against older physicians. (DSOF ¶ 91.) He also acknowledged that he did not know that any Rush physicians themselves complained about discrimination. (DSOF ¶¶ 120–121, 123–24.)

Finally, Jokich's statements about his opposition to the use of tomosynthesis as harmful to minority patients is not protected activity. *See Paulos-Johnson* v. *Advocate Trinity Hosp.*, No. 01 C 3639, 2002 WL 230783, at *4 (N.D. Ill. Feb. 15, 2002) (complaints of discrimination against Hispanic patients are not actionable).

The question of fact is whether Jokich made statements concerning Melgoza or anyone else who engaged in protected activity that may be viewed as participation in a fellow employee's discrimination complaint. Rush acknowledges that Nelson's April 9, 2018 report, which was transmitted to DeCresce, stated that Jokich claimed during her investigation that he was being targeted for "future retaliation" because "he might be called as a witness in Melgoza's lawsuit." (PRDSOF ¶ 53.) For purposes of this decision, then, the court considers this assertion sufficient to constitute participation in Melgoza's case and therefore protected activity.

### B. Causation

As Judge Easterbrook classically framed the causation issue in *Gehring* v. *Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994), an age discrimination case, a jury "must decide whether the employer would have fired [demoted, laid off] the employee if the employee had been younger than 40 and everything else had remained the same." Or, in this instance, could a reasonable jury decide that DeCresce on behalf of Rush would have terminated Jokich if he had not been a potential witness in Melgoza's discrimination case but everything else had been the same?

As set out above, the court first looks to whether Rush has demonstrated that there is no genuine issue of material fact that Jokich was not terminated because of protected activity. The court finds this threshold crossed in that Rush has proffered a mountain of evidence of conflict between Jokich and Rush arising from the conflict between DeCresce and Jokich and to the lack of any evidence, other than Jokich's belief, that the deciding official, DeCresce, was concerned about Jokich's knowledge of or potential support for Melgoza's lawsuit.

Jokich then has the responsibility to designate specific material facts showing that there is a genuine issue for trial. Jokich relies on circumstantial evidence, primarily "suspicious timing"

to show the causal link.[19] "Suspicious timing alone rarely establishes causation, but if there is corroborating evidence that supports an inference of causation, suspicious timing may permit a plaintiff to survive summary judgment." *Sklyarsky* v. *Means-Knaus Partners, L.P.*, 777 F.3d 892, 898 (7th Cir. 2015).

It is important to bear in mind that what DeCresce, and those who were required to concur in his decision to terminate, knew of Jokich's protected activity is critical in determining whether the activity was a but-for reason. *See*, *e.g.*, *Garza* v. *Illinois Institute of Technology*, 2018 WL 264198, at *4 (N.D. Ill. 2018) (holding plaintiff's retaliation claim could not proceed where he had not communicated the alleged discriminatory conduct to employer). In other words, what Jokich was thinking at the time about discriminatory practices at Rush means nothing in this analysis unless he conveyed his thoughts to his employer.

Jokich points to the facts that (1) a "baseless" gender discrimination complaint from the three women physicians was submitted against him (PSOF ¶ 36); (2) he was demoted eight days after Nelson's report came out revealing that he believed he was being targeted because he could be a witness in Melgoza's case (PSOF ¶ 44–46); and (3) he was terminated less than two months after his June 18 email, which again asserted that discrimination was a problem at Rush. (PSOF ¶ 56.)

As for (1), Jokich points to no evidence other than his belief that the three women physicians' meeting with Schopp was instigated by Rush because of his support of Melgoza. Furthermore, the report, even if it went to DeCresce (and there is no evidence it did), merely

---

[19] Circumstantial evidence to support causation can include: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Rowlands* v. *United Parcel Serv. - Fort Wayne*, 901 F.3d 792, 802 (7th Cir. 2018) (citation omitted).

relayed that Melgoza told him about the mask incident, hardly something to cause DeCresce concern.

These matters aside, the timing of the three women physicians' meeting with Schopp occurred shortly after Jokich's February 9, 2018 email asking his superiors to hire another breast surgeon to replace Witt, which the women felt diminished them. No reasonable jury would conclude that Jokich's statement to Wallace, rather than Jokich's email, motivated the women to speak to Schopp.

As for (2), Nelson's report came out on April 9, 2018, revealing that Jokich believed he was being targeted because he could be a witness in Melgoza's case. The court finds no indication that Jokich was demoted on or about April 17, however. Although Grabler took over responsibility for breast imaging at satellite sites, Jokich suffered no loss in pay or title. Neither has Jokich pointed to any evidence other than his own speculation that DeCresce was motivated by concern about Jokich in relation to Melgoza's case.

Thirdly, Jokich's reliance on the fact that he was terminated less than two months after his June 11 and 18 emails does relate to whether the decision to terminate him was made in May and whether Goodman's testimony is true that he put a "pause" on the termination pending Jokich's allegations so as to wait until Johnson's investigation was complete. There is undisputed evidence that DeCresce informed his superiors on May 22, 2018 that he had decided it was "time for a change in mammography" and, other than Goodman's supportive response, the record is void of any evidence of why the change was delayed until August 9 other than the "pause" Goodman testified to in response to Jokich's protected activity in June and the ensuing investigation.

A reasonable jury could believe DeCresce's documented disapproval of Jokich's behavior toward management and peers was the reason for the termination, and that Goodman's statement that he paused the termination pending Johnson's investigation was the reason it was delayed until August. A reasonable jury could not conclude, however, that but for Jokich's June 2018 protected activity he would not have been terminated.

Jokich has proffered his unquestioned competence, at least nine reasons given for his termination, and violation of Rush's own policies for termination of employment to support his argument that Rush's explanation of why it terminated him are pretextual (not true). These are insufficient to create an issue of fact. Rush has not questioned Jokich's competence as a physician. All of the dissatisfaction expressed by Rush's executives (negative attitude, inability to work cooperatively, low productivity, etc.) are not reasonably seen as shifting reasons but, rather, part of a chain of events that culminated in a decision that it would be in the best interest of Rush to part ways with Jokich. Even if Rush has violated its by-laws or the employment contract as Jokich claims, nothing about that points to retaliation for participating in Melgoza's lawsuit.

In sum, the entirety of the record in this case, which this court has examined in laborious detail, leads to the conclusion that Jokich's termination had nothing to do with his allegations of unlawful discrimination at Rush. He was terminated as a result of strong differences of opinion about how Rush, his department, and he as a senior physician, should be managed. The inferences Jokich asks the court to draw in his favor are simply not reasonable inferences.

## II.    State Law Claims

This case was originally filed in the Circuit Court of Cook County. Jokich, after motions for temporary injunctive relief and an appeal were denied, dismissed the case without prejudice.

He later filed his case as a civil rights action invoking federal jurisdiction. The allegations are essentially the same as the original case, but for additional facts concerning his unlawful retaliation claims. This court, having concluded that Rush is entitled to judgment as a matter of law on those claims, concludes that the remaining claims, which are based on principles of contract construction that are quintessentially matters of Illinois law, should be dismissed without prejudice to filing in the state court.

## **ORDER**

Defendant's motion for summary judgment on Counts I, II, and III of the First Amended Complaint (dkt. 130) is granted. The Clerk is directed to enter final judgment in favor of defendant on those claims. The court relinquishes jurisdiction over the claims set out in Counts IV, V, and VI. The case is terminated.

Date: May 11, 2021

U.S. District Judge Joan H. Lefkow