IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| PETER JOKICH, M.D., FSBI, FACR, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 18 C 7885 |
| RUSH UNIVERSITY MEDICAL CENTER, | ) ) Judge Joan H. Lefkow |
| Defendant. | ) ) |

**OPINION AND ORDER**

Peter Jokich, M.D., asserts claims for breach of contract based on his employment agreements (Counts IV and VI of First Amended Complaint) and the Rush Medical Staff Bylaws (Count V). Before the court is Rush's motion for summary judgment on these[1] claims. For the following reasons, the motion is granted.

**BACKGROUND**[2]

Rush is a not-for-profit tax-exempt corporation whose governing Board of Trustees conducts business through roughly a dozen standing committees, including a Compensation and Human Resources Committee. (For purposes of this decision this committee may be referred to as "the Board" as well as the "Comp Committee.") The Comp Committee reviews contracts for highly paid physicians.

---

[1] In an Opinion and Order entered on May 11, 2021 (dkt. 172), the court granted summary judgment in favor of Rush on Jokich's federal claims, relinquished jurisdiction over the state law claims, and entered final judgment in favor of Rush. Jokich moved to alter or amend the judgment, asking the court to retain jurisdiction over the state law claims because he is procedurally barred from refiling in the Illinois courts. The motion was granted. Those claims are the subject of this document.

[2] The disputed facts in this Background section are stated in a light favorable to Jokich. The procedures and legal standards for summary judgment motions are set out in the May 11, 2021 Opinion.

From 2001 until his termination, Jokich was employed by Rush in the Division of Breast Imaging (the DBI). By 2017, he was Director of the DBI. Throughout the years, Jokich, along with other faculty, had standard employment agreements with Rush. Beginning in 2012, Rush initiated the "Faculty Employment Agreement" (FEA) for its physicians. The FEA was a standard "evergreen" contract that renewed annually unless either party gave 120 days advance written notice of termination. The FEA covered base compensation and standard benefits.

In 2001, 2007, and 2013–14 (Jokich signed this letter on January 24, 2014), Jokich negotiated additional agreements providing multi-year terms. The terms were set out in an offer letter from Rush to Jokich, which upon Jokich's signature of acceptance became what is referred to as a "letter agreement."

The 2001 letter agreement was for a seven-year term. The 2007 letter agreement was for a four-year term. In 2013–14, the term was three years, ending June 30, 2016. The 2013–14 letter agreement specified that Rush would begin discussions at the beginning of the third year (July 1, 2015) regarding a further extension. The various letter agreements included bonuses and enhanced benefits for the DBI physicians and for Jokich that were not included in the FEA.

Rush consults Sullivan, Cotter & Associates to advise the Comp Committee. According to Sullivan Cotter, anti-kickback laws require that financial relationships between tax-exempt institutions and physicians be fair market value and commercially reasonable. If not, the institution can incur treble-damage penalties.

Sullivan Cotter uses a three-step test to judge whether compensation is fair market value. First, if proposed compensation for a physician within his or her specialty is at the 75th percentile or below by national standards, it will opine, absent unusual circumstances, that compensation is fair market value. Second, if the compensation is above the 75th percentile,

there must be a strong relationship between pay and the physician's clinical productivity. Third, if the physician's compensation fails the first or second test, Sullivan Cotter offers no fair market value opinion and tells Rush it must present "business judgment factors" for the Board to decide whether the proposed compensation is a sound business judgment.

Because of these rules, Rush management's policy is that any proposed contract whose compensation is over the 75th percentile may be submitted to the Comp Committee for approval, while anything over the 90th percentile must be submitted to it. Sullivan Cotter uses "Work Relative Value Units" (RVUs) to measure productivity. It considers this metric the "industry standard."[3]

Rush tracks RVUs of its employed physicians[4] and uses them to determine significant parts of their compensation and to judge their performance. Rush also assigns each a "Full Time Equivalent" percentage (FTE), i.e., the percentage of full time the physician is supposedly spending treating patients. Other things being equal, a lower FTE would lead to a lower expectation on what number of RVUs is expected from a given clinician.

Although, according to Sullivan Cotter, Jokich's compensation in the 2013–14 letter agreement exceeded the benchmark at the 95th percentile by national standards and his productivity level was below 10 percent by those standards, Rush management argued to the Comp Committee that its "business rationale … was highly supportive of [Jokich's] compensation level." The Comp Committee approved it and informed Jokich that the three-year letter agreement had been approved. That letter agreement included the statement, "As you are

---

[3] Jokich disputes this statement as self-serving and undocumented as a policy or industry standard. This is not a material fact. There is no dispute that these rules were imposed on Jokich.

[4] Jokich disputes that this practice is universal, but he offers no evidence to the contrary.

aware, your total achievable compensation benchmarks above the 90th percentile and has been approved by the Board."

During the seven-month period between June 30, 2013 and January 24, 2014, a period from when the previous letter agreement had expired and until a new letter agreement was signed by Jokich, Rush did not change Jokich's salary and benefits or the benefits for the breast imaging faculty that had been part of the 2013–14 letter agreement.

In January 2016, Dr. Ranga Krishnan, Dean of the Medical College, sent Jokich a proposed two-year letter agreement which stated that its proposed compensation arrangement "will have to be approved by the Compensation Committee of the Board of Trustees."

On August 12, 2016, Krishnan and Jokich signed a letter agreement keeping him as Director of the DBI through at least June 30, 2020. The letter was different in some respects from the January letter, but it contained the sentence about approval by the Comp Committee of the Board of Trustees.

Management submitted the signed August 12, 2016 letter agreement to the Comp Committee for approval. At its meeting of October 21, 2016, based on advice from Sullivan Cotter, the Comp Committee declined to approve the agreement, asking management to develop and embed pre-determined qualitative metrics into the contract for further Comp Committee review.

Thereafter, management and Jokich engaged in negotiations in efforts to reach an agreement that would be acceptable to the Comp Committee. Management insisted that the agreement would have to include productivity metrics according to Sullivan Cotter's

4

recommendations.[5] These negotiations continued into April, 2017, but Jokich would not agree to any of Rush's proposed metrics.

On April 19, 2017, after further discussions within management, Krishnan authorized Dr. Antonio Bianco, then president of the practice group of employed Rush physicians, to send Jokich an amended offer letter, which Bianco emailed to Jokich the following day, April 20. Bianco referred to it as "a letter that amends and restates" the 2016 letter agreement. This amended offer letter included specific productivity metrics and a stipulation that "[f]ailure to meet the productivity goal during Fiscal Years 2018–20 will trigger automatic review of your base salary, which will be subject to renegotiation upon renewal in Fiscal Years 2021–22."

The same day, Jokich wrote Krishnan, copying Dr. Larry Goodman, Rush's CEO and Board president, stating, "The amended offer is unacceptable to me and is insulting and disrespectful to me and to all of the senior breast imaging physicians in the group."

Nonetheless, with a couple of concessions to Jokich from the April 20 draft offer letter, management presented the amended offer letter to the Comp Committee at its June 14, 2017 meeting. The Comp Committee approved the amended offer letter, and it was sent to Jokich for his signature. The amended offer letter set out the reason the 2016 letter agreement had not been approved and set out the terms of what had been approved. There was no other communication to Jokich that explicitly said the 2016 letter agreement was void or superseded by the amended offer letter.

Jokich neither signed nor returned the letter. He did not communicate to management that he would not sign. No one in management reached out to Jokich about the letter and, according

---

[5] Emails were exchanged between Jokich and management in which Jokich suggested possible workarounds, such as reducing his bonus percentage or making him a department chair.

to Krishnan, he assumed that Jokich had signed. In the fall of 2017, Krishnan approved Jokich's FY 2016 bonus (for the year ending June 30, 2017).

Jokich disputes that Krishnan did not know that he had not signed the amended offer letter until after the decision to terminate him had been made the following Spring.[6]

The 2013–14 letter agreement, the 2016 letter agreement, and the amended offer letter contained the same bonus and benefit provisions for Jokich, although the amended offer letter had new, more demanding performance metrics.[7] Jokich's salary under the FEA remained the same for these years.

In any event, things went along until, as described in the May 2021 Opinion, Jokich's relationship with Rush deteriorated to the point that Dr. Robert DeCresce, Acting Director of the Cancer Center, to whom Jokich had been told to report,[8] recommended to Goodman and Krishnan that Jokich's employment be terminated.

DeCresce and Krishnan met with Jokich on Wednesday, August 8, 2018. They presented a separation agreement that, upon mutual release, would pay him at his then-current salary of $659,815 until June 30, 2020. The offer would let him take any other job, provide an agreed-on

---

[6] Jokich believes Krishnan is not credible on this point, and that is sufficient to create a dispute of material fact in contrast to his own inference from management's silence that Rush had accepted the 2016 letter agreement. The court is unable to find even circumstantial evidence that points to Krishnan's learning at an earlier time. In any event, this is not a material fact, as is explained below.

Jokich also believes that Bianco's use of the terms "amends" and "restates" the 2016 letter agreement when transmitting the amended offer letter, means that Rush accepted the 2016 letter agreement. The court must rely on the amended offer letter to discern what it means.

[7] Neither party points to evidence of how eligibility for the bonus was measured against performance metrics. Krishnan testified that he "signs off" after the Rush University Medical Group. "takes a look at it. If they find everything is correct, then it comes to me for final approval." Krishnan dep. at 39 (Dkt. 150-2 at 460).

[8] In February or March 2018, Krishnan told both Jokich and DeCresce that henceforward Jokich would report to DeCresce. Jokich thought it was a temporary change but, temporary or not, the relationship existed at relevant times.

departure announcement, give him a good recommendation from Goodman, and include a mutual non-disparagement provision. Jokich was given 21 days to consider the severance offer.

On August 21, Jokich's attorney wrote Rush's counsel that his client would not accept the offer "in its present form," asking for a 30-day standstill for further negotiations.

Rather than informing Jokich's counsel that it was Rush's last and best offer, on August 22, 2018, DeCresce wrote Jokich that, in light of his rejection of Rush's offer, he was removed from his position; that pursuant to section 7 of his FEA his salary would be lowered after 60 days to $448,802; and that when his then-current one-year term under the FEA expired on June 30, 2019, it would not be renewed.

Rush lowered Jokich's salary 60 days later to $448,802 and did not renew his FEA when its term expired on June 30, 2019. Rush did not pay Jokich any bonus for the fiscal year 2018 or for the fiscal year 2019.

Under the 2016 letter agreement, Jokich's term did not expire until June 30, 2020 at the earliest and he would have been entitled to his salary of $659,815 and eligible for bonuses for FY 2017 through its expiration.

Section 6 of the FEA provides for annual automatic renewal "unless (i) one Party provides the other Party with notice of its intent not to renew at least one hundred twenty days prior to the end of any term or (ii) this Agreement is terminated in accordance with Section 7…." Section 7 provides,

> **Amendment or Modification.** … Rush may modify [services] or [compensation] of this Agreement by providing the Faculty Member with at least sixty (60) days prior written notice of the modification. Unless Faculty Member provides Rush with a written objection within fifteen (15) days of the modification notice, then the modification is deemed accepted. If Faculty Member objects to a modification, the Parties will use good faith efforts to reach agreement regarding the Exhibit modification within thirty (30) days of the Faculty Member's objection. If

7

agreement is not reached within this time period, then either Party may terminate the Agreement upon fifteen (15) days notice to the other Party.

Rush is a "matrix" organization in which a person may report to more than one person. The DBI was within the Department of Diagnostic Radiology, chaired by Dr. Sharon Byrd. As such, Jokich administratively reported to both Byrd and DeCresce. Broadly stated, however, the DBI functioned independently of Byrd's department.[9]

Byrd performed biannual evaluations known as OPPE and annual performance reviews of all radiologists in her department, including Jokich and the breast imagers who worked in the DBI.

Other than these tasks, Byrd had no regular contact with Jokich or his physicians. When Jokich submitted a five-year plan in 2016 for the DBI, he did not submit it to Byrd, although he may have discussed it with her at an annual review. Similarly, Jokich did not have regular contact with DeCresce, and he did not submit his five-year plan to DeCresce.

Byrd was not involved in the decision to terminate Jokich in the Spring of 2018 (according to Rush) or at any time thereafter. Indeed, Byrd was on vacation at the time Krishnan and DeCresce met with Jokich on August 8 until sometime after August 22, 2018. Upon her return, some physicians in the DBI contacted her about why Jokich had not been present for two weeks, so she placed a phone call to DeCresce.

DeCresce returned the call on or about August 26 and told her that Jokich "was not coming back." He said he would meet with the breast imagers to explain what was going on. Byrd did not ask and was not told whether he had left voluntarily or involuntarily. She also attended a meeting where Krishnan explained to some of the DBI physicians that Jokich was not

---

[9] Rush admits that Byrd came to know and work *closely* with Jokich, but Jokich's citations to Byrd's deposition do not support a "close" relationship.

coming back but assured them their jobs were safe. Krishnan did not reveal the reason, and Byrd stated at her deposition that she still did not know the reason in any detail.[10]

While he was Dean, Krishnan was the direct supervisor of all clinical Department Chairs, including Byrd, and had frequent meetings and conversations with them.

## ANALYSIS

To prevail on a claim for breach of contract under Illinois law, a plaintiff must prove four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC* v. *Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010) (quoting *W.W. Vincent & Co.* v. *First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). The parties here agree that they had a valid, enforceable contract but do not agree on its terms. Ascertaining those terms determines whether a breach occurred.

Ordinarily, "contract interpretation is a subject particularly suited to disposition by summary judgment." *Metalex Corp.* v. *Uniden Corp. of Am.,* 863 F.2d 1331, 1333 (7th Cir. 1988). At the summary judgment stage, the court determines "whether the contract is ambiguous or unambiguous as a matter of law." *Id.* Under Illinois law, which the parties agree applies in this case, if a contractual term is susceptible to reasonable alternative interpretations, it is ambiguous. *See Thompson* v. *Gordon,* 948 N.E.2d 39, 47 (Ill. 2011). At that point, contract interpretation "generally becomes a question for the jury." *Harmon* v. *Gordon,* 712 F.3d 1044, 1051 (7th Cir. 2013).

An exception to this rule allows for the consideration of undisputed extrinsic evidence to determine the parties' intent. *See Citadel Grp. Ltd.* v. *Wash. Reg'l Med. Ctr.*, 692 F.3d 580, 587

---

[10] She also stated that it was DeCresce's responsibility to name a new DBI director.

(7th Cir. 2012). If the extrinsic evidence is undisputed and leads to only one reasonable interpretation, the court may decide the matter on summary judgment. *See id.*

Rush rests on two arguments: (1) The 2016 letter agreement was not approved by Rush and does not bind Rush; and (2) the Rush Medical Staff Bylaw providing that a division director "serves at the discretion of" the department chair does not mean that only a chair could remove a director. Jokich responds: (1) the 2016 letter agreement is binding because Rush impliedly waived the condition precedent of Board approval; Rush made misrepresentations to him on which he relied, invoking equitable estoppel; or Rush breached its duty of good faith and fair dealing; (2) an issue of material fact exists as to whether Jokich's removal from his director position without cause violated the FEA; and (3) only the department chair had authority to terminate Jokich as Director of the DBI.[11]

### I. Whether Rush Impliedly Waived Board Approval of the 2016 Letter Agreement or Is Otherwise Bound to It.

The court understands the FEA plus the various letter agreements to comprise the entire employment contract between the two parties for the respective terms. Jokich concedes that the Board did not approve the 2016 letter agreement and that approval was a condition precedent to forming a contract. He bases his waiver argument on the fact that Rush allowed him to continue to work at Rush from the time the 2013–14 letter agreement expired on June 30, 2016 until he was terminated in October 2018. In his view, Rush fully complied with the terms of the 2016 letter agreement, not only by paying his base salary, but also his staff's FY 2016 bonuses and benefits. Rush concedes these facts but argues its conduct did not amount to waiver.

---

[11] Jokich does not respond to Rush's motion arguing that it is entitled to summary judgment on Jokich's claim for violation of the Illinois Hospital Licensing Act. As such, the court infers that Jokich has abandoned the argument. *See Bonte* v. *U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument—as [the non-movant has] done here—results in waiver").

Under Illinois law, "[c]onditions precedent may be waived when a party to a contract intentionally relinquishes a known right either expressly or by conduct indicating that strict compliance with the conditions is not required." *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd.* v. *Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992) (citing *MBC, Inc.* v. *Space Ctr. Minn., Inc.*, 532 N.E.2d 255, 259–60 (Ill. App. Ct. 1988)). "Such conduct might include continuing to accept the breaching party's performance and the benefits thereof after learning of the breach." *Id.* "Although waiver may be implied, the act relied on to constitute the waiver must be clear, unequivocal and decisive." *Levin* v. *Grecian*, 974 F. Supp. 2d 1114, 1125 (N.D. Ill. 2013) (citing *Galesburg Clinic Ass'n* v. *West*, 706 N.E.2d 1035, 1037 (Ill. App. Ct. 1999)). An implied waiver arises when conduct of the person against whom waiver is asserted is inconsistent with any intention other than to waive it. *Home Ins. Co.* v. *Cincinnati Ins. Co.*, 821 N.E.2d 269, 282 (Ill. 2004) (citing *Liberty Mutual Insurance Co.* v. *Westfield Insurance Co.,* 703 N.E.2d 439, 441 (Ill. App. Ct. 1998)).

In general, waiver presents an issue of fact. *See Downs* v. *Rosenthal Collins Grp., LLC,* 963 N.E.2d 282, 291 (Ill. App. Ct. 2011) ("The potential for waiver of a condition precedent through actions or deeds involves a question of fact[.]"). Of course, to survive summary judgment, Jokich's evidence must at least permit an inference that waiver occurred. *See Home Ins. Co.*, 821 N.E.2d at 282 ("Where there is no dispute as to the material facts and only one reasonable inference can be drawn, it is a question of law as to whether waiver has been established.").

Rush argues that its conduct did not establish a clear, unequivocal, and decisive action on Rush's behalf based on the following claimed-to-be undisputed facts. First, the FEA required payment of the base salary, no matter the existence of a letter agreement. Second, the enhanced

11

benefits were negotiated in 2001 and continued during periods when no letter agreement was in effect.[12] Third, Rush paid Jokich a bonus in October 2017 (for the fiscal year ending June 30, 2016) but Krishnan withheld further bonuses for which he would have been eligible under the 2016 letter agreement.

All of these facts are undisputed but for Krishnan's motivation for authorizing the 2016 bonus. Jokich acknowledges that he told no one that he did not sign the amended offer letter and that no one reached out to him about it. He argues that it is a jury question whether Rush understood that the condition precedent had not been satisfied and was under the impression that the 2016 letter agreement was in effect.

Whatever Krishnan's reason for paying one bonus and withholding two, the issue is whether this conduct is "inconsistent with any other intention than to implement the 2016 letter agreement." *Home Ins. Co.*, 821 N.E.2d at 282. The undisputed facts are that the amended offer letter had been approved by the Board on June 14, 2017. It was given to Jokich for his signature. He did not sign it but did not inform anyone of that. The undisputed facts surrounding the period of negotiations during the Spring of 2017 show that Jokich understood that his employment contract had not been finalized.

At the same time, other than the bonus payment, there is no actual evidence that anyone involved on Rush's side thought the 2016 letter agreement was in force. The facts that the amended offer letter also provided for a bonus and that Krishnan did not authorize subsequent bonuses are consistent with Rush's view that it was not acting pursuant to the 2016 letter

---

[12] The 2013–14 letter agreement had recently expired (on June 30, 2016) when the 2016 letter agreement was signed (August 18, 2016). Both documents contained the same base salary of $659,814 and 10% bonus opportunity, as well as the benefits and enhanced compensation for Jokich and the DBI faculty. (This also occurred in the period between the 2012 and 2013–14 agreements.) The FEA portion of these agreement also contained the same salary, which the parties agree remained in effect through June 30, 2018.

12

agreement.[13] Jokich does not point to evidence that would permit a jury to conclude that Rush was unequivocally acting pursuant to the 2016 letter agreement when it paid his 2016 bonus.

Jokich's only additional support for his waiver argument is that he was never told that his failure to sign the amended offer letter replaced the 2016 letter agreement.[14] In fact, the 2016 letter agreement specifically stated that Board approval was necessary. The amended offer letter recited that the 2016 letter agreement did not get Board approval. Jokich participated with management in negotiating amendments during March 2017. He also received the amended offer letter and was advised that it had been approved, requesting his signature. Whatever Jokich may have subjectively believed, there is no basis for a reasonable jury to infer that Rush's conduct was inconsistent with any intention other than to waive [the Board approval requirement]. This is so because it's conduct was also consistent with another intention: to implement the amended offer letter (agreement).[15]

Jokich's alternative estoppel theory also lacks evidentiary foundation. As stated in *Schwinder* v. *Austin Bank of Chi.*, 809 N.E.2d 180, 191–92 (Ill. App. Ct. 2004),

> Estoppel arises when a party, by his words or conduct, intentionally or through culpable negligence, induces reasonable reliance by another on his representations and thus leads the other, as a result of that reliance, to change his position to his injury. While an intent to mislead is not necessary, the reliance by the other party must be reasonable.

---

[13] It is also consistent with letting the 2013—14 letter agreement remain in place until the new employment agreement was finalized, as occurred between the 2007 and the 2013—14 letter agreements.

[14] Jokich also points to a draft termination letter written by outside counsel, George Galland. That letter stated that Jokich had a multi-year contract. This is fully consistent with Rush's position that management believed Jokich had signed the amended offer letter.

[15] Rush's acting pursuant to the amended offer letter could arguably amount to waiver of Jokich's signature, but Jokich does not argue for that outcome.

13

(citations omitted). He seems to rely on Krishnan's signature on the 2016 letter agreement as a misrepresentation but, as set out above, that very document contained the provision that it was subject to Board approval.

Similarly, the argument that Rush violated its duty of good faith and fair dealing when it denied the validity of the 2016 letter agreement is unsustainable. A duty of good faith and fair dealing requires a party to exercise its discretion "reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the reasonable expectations of the parties." *Schwinder*, 809 N.E.2d at 193. Relying on Restatement (Second) of Contracts § 205, comment a, at 100 (1981), the court explained:

> The phrase 'good faith' is used in a variety of contexts, and its meaning varies somewhat with the context. Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness.

(citations omitted).

Jokich relies on *Schwinder*, in which the Illinois Appellate Court found that the chancery court did not abuse its discretion in finding that the defendant sellers breached the duty of good faith and fair dealing when they refused to convey title to buyers of a condominium unit. There, the sellers contended that the contract provision granting the right to terminate the purchase contract and return the earnest money meant they did not have to convey, even though the buyers had performed their obligations under the contract and the sellers had granted use and occupancy to the buyers. *Id*. at 194–95.

While the principle of *Schwinder* is certainly applicable to Rush, the circumstances are very different. Most importantly, Rush did not finalize the 2016 letter agreement, whereas in *Schwinder* the agreement had been fully executed. The defendants were relying on a clause that,

14

if accepted, would have defeated the intentions of the parties when they entered into the contract to convey title to the property. Reliance on Board approval was always known to be required and intended to fulfill the intentions of the parties to retain Jokich at Rush. Furthermore, there is a good deal of email correspondence between management and Jokich in early 2017 reflecting good faith efforts on both sides to reach a mutually acceptable agreement. Understandably, Jokich is aggrieved by the harsh treatment he received from Rush.[16] But the facts do not support a finding that Rush breached its duty of good faith and fair dealing in rejecting the 2016 letter agreement.

## II.     Whether Jokich's Removal as Director of the DBI Violated the FEA or Rush Medical Staff Bylaws

These conclusions do not fully resolve the question of what the terms of the employment agreement were at the time Rush demoted and later terminated Jokich. The 2013–14 letter agreement had expired in 2016 and the amended offer letter had not been fully executed. Both parties agree that an FEA was in effect, so, lacking a letter agreement, the terms of employment must be derived from that document.

It is undisputed that the notice of non-renewal was given 120 days in advance, but Jokich argues that Rush breached its obligations under the FEA when it gave him notice of his removal (or termination) as Director of the DBI without a cause as specified in the FEA's appended General Terms and Conditions. These provisions allow for *immediate* termination of the FEA for specific causes not applicable to Jokich. As this court previously observed in ruling on Rush's motion to dismiss, Section 7 provides that Rush may modify Jokich's services—which include

---

[16] Remarkably, rather than responding with a firm "No" to counsel's request for a standstill to permit further negotiations, Rush pulled the severance agreement off the table. This arbitrariness, however, falls into the category of "community standard of reasonableness" and is not within the doctrine.

his position as director—by providing at least 60 days prior written notice. (Dkt. 40 at 11–12.) To characterize this change as a termination rather than a demotion does not change the outcome.

However, section 10.3-2(c) of the Rush Medical Staff Bylaws, entitled "Term of Office," provides: "A division . . . director shall be appointed and shall serve solely at the discretion of the Department Chairperson." One reasonable interpretation of this bylaw is that Rush violated section 10.3-2(c) by not obtaining Byrd's approval before removing Jokich as Director of DBI. Unfortunately for Jokich, this omission does not seem to lead to relief.

Byrd's deposition makes it clear that she did not consider the matter to be within her wheelhouse. She was a busy clinician and felt she had no reason to become involved other than to attend a meeting when Krishnan spoke with concerned radiologists. The only reasonable inference to be drawn from her conduct is that she exercised her discretion to allow Jokich's removal.

Accordingly, no genuine issue of material fact exists here and the court grants Rush's motion for summary judgment in regard to Count V.

## CONCLUSION

For the foregoing reasons, Rush's motion for summary judgment is granted on the breach of contract claims (Counts IV, V, and VI). The case is terminated.

Date: August 9, 2021

U.S. District Judge Joan H. Lefkow

16